**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL TECH INDUSTRIES GROUP, INC., | Civil Action: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| CANACCORD GENUITY LLC, CREDIT SUISSE SECURITIES (USA) LLC, INSTINET, LLC, LIME TRADING CORP., GTS SECURITIES LLC, and JOHN DOES 1-50, | **JURY TRIAL DEMAND** |
| Defendants. | |

Plaintiff Global Tech Industries Group, Inc. ("Plaintiff" or "the Company" or "GTII"), by and through its undersigned attorneys Warshaw Burstein, LLP and Christian Levine Law Group, as and for its Complaint against defendants Canaccord Genuity LLC ("Canaccord"), Lime Trading Corp. ("Lime"), Credit Suisse Securities (USA) LLC ("CS"), GTS Securities LLC ("GTS"), Instinet LLC ("Instinet"), and John Does 1-50 (collectively "Defendants"), alleges, upon personal knowledge, information and belief, and an investigation by counsel, as follows:

## PRELIMINARY STATEMENT

1.      This case involves Defendants' use of "spoofing," an unlawful trading device that they utilized to manipulate the share price of GTII common stock during the period March 25, 2021 to October 31, 2022 ("Relevant Period").  The U.S. Securities and Exchange Commission ("SEC") describes spoofing as "the submission and cancellation of buy and sell orders without the intention to trade in order to manipulate other traders."  SEC "Staff Report on Algorithmic Trading in U.S. Capital Markets," dated August 5, 2020 (at p. 75).[1]

2.      In the absence of market manipulation, the market price of a security is determined by the natural forces of supply and demand—the greater the demand, the higher the price; the lower the demand the lower the price.  Spoofing is a form of market manipulation that interferes with the natural forces of supply and demand by placing "Baiting Orders," either to buy or sell, that have no legitimate economic purpose and are never intended to be executed.

3.      Defendants placed numerous Baiting Sell Orders, to create the illusion that GTII's securities were declining in value (relative to the available supply), in order to "trick" or "bait" other investors to enter their own orders to sell, which would further drive GTII's share price downward.  Once GTII's market price reached an artificially low price as the result of this

---

[1] *See* https://www.sec.gov/files/algo_trading_report_2020.pdf (site visited March 13, 2023).

manipulation, Defendants cancelled their Baiting Sell Orders and executed buy orders of GTII shares at artificially depressed prices.  When the downward pressure of the Baiting Sell Orders was removed, the market price of GTII shares would partly increase in value thereby permitting Defendants to make a profit on the shares they purchased at artificially depressed prices.

4.       GTII was itself harmed by Defendants' market manipulation.  During the Relevant Period, GTII sold 18 million of its shares at artificially depressed prices that were caused by Defendants' spoofing schemes.  GTII's shares (symbol GTII) are traded over-the-counter on Alternative Trading Systems ("ATSs")[2] known as the OTC Link, LLC (the "OTC Link") and NYSE ARCA Global OTC (the "Global OTC").

5.        This lawsuit seeks to hold each Defendant primarily liable for placing and cancelling orders, either for their customers or their own proprietary accounts, that they knew (or were reckless in not knowing) were never intended to be executed, had no legitimate financial purpose, and were intended to artificially cause the market price of GTII shares to move downward, in violation of Section 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## I.       JURISDICTION AND VENUE

6.       This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and 28 U.S.C. § 1331.

---

[2] An Alternative Trading Systems ("ATS") is "a trading venue that is more loosely regulated than an exchange … ATS platforms are often used to match large buy and sell orders among its subscribers." https://www.investopedia.com/terms/a/alternative-trading-system.asp (site visited March 12, 2023).  An ATS is "a trading system that meets the definition of an 'exchange' under federal securities laws but is not required to register as a national securities exchange if the ATS operates under the exemption provided by Exchange Act Rule 3a1-1(a)." https://www.sec.gov/foia/docs/atslist (site visited March 12, 2023).

7.      This Court has personal jurisdiction over each Defendant, each of which either maintained its business office and conducted a substantial part of the events asserted in this Complaint in this District, or directed its fraudulent activity into this market by manipulating GTII stock on OTC Link and/or Global OTC, both of which are located in this District.  The unlawful acts committed by Defendants had a direct and substantial impact on the market price of GTII's shares traded in this District and in the United States.

8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 27 of the Exchange Act, in that many of the acts and transactions alleged occurred in this District, and each of the Defendants conducted business in this District in connection with the events described herein.  Each of the Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce, including the mails, in connection with the conduct alleged herein.

## II.      THE PARTIES

### A.      Plaintiff

9.      Plaintiff GTII is a company incorporated in the State of Nevada whose shares trade on over-the-counter markets, including OTC Link and Global OTC.  GTII has a diversified portfolio of businesses including green technologies, information technologies and healthcare early-intervention technologies.  GTII's corporate mission is to facilitate, through the use of next-generation technology, the delivery of alternative and innovative methods and systems that will lead to healthier lifestyles and result in a more sustainable planet.  The Company works across various and diverse industry sectors to find potential partners and assist them in animating their business plans or facilitating them, through joint venture or stock purchases.  The Company provides these acquisition candidates with the protective umbrella of an SEC reporting company

and can deliver the means, through incubation, for these private companies to become public entities in good standing.

10.     Defendants' spoofing scheme has materially damaged GTII by impairing its ability to either sell shares to raise capital or borrow funds to finance its strategic growth plan and its operations.

11.     For example, GTII entered into a letter of intent with WE Supergreen Energy Corp. ("WSGE") on July 30, 2021 to acquire its assets in exchange for newly-issued shares of GTII.  Due to Defendants' unlawful downward manipulation of the price of GTII shares, which persisted over the Relevant Period, the Company was unable to issue an amount of shares that were acceptable to WSGE, causing the merger to fail.

12.     The cumulative damages to Plaintiff are substantial and ongoing until Defendants are made to cease this illegal behavior.

**B.      Defendants[3]**

*Defendant Canaccord*

13.     Defendant Canaccord maintains its principal place of business at 535 Madison Avenue, New York, New York.  Canaccord is a registered broker-dealer that executes securities transactions through various trading venues in the U.S. on behalf of its customers and its own proprietary accounts.  As of June 2022, Canaccord possessed market-making capability for over 2,500 companies.

---

[3]   Whenever reference is made to any act, device, contrivance, or scheme to manipulate GTII securities by any of the Defendants, the allegation is intended to also include John Does 1-50, which are the subsidiaries, affiliates, sister companies, agents, and representatives of that Defendant, whose identities and specific involvement in this market manipulation case are unknown to Plaintiff at this time.  Only after discovery is taken will their identities and involvement become known.

14.    Canaccord conducted continuous activity in New York, directly related to these claims, by employing high-speed algorithmic computer systems to route orders and execute trades of GTII shares throughout the U.S., including in New York, on trading venues in the U.S.

### Defendant GTS

15.    Defendant GTS is headquartered at 545 Madison Avenue, New York, New York. GTS is a registered broker-dealer that executes securities transaction through various trading venues in the U.S.  GTS is a global electronic market-maker.  As a quantitative trading firm, GTS leverages the latest in artificial intelligence systems and sophisticated pricing models.  GTS singlehandedly accounts for 3-5% of daily cash equities volume in the U.S. and trades over 30,000 different instruments globally.

16.    Defendant GTS conducted continuous activity in New York, directly related to these claims by employing high-speed algorithmic computer systems to route orders and execute trades of GTII shares throughout the U.S., including in New York, on trading venues in the U.S.

### Defendant Instinet

17.    Defendant Instinet is headquartered at 309 West 49th Street, New York, New York.  Instinet is a registered broker-dealer that executes securities transactions through various trading venues in the U.S.  A part of Nomura Group, Instinet offers advanced algorithmic trading strategies which are operated and monitored in real time by Instinet's global support organization, using advanced reporting, altering, and control software.

18.    Defendant Instinet conducted continuous activity in New York, directly related to these claims, by employing high-speed algorithmic computer systems to route orders and execute trades of GTII shares throughout the U.S., including in New York, on trading venues in the U.S.

### *Defendant CS*

19.     Defendant CS is headquartered at 11 Madison Avenue, New York, New York.  It is a registered broker-dealer that executes securities transactions through various trading venues in the U.S.

20.     Defendant CS conducts continuous activity in New York, directly related these claims, by employing high-speed algorithmic computer systems to route orders and execute trades of GTII shares throughout the U.S., including in New York, on trading venues in the U.S..

### *Defendant Lime*

21.     Defendant Lime, formerly known as Score Priority Corp., is headquartered at 1 Penn Plaza, 16th Floor, New York, New York.  It is a registered broker-dealer that executes securities transactions through various trading venues in the U.S.

22.     Defendant Lime conducted continuous activity in New York, directly related to these claims, by employing high-speed algorithmic computer systems to route orders and execute trades of GTII shares throughout the U.S., including in New York, on trading venues in the U.S.

### *John Doe Defendants*

23.     Defendants John Doe 1-50 are the subsidiaries, affiliates, sister companies, agents, and representatives of the named Defendants, whose identities and specific involvement in this market manipulation case are unknown to Plaintiff at this time.

## III.     SPOOFING IS A FORM OF MARKET MANIPULATION

24.     In the absence of market manipulation, there are four well-established economic principles that animate securities markets: (i) increased supply decreases share prices and increased demand increases share prices; (ii) a security's share price accurately reflects the security's value at that point in time, based on the public information available to the market;

(iii) the quotes and orders published in the market reflect legitimate trading interest; and (iv) in an efficient market, the interaction of the forces of supply and demand determine the market price of a security.

25.     Spoofing is a form of market manipulation that can profoundly undermine the integrity and stability of securities markets by injecting false and misleading information into the marketplace.  The objective of a spoofing scheme is to distort the publicly available information concerning the actual supply and demand of a company's securities.  This objective is accomplished by the use of algorithmic trading programs that operate on high-frequency computer systems that are capable of generating, placing, and canceling thousands of Baiting Orders within seconds and sometimes nanoseconds or milliseconds.  These Baiting Orders have no legitimate economic purpose and are not intended to actually be executed.   Their sole purpose is to create the *illusion* of market interest in a security at an artificial price in order to cause other market participants to "pile on" and follow the selling or buying trend created by the Baiting Orders.

26.     If the spoofer's goal is to drive the price down, the spoofer may enter hundreds or thousands of Baiting Sell Orders, which are intended to "bait" or "trick" investors into placing their own sell orders to minimize or avoid suffering losses in a downward trending market. Shortly after the spoofer places the Baiting Sell Orders, and after those Baiting Sell Orders have lured unsuspecting traders into placing their own orders, the spoofer places buy orders that it actually intends to execute ("Executing Buy Orders") on the opposite side of the Limit Order

Book[4] and/or IDQS.[5]  These Executing Buy Orders are intended to be executed at the artificially low prices generated by the Baiting Sell Orders.  Immediately after executing the Executing Buy Orders in the Limit Order Book or IDQS, the spoofer cancels all of the Baiting Sell Orders, which completes the spoofing cycle.  In short, manipulative spoofing can be seen as high-speed bluffing, whereby the spoofer deceives unsuspecting traders into trading at artificially high or low prices.

27.     In the SEC's "Staff Report on Algorithmic Trading in U.S. Capital Markets," dated August 5, 2020 (at p. 75), the SEC has called spoofing a "harmful strategy" employed by some high-frequency traders that is carried out by "strategically plac[ing] spoofing orders to create the impression of substantial order book imbalances in order to manipulate subsequent prices," and noted that "stocks targeted for spoofing had higher return volatility, lower market capitalization, lower price level, and lower managerial transparency."  (*Id.*)[6]

28.     Spoofing can be employed multiple times during a trading day and repeated throughout a protracted trading period.  While the margins realized in each spoofing cycle may be small, the aggregate gains from illegal spoofing can be extremely high depending upon the volume of trades and the frequency and duration of the spoofing scheme.

---

[4]  A "Limit Order Book" is an electronic list of buy and sell orders for specific securities and other financial instruments that is organized by price levels and lists the number of shares being bid or offered at each price point.  The Limit Order Book reflects whether the market price for the security is moving upwards or downwards and is visible to every trader on the exchange.

[5] An IDQS provides "bid and ask quotations of participating brokers or dealers or comparably accurate and reliable pricing information, which shall constitute firm bids or offers for at least such minimum numbers of shares or minimum dollar amounts as the Commission and the registered securities association or national securities exchange shall require."  15 U.S.C. § 78q-2(b)(2)(C).  According to FINRA, eligible IDQS include Global OTC and OTC Link.  *See*  Letter from J. Matthew DeLesDernier, Assistant Secretary, SEC, to Robert Colby Executive Vice President and Chief Legal Officer, FINRA, dated June 21, 2021.

[6] *See* https://www.sec.gov/files/algo_trading_report_2020.pdf (site visited March 13, 2023).

{1559154.1 }                                   8

IV.    **SUMMARY OF DEFENDANTS' MANIPULATIVE SPOOFING SCHEMES**

29.    During the Relevant Period, Defendants engaged in unlawful spoofing to manipulate the price of GTII shares on OTC Link and Global OTC, which created a false sell-side imbalance in the market for GTII shares and induced other market participants to sell at artificially depressed prices.  In order to execute their spoofing scheme, Defendants placed hundreds of thousands of Baiting Sell Orders and executed tens of thousands of Executing Buy Orders at manipulated prices during the Relevant Period.

30.    During the Relevant Period, GTII sold over 18 million of its shares to investors at artificially depressed prices that were caused by Defendants' unlawful actions.  By brazenly and repeatedly manipulating the market through their spoofing, Defendants' unlawful conduct directly impacted the market price of GTII's shares, causing GTII to suffer significant losses as it sold millions of its shares at artificially depressed prices during the Relevant Period.

31.    During the Relevant Period, Defendants submitted fictitious Baiting Sell Orders, totaling 433,053 shares on Global OTC and OTC Link, at share prices ranging from $9.28 down to $1.00.[7]  Defendants' Baiting Sell Orders led to a substantial sell-side imbalance in Defendants' order flow, which intentionally created artificial selling pressure that induced other market participants to submit additional sell orders and artificially drove down the price of GTII shares.

32.    The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares down by 6.597% on average.[8]  Defendants,

---

[7] Any allegation in this Complaint that refers to the "cancellation" of a Baiting Sell Order refers to the actual cancellation or modification of a Baiting Sell Order submitted prior to the placement of an Executing Buy Order or to a different order placed by the same Defendant, the cancellation of which has an effect that is substantively equivalent to cancelling the original Baiting Sell Order.

[8] The term "on average" reflects the average peak to trough price decline over all the Spoofing Episodes during the relevant period.

on behalf of themselves and/or their customers, placed Executing Buy Orders to purchase a total of 77,558 shares at these artificially depressed prices, which were below the prevailing best offer prior to entry of the Baiting Sell Orders.  Shortly thereafter, Defendants cancelled all of the fictitious Baiting Sell Orders.

33.     For each Defendant, the following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at artificially depressed prices, and the resulting decline in GTII's share price over the Relevant Period.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| CANACCORD GENUITY INC. | 12 | 127,460 | 5,147 | 24.76-to-1 | -7.211% |
| CREDIT SUISSE SECURITIES (USA) LLC | 31 | 15,000 | 7,635 | 1.965-to-1 | -4.325% |
| GTS SECURITIES LLC | 14 | 37,102 | 18,063 | 2.054-to-1 | -10.91% |
| INSTINET, LLC | 46 | 172,091 | 30,596 | 5.625-to-1 | -5.214% |
| LIME PRIORITY CORP. | 36 | 81,400 | 16,117 | 5.051-to-1 | -8.438% |

34.     An ordinary, legitimate trader will buy a security when he believes that the price is likely to go higher and will sell when he believes that the price of the security will go lower. There are several indicia that can show when a market is being manipulated by a spoofer.  A strong inference of market manipulation through spoofing activity can be derived from, among other things: (1) the short time period between the continuous and repeated placement and

cancellation of the Baiting Sell Orders; (2) the concentration of cancelled Baiting Sell Orders during the limited period when each spoofing event occurred; (3) the average size of the Baiting Sell Orders that were cancelled, in comparison to the average size of bona fide Sell orders that were executed; (4) the ratio of cancelled Baiting Sell Orders compared to the executed bona fide Buy orders that existed; and (5) the reoccurrence of the same trading patterns.  One well-recognized signal of a spoofing scheme is the rapid and repetitive placement and cancellation of Baiting Sell Orders and executions of Executing Buy Orders within a short time, which suggests that, the original Baiting Sell Orders were never intended to be executed but were merely a ploy to drive the price down in order to "buy low" or to drive the price up in order to "sell high."

35.    These indicia are apparent in each "Spoofing Episode" perpetrated by Defendants. Across these Spoofing Episodes, Defendants submitted a median of 1,175 shares in new sell-side orders for each Executing "Buy" Order during the "Baiting Period" preceding the execution of Executing Orders.  By comparison, during the same time window as the Baiting Period prior to non-spoofed executed purchases, market participants submitted a median of 750 shares in new sell-side orders per Buy order.  Across the Spoofing Episodes, during the "Cancellation Period" following the Defendants' placement of Executing Buy Orders, Defendants cancelled a median of 2,300 shares in sell-side orders, or 196% of the created volume of 1,175 sell-side shares.[9] During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders, or 0% of the created volume of 750 sell-side shares.  On median, there were 57% more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed

---

[9] The cancellation percentage above the whole, 196% in this example, includes sell orders entered prior to the Baiting Periods, but cancelled during the Baiting Periods.

purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

36.     Stated differently, when spoofing the market, Defendants injected more artificial sell-side order flow than normal orders placed prior to buying shares, as measured by (1) the volume of sell-side order flow (57% higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (196% vs. 0%).  This shows that Defendants repeatedly and intentionally manipulated the market.

37.     Moreover, Defendants' behavior was inconsistent with bona fide market making. Over the Cancellation Periods, Defendants cancelled 196% of the sell-side orders created during Baiting Periods, but cancelled only 40% of the buy-side orders created during Baiting Periods. This asymmetry in order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts on both sides of the market to provide liquidity to customers or other broker-dealers.

38.     The spoofing patterns identified here give rise to a strong inference of scienter and are evidence of intentional market manipulation for several reasons.  First, on median, Defendants submitted Baiting Sell Orders for 1,000 sell-side shares per Spoofing Episode that were subsequently cancelled.  By contrast, over those same periods, other market participants submitted sell-side orders for a median of only 533 sell-side shares that were subsequently cancelled—a difference of nearly 88%.

39.     Second, based on a reasonable investigation of publicly-available data, Defendants' purchases of shares at prices artificially depressed by the Spoofing Episodes far exceeded those of other market participants.  Moreover, Defendants purchased far more shares at artificially depressed prices during the minutes following the spoofing window.  Specifically,

over the two minutes after the spoofing windows, Defendants purchased a median of 1,200 shares while other market participants purchased a median of 53 shares over these same windows.

40.     Third, the median size of the Baiting Sell Orders that were cancelled, in comparison to the median size of the bona fide Sell orders that were executed is also indicative of scienter.  During each Spoofing Episode, Defendants placed and subsequently cancelled a median of 1,000 Baiting Sell Orders, while they in contrast executed only a median of 300 sell-side orders based on data which is publicly available to Plaintiffs.  The stark contrast between the number of Baiting Sell Orders and the number of executed sell-side orders during each Spoofing Episode indicates that Defendants were manipulating the market by using Baiting Sell Orders as tools to generate artificially depressed prices so they could place Executing Buy Orders at favorable prices.

41.     Defendants had a strong motive to spoof the shares of GTII stock.  By posting the fictitious Baiting Sell Orders, Defendants were able to purchase tens of thousands of shares of GTII stock at artificially depressed prices below the prevailing best offer—lining their pockets at the expense of GTII and its shareholders.  To the extent that Defendants were following the instructions of their customers to place Baiting Sell Orders and execute Executing Buy Orders, they followed those instructions in order to receive a fee and accommodate their customers to ensure an ongoing relationship.  Defendants either knew or recklessly ignored the fact that the orders being placed on behalf of their customers were intended to manipulate the market.

## V.    SPECIFIC EXAMPLES OF EACH DEFENDANT'S SPOOFING ACTIVITIES

42.    The following examples are representative of the type of Spoofing Episodes that each Defendant repeatedly employed during the Relevant Period.  These examples are not the only Spoofing Episodes that were performed by each Defendant during the Relevant Period.

### A.    CS – June 23, 2021

*a)    Overview*

43.    As detailed below, on June 23, 2021, Defendant CS submitted 600 shares of fictitious Baiting Sell Orders at share prices ranging from $1.62 to $1.60 through Global OTC. CS never intended these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by -4.878% on average.  CS then rapidly reversed course and placed Executing Buy Orders for a total of 200 shares of GTII at prices below the prevailing best offer prior to entry of the Baiting Sell Orders. Shortly thereafter, CS cancelled all of its fictitious Baiting Sell Orders.

44.    The following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at artificially depressed prices, and the resulting decline in GTII's share price on June 23, 2021.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| CREDIT SUISSE SECURITIES (USA) LLC | 1 | 600 | 200 | 3.00-to-1 | -4.878% |

45.    During the Baiting Period that day, CS submitted new sell-side orders for 600 shares per Executing "Buy" Order.  During the same time window prior to non-spoofed executed

purchases, market participants submitted new sell-side orders for a median of 300 shares per purchase.

46.     During the Cancellation Period following the Executing Buy Orders, CS cancelled a median of 600 shares in sell-side orders, or ***100%*** of the created volume of 600 sell-side shares.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders, or 0% of the created volume of 300 sell-side shares.

47.     On median, therefore, there were 100% more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

48.     CS thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (100% higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (100% vs. 0%).

49.     Moreover, CS's behavior was inconsistent with bona fide market making.  Over Cancellation Periods, CS cancelled 100% of the sell-side orders created during Baiting Periods, but only 15% of the buy-side orders created during Baiting Periods.  This asymmetry in order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

b)      *Example Episode:  June 23, 2021 – 13:53:40*

50.      As of June 23, 2021 at 13:53:40, the best bid and offer for GTII according to the OTC Link inside quote was a bid to purchase 600 shares at a price of $1.59 per share and an offer to sell 100 shares at a price of $1.62 per share.

51.      From 13:51:40 to 13:53:40, CS placed 600 shares of Baiting Sell Orders at prices ranging from $1.62 to $1.60 per share.  As of 13:53:40 the submission of these Baiting Sell Orders left CS with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 200 shares at a price of $1.59 per share, and an offer to sell 300 shares at a price of $1.62 per share.

52.      Between 13:53:40 and 13:55:40, based on a reasonable investigation of publicly available data, CS did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

53.      The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 13:53:40 CS took advantage of this artificial downward pressure and placed Executing Buy Orders to buy a total of 200 shares, at a price of $1.59 per share, which was below the prevailing best offer of $1.62 per share.

54.      CS began to cancel its Baiting Sell Orders within 5 seconds.  By 13:55:40, CS had cancelled ***all*** of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by CS.

**B.**     <u>**Canaccord – March 29, 2021**</u>

*1.    Overview*

55.     As detailed below, on March 29, 2021, Defendant Canaccord submitted 73,544 shares of fictitious Baiting Sell Orders at share prices ranging from $4.64 to $3.47 through OTC Link.  Canaccord never intended for these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the Executing Buy Orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by 5.992% on average.  Canaccord then rapidly reversed course and purchased a total of 200 shares at prices below the prevailing best offer prior to entry of the Baiting Sell Orders.  Shortly thereafter, Canaccord cancelled all of its fictitious Baiting Sell Orders.

56.     The following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at artificially depressed prices, and the resulting decline in GTII's share price on March 29, 2021.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| CANACCORD GENUITY INC. | 2 | 73,544 | 200 | 367.72-to-1 | -5.992% |

57.     During the Baiting Period for each Spoofing Episode that day, Canaccord submitted new sell-side orders for a median of 47,284 shares per Executing "Buy" Order. During the Cancellation Period following the Executing Buy Orders, Canaccord cancelled a median of 39,947 shares in sell-side orders, or almost 85% of the created volume of 47,284 sell-side shares.

58.     During the same time window prior to non-spoofed executed purchases, market participants submitted new sell-side orders for a median of 1,000 shares per purchase.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders.

59.     On median, therefore, there were 4,628% more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

60.     Canaccord thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (4,628% higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (84.48% vs. 0%).

61.     Moreover, Canaccord's behavior was inconsistent with bona fide market making. Over Cancellation Periods, Canaccord cancelled 84% of the sell-side orders created during Baiting Periods, but only 51% of the buy-side orders created during Baiting Periods.  This asymmetry in order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

2.      *Example Episode:  March 29, 2021 – 09:32:33*

62.     As of March 29, 2021 at 09:32:33.000, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 100 shares at a price of $3.46 per share and an offer to sell 100 shares at a price of $3.49 per share.

63.     From 09:30:40 to 09:32:33, Canaccord placed 19,710 shares of Baiting Sell Orders at prices ranging from $4.64 to $3.47 per share.  During this period, the submission of these Baiting Sell Orders left Canaccord with an imbalanced order book position, favoring the sell side, which at one point was so imbalanced as to consist of a bid to purchase 300 shares and an offer to sell 5,250 shares of GTII.

64.     Between 09:32:40 and 09:34:40, based on a reasonable investigation of publicly available data, Canaccord did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

65.     Canaccord parked these Baiting Sell Orders behind orders placed by other unsuspecting traders.  For example, at 09:32:07.163, Ascendiant Capital Markets, LLC had placed orders to sell 100 shares at prices as low as $3.56, a better price than some or all of the Baiting Sell Orders placed by Canaccord.  The fact that Canaccord parked its Baiting Sell Orders behind sell orders from other market participants like Ascendiant is further evidence that Canaccord was not engaging in legitimate market activity.  None of the non-spoofed executed purchases had the purchaser previously park sell-side orders behind other market participants.

66.     The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 09:32:33.240, Canaccord took advantage of this artificial downward pressure and placed Executing Buy Orders to buy a total of 100 shares, at a price of $3.46 per share, which was below the prevailing best offer of $3.49 per share.[10]

---

[10] While FINRA trading records are anonymized, this purchase is inferred from a transaction to purchase 100 shares at a price of $3.46 per share at 09:32:37.384 and the fact that Canaccord was the only market participant on the OTC Link ATS with an active quote at $3.46 per share at that time.

67.     Canaccord began to cancel its Baiting Sell Orders within 3.075 seconds.  By 09:32:36.315, Canaccord had cancelled **all** of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by Canaccord.

**C.**     **CS- June 01, 2022**

        *a)*     *Overview*

68.     On June 01, 2022, CS submitted 300 shares of fictitious Baiting Sell Orders at a share price of $1.55 through Global OTC.  CS never intended for these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the Executing Buy Orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by -3.846% on average.  CS then rapidly reversed course and purchased a total of 200 shares at prices below the prevailing best offer prior to entry of the Baiting Sell Orders.  Shortly thereafter, CS cancelled all of the fictitious Baiting Sell Orders.

69.     The following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at depressed prices, and the resulting decline in GTII's share price on June 01, 2022.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| CREDIT SUISSE SECURITIES (USA) LLC | 1 | 300 | 200 | 1.50-to-1 | -3.846% |

70.     During the Baiting Period, CS submitted new sell-side orders for a median of 600 shares per Executing "Buy" Order.  During the same time window prior to non-spoofed executed

purchases, market participants submitted new sell-side orders for a median of 0 shares per purchase.

71.     During the Cancellation Period following the Executing Buy Orders, CS cancelled a median of 300 shares in sell-side orders, or 50% of the created volume of 600 sell-side shares.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders, or 0% of the created volume of 0 sell-side shares.

72.     On median, therefore, there were infinitely more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

73.     CS thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (infinitely higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (50% vs. 0%).

74.     Moreover, CS's behavior was inconsistent with bona fide market making.  On median, over Baiting Periods that day, CS posted 149% more new sell-side orders than new buy-side orders, net of cancellations.  Over Cancellation Periods, CS cancelled 50% of the sell-side orders created during Baiting Periods, but only 25% of the buy-side orders created during Baiting Periods.  This asymmetry in the posting of new orders and order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

3.      *Example Episode:  June 01, 2022 – 10:12:12*

75.      As of June 01, 2022 at 10:12:12, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 600 shares at a price of $1.52 per share and an offer to sell 100 shares at a price of $1.54 per share.

76.      From 10:10:12 to 10:12:12, CS placed 300 shares of Baiting Sell Orders at a price of $1.55 per share.  As of 10:12:12 the submission of these Baiting Sell Orders left CS with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 200 shares at a price of $1.52 per share, and an offer to sell 300 shares at a price of $1.55 per share.

77.      Between 10:12:12 and 10:14:12, based on a reasonable investigation of publicly available data, CS did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

78.      The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 10:12:12 CS took advantage of this artificial downward pressure and placed Executing Buy Orders to buy a total of 200 shares, at a price of $1.52 per share, which was below the prevailing best offer of $1.54 per share.

79.      CS began to cancel these Baiting Sell Orders within 5 seconds.  By 10:14:12, CS had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by CS.

D.      **Instinet – September 28, 2022**

1.      *Overview*

80.      As detailed below, on September 28, 2022, Defendant Instinet submitted 42,956 shares of fictitious Baiting Sell Orders at share prices ranging from $2.54 to $2.44 through

Global OTC.  Instinet never intended for these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the Executing Buy Orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by 5.486% on average.  Instinet then rapidly reversed course and purchased a total of 1,900 shares at prices below the prevailing best offer prior to entry of the Baiting Sell Orders.  Shortly thereafter, Defendant Instinet cancelled all of the fictitious Baiting Sell Orders.

81.    The following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at artificially depressed prices, and the resulting decline in GTII's share price on September 28, 2022.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| INSTINET, LLC | 3 | 42,956 | 1,900 | 22.61-to-1 | -5.486% |

82.    During the Baiting Period for each Spoofing Episode that day, Instinet submitted new sell-side orders for a median of 7,600 shares per Executing "Buy" Order.  During the same time window prior to non-spoofed executed purchases, market participants submitted new sell-side orders for a median of 4,122 shares per purchase.

83.    During the Cancellation Period following the Executing Buy Orders, Instinet cancelled a median of 10,900 shares in sell-side orders, or 143.4% of the created volume of 7,600 sell-side shares.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders, or 0% of the created volume of 4,122 sell-side shares.

84.     On median, therefore, there were 84% more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

85.     Instinet thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (84% higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (143.4% vs. 0%).

86.     Moreover, Instinet's behavior was inconsistent with bona fide market making. Over Cancellation Periods, Instinet cancelled 143% of the sell-side orders created during Baiting Periods, but only 83% of the buy-side orders created during Baiting Periods.  This asymmetry in order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

*2.    Example Episode:  September 28, 2022 – 09:34:02*

87.     As of September 28, 2022 at 09:34:02, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 200 shares at a price of $2.52 per share and an offer to sell 200 shares at a price of $2.53 per share.

88.     From 09:32:02 to 09:34:02, Instinet placed 30,856 shares of Baiting Sell Orders at prices ranging from $2.54 to $2.46 per share.  As of 09:34:02 the submission of these Baiting Sell Orders left Instinet with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 410 shares at a price of $2.52 per share, and an offer to sell 6,297 shares at a price of $2.53 per share.

89.     Between 09:34:02 and 09:36:02, based on a reasonable investigation of publicly available data, Instinet actually sold only 4,703 shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

90.     The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 09:34:02 Instinet took advantage of this artificial downward pressure and placed Executing Buy Orders to buy a total of 400 shares, at a price of $2.52 per share, which was below the prevailing best offer of $2.53 per share.

91.     Instinet began to cancel these Baiting Sell Orders within 1.772 seconds.  By 09:36:02 Instinet had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by Instinet.

**E.      September 30, 2022**

        *1.     Overview*

92.     As detailed below, on September 30, 2022, Defendants in combination submitted 4,458 shares of fictitious Baiting Sell Orders at share prices ranging from $4.29 to $3.50 through Global OTC.  Defendants never intended for these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the Executing Buy Orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by 4.044% on average.  Defendants then rapidly reversed course and purchased a total of 500 shares at prices below the prevailing best offer prior to entry of the Baiting Sell Orders.  Shortly thereafter, Defendants cancelled all of the fictitious Baiting Sell Orders.

93.     For each Defendant, the following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at depressed prices, and the resulting decline in GTII's share price on September 30, 2022.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| INSTINET, LLC | 1 | 2,959 | 200 | 14.79-to-1 | -4.67% |
| LIME PRIORITY CORP. | 1 | 1,499 | 300 | 4.997-to-1 | -3.417% |

94.     During the Baiting Period for each Spoofing Episode that day, Defendants submitted new sell-side orders for a median of 3,730 shares per Executing "Buy" Order.  During the same time window prior to non-spoofed executed purchases, market participants submitted new sell-side orders for a median of 1,469 shares per purchase.

95.     During the Cancellation Period following the Executing Buy Orders, Defendants cancelled a median of 3,379 shares in sell-side orders, or 90.6% of the created volume of 3,730 sell-side shares.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders, or 0% of the created volume of 1,469 sell-side shares.

96.     On median, therefore, there were 154% more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

97.     Defendants thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (154%

higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (90.6% vs. 0%).

98.     Moreover, Defendants' behavior was inconsistent with bona fide market making. On median, over Baiting Periods that day, Defendants posted 137% more new sell-side orders than new buy-side orders, net of cancellations.  Over Cancellation Periods, Defendants cancelled 91% of the sell-side orders created during Baiting Periods, but only 15% of the buy-side orders created during Baiting Periods.  This asymmetry in the posting of new orders and order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

2.     *Example Episode:  September 30, 2022 – 12:32:42*

99.     As of September 30, 2022 at 12:32:42, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 400 shares at a price of $4.27 per share and an offer to sell 481 shares at a price of $4.28 per share.

100.     From 12:30:42 to 12:32:42, Defendant Lime placed 1,499 shares of Baiting Sell Orders at prices ranging from $4.29 to $4.25 per share.  As of 12:32:42 the submission of these Baiting Sell Orders left Lime with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 1,000 shares at prices ranging from $4.21 per share to $4.27 per share, and an offer to sell 1,300 shares at prices ranging from $4.28 per share to $4.49 per share.

101.     Between 12:32:42 and 12:34:42, based on a reasonable investigation of publicly available data, Lime actually sold only 181 shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

102.     Defendant Lime parked these Baiting Sell Orders behind orders placed by other unsuspecting traders.  For example, when submitting the Baiting Sell Orders, Virtu Americas

LLC had placed orders to sell 100 shares at prices as low as $4.28, a better price than some or all of the Baiting Sell Orders placed by Lime.  That fact that Lime parked its Baiting Sell Orders behind orders by other market participants like Virtu Americas LLC is further evidence that Lime was not engaging in legitimate market activity.  Only 30% of the non-spoofed executed purchases had the purchaser previously park sell-side orders behind other market participants.

103.    The Baiting 'Sell" Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 12:32:42 Lime took advantage of this artificial downward pressure and placed Executing Buy Orders to purchase a total of 300 shares, at a price of $4.27 per share, which was below the prevailing best offer of $4.28 per share.

104.    Lime began to cancel its Baiting 'Sell" Orders within 3.323 seconds.  By 12:34:42 Lime had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by Lime.

**F.    <u>October 04, 2022</u>**

*1.    Overview*

105.    As detailed below, on October 04, 2022, Defendants submitted 38,483 shares of fictitious Baiting Sell Orders at share prices ranging from $7.25 to $3.82 through Global OTC and OTC Link.  Defendants never intended for these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the Executing Buy Orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by 14.97% on average.  Defendants then rapidly reversed course and purchased a total of 14,876 shares at prices below the prevailing best offer prior to entry of

the Baiting Sell Orders.  Shortly thereafter, Defendants cancelled all of the fictitious Baiting Sell Orders.

106.    For each Defendant, the following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at artificially depressed prices, and the resulting decline in GTII's share price on October 04, 2022.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| GTS SECURITIES LLC | 3 | 4,473 | 10,071 | 0.4441-to-1 | -16.38% |
| INSTINET, LLC | 4 | 12,448 | 4,229 | 2.943-to-1 | -10.97% |
| LIME PRIORITY CORP. | 4 | 21,562 | 576 | 37.43-to-1 | -17.91% |

107.    During the Baiting Period for each Spoofing Episode that day, Defendants submitted new sell-side orders for a median of 2,526 shares per Executing "Buy" Order.  During the same time window prior to non-spoofed executed purchases, market participants submitted new sell-side orders for a median of 900 shares per purchase.

108.    During the Cancellation Period following the Executing Buy Orders, Defendants cancelled a median of 6,876 shares in sell-side orders, or 272% of the created volume of 2,526 sell-side shares.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders, or 0% of the created volume of 900 sell-side shares.

109.     On median, therefore, there were 181% more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

110.     Defendants thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (181% higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (272% vs. 0%).

111.     Moreover, Defendants' behavior was inconsistent with bona fide market making. Over Cancellation Periods, Defendants cancelled 272% of the sell-side orders created during Baiting Periods, but only 41% of the buy-side orders created during Baiting Periods.  This asymmetry in order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

            2.     *Example Episode:  October 04, 2022 – 09:34:38*

112.     As of October 04, 2022 at 09:34:38, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 1,000 shares at a price of $5.15 per share and an offer to sell 100 shares at a price of $5.17 per share.

113.     From 09:32:38 to 09:34:38, Lime placed 6,542 shares of Baiting Sell Orders at prices ranging from $6.14 to $5.16 per share.  As of 09:34:38 the submission of these Baiting Sell Orders left Lime with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 2,200 shares at prices ranging from $4.56 per share to $5.16 per share, and an offer to sell 4,085 shares at prices ranging from $5.22 per share to $7.74 per share.

114.   Between 09:34:38 and 09:36:38, based on a reasonable investigation of publicly available data, Lime actually sold only 2,514 shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

115.   Lime parked these Baiting Sell Orders behind orders placed by other unsuspecting traders.  For example, when submitting the Baiting Sell Orders, Citadel Securities LLC had placed orders to sell 100 shares at prices as low as $5.17, a better price than some or all of the Baiting Sell Orders placed by Lime.  The fact that Lime parked its Baiting Sell Orders behind orders by other market participants like Citadel Securities LLC is further evidence that Lime was not engaging in legitimate market activity.  Only 12% of the non-spoofed executed purchases had the purchaser previously park sell-side orders behind other market participants.

116.   The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 09:34:38 Lime took advantage of this artificial downward pressure and placed Executing Buy Orders to purchase a total of 145 shares, at a price of $5.16 per share, which was below the prevailing best offer of $5.17 per share.

117.   Lime began to cancel its Baiting Sell Orders within 156 milliseconds of its Executing Buy Orders.  By 09:36:38, Lime had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by Lime.

   3.   *Example Episode:  October 04, 2022 – 11:25:59*

118.   As of October 04, 2022 at 11:25:59, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 199 shares at a price of $4.05 per share and an offer to sell 100 shares at a price of $4.08 per share.

119.     From 11:23:59 to 11:25:59, Instinet placed 1,175 shares of Baiting Sell Orders at prices ranging from $4.09 to $4.00 per share.  As of 11:25:59 the submission of these Baiting Sell Orders left Instinet with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 300 shares at a price of $4.06 per share, and an offer to sell 625 shares at prices ranging from $4.08 per share to $4.09 per share.

120.     Between 11:25:59 and 11:27:59, based on a reasonable investigation of publicly available data, Instinet did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

121.     Instinet parked these Baiting Sell Orders behind orders placed by other unsuspecting traders.  For example, when submitting the Baiting Sell Orders, Citadel Securities LLC had placed orders to sell 100 shares at prices as low as $4.08, a better price than some or all of the Baiting Sell Orders placed by Instinet.  The fact that Instinet parked its Baiting Sell Orders behind orders by other market participants like Citadel Securities LLC is further evidence that Instinet was not engaging in legitimate market activity.  Only 12% of the non-spoofed executed purchases had the purchaser previously park sell-side orders behind other market participants.

122.     The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 11:25:59, Instinet took advantage of this artificial downward pressure and placed Executing Buy Orders to purchase a total of 300 shares, at a price of $4.06 per share, which was below the prevailing best offer of $4.08 per share.

123.     Instinet began to cancel its Baiting Sell Orders within 1.666 seconds.  By 11:27:59, Instinet had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by Instinet.

4.   *Example Episode: October 04, 2022 - 09:39:12*

124.    As of October 04, 2022 at 09:39:12, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 275 shares at a price of $5.55 per share and an offer to sell 700 shares at a price of $5.56 per share.

125.    From 09:37:12 to 09:39:12, Defendant GTS placed 1,872 shares of Baiting Sell Orders at prices ranging from $6.50 to $5.55 per share.  As of 09:39:12 the submission of these Baiting Sell Orders left GTS with an imbalanced order book position, favoring the sell side, consisting of bids to purchase 275 shares at a price of $5.55 per share, and an offer to sell 500 shares at a price of $5.56 per share.

126.    Between 09:39:12 and 09:41:12, based on a reasonable investigation of publicly available data, GTS did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

127.    GTS parked these Baiting Sell Orders behind orders placed by other unsuspecting traders.  For example, when submitting the Baiting Sell Orders, GTS had placed orders to sell 500 shares at prices as low as $5.56, a better price than some or all of the Baiting Sell Orders placed by GTS.  The fact that GTS parked its Baiting Sell Orders behind orders by other market participants like GTS is further evidence that GTS was not engaging in legitimate market activity.  Only 12% of the non-spoofed executed purchases had the purchaser previously park sell-side orders behind other market participants.

128.    The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 09:39:12, GTS took advantage of this artificial downward pressure and placed Executing Buy Orders to purchase a

total of 175 shares, at a price of $5.55 per share, which was below the prevailing best offer of $5.56 per share.

129.     GTS began to cancel its Baiting Sell Orders within 3.404 seconds.  By 09:41:12, GTS had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by GTS.

                5.    *Example Episode:  October 04, 2022 – 09:31:27*

130.     As of October 04, 2022 at 09:33:27, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 10,593 shares at a price of $5.50 per share and an offer to sell 300 shares at a price of $5.51 per share.

131.     From 09:31:27 to 09:33:27, GTS placed 2,526 shares of Baiting Sell Orders at prices ranging from $7.25 to $5.25 per share.  As of 09:33:27 the submission of these Baiting Sell Orders left GTS with an imbalanced order book position, favoring the sell side, consisting of no bids and an offer to sell 290 shares at a price of $6.13 per share.

132.     Between 09:33:27 and 09:35:27, based on a reasonable investigation of publicly available data, GTS did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

133.     GTS parked these Baiting Sell Orders behind orders placed by other unsuspecting traders.  For example, when submitting the Baiting Sell Orders, Ascendiant Capital Markets, LLC had placed orders to sell 100 shares at prices as low as $5.51, a better price than some or all of the Baiting Sell Orders placed by GTS.  The fact that GTS parked its Baiting Sell Orders behind orders by other market participants like Ascendiant Capital Markets, LLC is further evidence that GTS was not engaging in legitimate market activity.  Only 12% of the non-spoofed

executed purchases had the purchaser previously park sell-side orders behind other market participants.

134.     The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 09:33:27, GTS took advantage of this artificial downward pressure and placed Executing Sell Orders to buy a total of 9,496 shares, at a price of $5.50 per share, which was below the prevailing best offer of $5.51 per share.

135.     GTS began to cancel its Baiting Sell Orders within 17.46 seconds.  By 09:35:27 GTS, had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by GTS.

**G.     October 25, 2022**

*1.     Overview*

136.     As detailed below, on October 25, 2022, Canaccord submitted 550 shares of fictitious Baiting Sell Orders at share prices ranging from $5.10 to $5.05 through OTC Link.  Canaccord never intended for these Baiting Sell Orders to be filled, but instead, planned to cancel them before placing the Executing Buy Orders.  The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, artificially driving the price of GTII shares down by -3.854% on average.  Canaccord then rapidly reversed course and purchased a total of 200 shares at prices below the prevailing best offer prior to entry of the Baiting Sell Orders.  Shortly thereafter, Canaccord cancelled all of the fictitious Baiting Sell Orders.

137.    The following table lists the share volume of Baiting Sell Orders that were subsequently cancelled, the share volume of Executing Buy Orders that were executed at artificially depressed prices, and the resulting decline in GTII's share price on October 25, 2022.

| Defendant | No. of Episodes | Baiting Sell Orders | Executing Buy Orders | Ratio of Baiting Sell Orders to Executing Buy Orders | Average Price Decline |
|---|---|---|---|---|---|
| CANACCORD GENUITY INC. | 1 | 550 | 200 | 2.75-to-1 | -3.854% |

138.    During the Baiting Period for each Spoofing Episode that day, Canaccord submitted new sell-side orders for a median of 1,175 shares per Executing "Buy" Order.  During the Cancellation Period following the Executing Buy Orders, Canaccord cancelled a median of 550 shares in sell-side orders, or 46.81% of the created volume of 1,175 sell-side shares.

139.    During the same time window prior to non-spoofed executed purchases, market participants submitted new sell-side orders for a median of 0 shares per purchase.  During the same time window as the Cancellation Period following non-spoofed executed purchases, market participants cancelled a median of 0 shares in sell-side orders.

140.    On median, therefore, there were infinitely more sell-side shares created in the Baiting Period prior to Executing Buy Orders compared to non-spoofed executed purchases, and infinitely more sell-side shares cancelled in the Cancellation Period following Executing Buy Orders compared to non-spoofed executed purchases.

141.    Canaccord thus injected more artificial sell-side order flow than non-spoofed orders prior to buying shares, as measured by (1) the volume of sell side order flow (infinitely higher); (2) the cancellation of that order flow (infinitely higher); and (3) the greater share of cancelled sell-side order flow (46.81% vs. 0%).

142.    Moreover, Canaccord's behavior was inconsistent with bona fide market making. Over Cancellation Periods, Canaccord cancelled 47% of the sell-side orders created during Baiting Periods, but only 5% of the buy-side orders created during Baiting Periods.  This asymmetry in order cancellation rates is inconsistent with bona fide market making, which involve purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers.

2.   *Example Episode:  October 25, 2022 – 09:32:46*

143.    As of October 25, 2022 at 09:32:46, the best bid and offer for GTII according to the OTC Link ATS inside quote was a bid to purchase 300 shares at a price of $5.11 per share and an offer to sell 280 shares at a price of $5.14 per share.

144.    From 09:30:46 to 09:32:46, Canaccord placed 550 shares of Baiting Sell Orders at prices ranging from $5.10 to $5.05 per share.  As of 09:32:46 the submission of these Baiting Sell Orders left Canaccord with an imbalanced order book position favoring the sell side consisting of bids to purchase 300 shares at a price of $5.10 per share, and an offer to sell 375 shares at a price of $5.15 per share.

145.    Between 09:32:46 and 09:34:46, based on a reasonable investigation of publicly available data, Canaccord did not actually sell any shares of GTII, consistent with the fictitious nature of the Baiting Sell Orders.

146.    The Baiting Sell Orders successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward.  At 09:32:46, Canaccord took advantage of this artificial downward pressure and placed Executing Buy Orders to buy a total of

200 shares, at a price of $5.08 per share, which was below the prevailing best offer of $5.14 per share.[11]

147.    Canaccord began to cancel its Baiting Sell Orders within 9.26 seconds after they were placed.  By 09:34:46, Canaccord had cancelled all of its Baiting Sell Orders, eliminating the artificial sell-side imbalance that had been falsely conveyed and injected into the market by Canaccord.  After cancelling the Baiting Sell Orders, Canaccord had an order book position on the over-the-counter markets consisting of bids to purchase 728 shares at a price of $4.95 per share and offers to sell 100 shares at a price of $5.08 per share—dramatically reversing the position it had taken only moments before.

## VI.    INJURY IN FACT AND LOSS CAUSATION

148.    Plaintiff sold over 18 million shares at artificially depressed, manipulated prices as a result of Defendants' unlawful actions.  By brazenly and repeatedly manipulating the market, Defendants directly impacted the market price of GTII's shares, causing GTII significant losses when it sold millions of shares of its stock at artificially depressed prices.  GTII had the right to rely on an efficient market that was free of all manipulative conduct when it sold its shares into the marketplace.

149.    For example, on March 30, 2021, GTII shares were subjected to six distinct Spoofing Episodes, culminating in Executing Buy Orders at 9:51:43 am, 11:00:10 am, 11:37:40 am, 12:12:52 pm, 1:59:56 pm, and 3:49:15 pm.  Collectively, these episodes drove the market

---

[11] While FINRA trading records are anonymized, this purchase is inferred from a transaction to purchase 100 shares at a price of $5.08 per share at 09:32:46.218 and the fact that Defendant Canaccord had an active bid at $5.08 per share at that time.  Defendant GTS also had an active bid for $5.08 at that time, but Defendant GTS reposted that bid at 09:32:49.597, after the Executing Buy Order, while Defendant Canaccord revised its bid to $5.00 at 09:32:50.421, suggesting that Defendant Canaccord's bid for $5.08 per share had been executed.

price of GTII's shares down from $3.63 to $2.70, a decline of 25.6%.  As the following figure

shows, the effect of Defendants' unlawful manipulation did not dissipate before GTII sold 2.65

million of its shares the next day at a price of $2.795 per share.



150.    For another example, on August 12, 2021, GTII shares were subject to three distinct Spoofing Episodes culminating in Executing Buy Orders at 11:10:03 am, 2:25:10 pm and 3:05:11 pm.  These episodes collectively drove the price of GTII shares down from $1.995 to $1.87, a decline of 6.3%.  The effect of Defendants' unlawful manipulation on the market price of GTII shares did not dissipate before GTIII sold 125,000 of its shares the next day at a price of $1.90 per share.

151.    For yet another example, on September 28, 2021, GTII shares were subject to a Spoofing Episode culminating in an Executing Buy Order at 3:33:17 pm, which drove the price of GTII shares down from $1.34 to $1.31, a decline of 2.23%.  The effect of Defendants' unlawful manipulation of the price of GTII shares did not dissipate before GTII sold 50,000 of its shares three days later at a price of $1.30 per share.

152.    Moreover, Defendants' fraudulent trading activities had both a temporary and long-term adverse effect on the market price of GTII's shares.  In general, the artificially depressed price of a Spoofing Episode may not fully recover to the price that existed prior to the Spoofing Episode.  When spoofing events occur repeatedly over a protracted period of time, the long-term cumulative effect of spoofing places enormous downward pressure on the market price of a security, which is persistent and long-lasting.

153.    The impact of this spoofing activity extended beyond the specific spoofing cycle (*i.e.*, the cycle of baiting sell orders, executing buy orders, and cancellations of baiting sell orders), because the market neither immediately nor fully rebounded from the manipulated prices once each of the Spoofing Episodes was completed.  In fact, during the Relevant Period, a large

fraction of trading in GTII stock through OTC Link and Global OTC took place at manipulated prices.

154.    While each Spoofing Episode had a small negative impact on the price of GTII's shares, the placement and cancellation of Baiting Sell Orders throughout the Relevant Period had the cumulative effect of driving GTII's share price down during the Relevant Period.

155.    Defendants' wrongful conduct proximately caused the loss that GTII suffered when the market price of its shares was being driven downward.

## VII.    DEFENDANTS ACTED WITH SCIENTER

156.    Based on the alleged facts herein, strong circumstantial evidence of conscious misbehavior or recklessness exists that Defendants engaged in market manipulation that was intended to– and in fact did – deceive, manipulate, or defraud the market for GTII shares and participants in that market, including Plaintiff.

157.    First, each Defendant specifically designed and implemented algorithmic trading programs to execute their spoofing schemes.  Their algorithms were programmed to, and did, generate trading patterns that involved the placement and cancellation of hundreds of thousands of Baiting Sell Orders on the OTC Link and Global OTC ATSs that were never intended to be executed during the Relevant Period.  Moreover, each Defendant – who are all sophisticated entities that utilize cutting-edge technology – closely monitored, modeled, and analyzed the performance, impact and effects of their algorithmic trading program throughout the Relevant Period, including the spoofing patterns which the algorithm executed again and again on GTII stock during the Relevant Period, with similar effects each time.

158.    Second, each Defendant's trading activities were approved by corporate officials, who were sufficiently knowledgeable about their respective trading practices, such that each

Defendant knew (or recklessly ignored the fact) that they were engaged in illegal spoofing activities.

159.    Third, as registered broker-dealers, Defendants knew and/or recklessly ignored the fact that it was unlawful to place Baiting Sell Orders in a Limit Order Book or IDQS that were never intended to be executed in order to trick market participants into selling shares of GTII stock.

160.    Fourth, as registered broker-dealers, Defendants were required, pursuant to FINRA Rule 2020, to have internal policies procedures and systems that detected, monitored, and prohibited manipulative or fraudulent trading devices or schemes.  As registered broker-dealers, Defendants were also required, pursuant to FINRA Rules 5210, Supplementary Material .02; Rule 1220 and NASDAQ Exchange Rule 575.  Disruptive Practices Prohibited, to detect and prevent manipulative or fraudulent trading that originated from algorithmic high-speed trading under the supervision and control of their firm.  Indeed, during the Relevant Period each Defendant filed an "Annual Certification of Compliance and Supervisory Processes," pursuant to FINRA Report 3130 in which they confirmed that they have:

> (A)    established[ed], maintain[ed] and review[ed] policies and procedures reasonably designed to achieve compliance with applicable FINRA rules, Municipal Securities Rulemaking Board ("MSRB") rules and federal securities laws and regulations: (B) modif[ed] such policies and procedures as business, regulatory and legislative changes and events dictate; and (C) test[ed] the effectiveness of such policies and procedure on a periodic basis, the timing and extent of which is reasonably designed to ensure continuing compliance with FINRA rules, MSRB rules and federal securities laws and regulations.

161.    Given Defendants' obligation to monitor, detect, and prevent manipulative or fraudulent trading, and their filing of FINRA Report 3130s in which they stated that they did, Defendants either intentionally manipulated the market through their spoofing scheme, or were highly reckless in allowing such behavior to occur.

162.   <u>Fifth</u>, Defendants regularly and intentionally parked fictitious Baiting Sell Orders behind orders placed by other unsuspecting traders – which meant they were extraordinarily unlikely to be executed – in order to hide their spoofing scheme.  Parking such Baiting Sell Orders is further evidence that Defendants did not intend for their orders to be filled and knew that they were placing the orders as a manipulative technique and not engaging in legitimate market activity.

163.   <u>Sixth</u>, Defendants' Baiting Sell Orders frequently left Defendants with an imbalanced order book position, favoring the sell side.  Despite these imbalanced order book positions, based on a reasonable investigation of publicly available data, Defendants often did not sell *any* shares of GTII after posting Baiting Sell Orders.  This is consistent with the fictitious nature of the Baiting Sell Orders and indicates that Defendants never intended to execute any of their numerous Baiting Sell Orders; instead, Defendants placed Baiting Sell Orders in order to create artificial selling pressure and induce other market participants to submit additional sell orders, and thus artificially drive down the price of GTII shares.  Defendants either knew or recklessly ignored the fact that this behavior was contrary to that of an ordinary trader, who buys when he thinks the price of a security is likely to go higher and sells when he thinks the price of a security will go lower.

164.   <u>Seventh</u>, the short time period between the placement and cancellation of Defendants' Baiting Sell Orders is further evidence of scienter.  During each Spoofing Episode, Defendants often placed and then cancelled the Baiting Sell Orders within nanoseconds or milliseconds.  This practice occurred frequently over the Relevant Period and indicates that Defendants never intended to execute the Baiting Sell Orders.

165.    Eighth, the concentration of cancelled Baiting Sell Orders during the limited

period when each spoofing event occurred is also indicative of scienter.  During each Spoofing

Episode, Defendants cancelled all of their Baiting Sell Orders, sometimes amounting to tens of

thousands of Baiting Sell Orders, in a matter of seconds, all of which had been placed by

Defendants at most mere minutes earlier.

166.    Ninth, the size of the Baiting Sell Orders that were cancelled, in comparison to the

size of bona fide sell-side orders that were executed by Defendants, is also indicative of scienter.

Based on a reasonable investigation of publicly available data, during each Spoofing Episode,

Defendants placed and subsequently cancelled a median of 1,000 shares in Baiting Sell Orders

while executing a median of zero executed sell-side orders.  The stark contrast between the share

volume of Baiting Sell Orders and executed sell-side orders during each Spoofing Episode

indicates that Defendants were manipulating the market by using Baiting Sell Orders as tools to

generate artificial prices, rather than making a genuine attempt to sell GTII shares.

167.    Tenth, the ratio of cancelled Baiting Sell Orders compared to executed bona fide

sell orders is also indicative of scienter.  Based on a reasonable investigation of publicly

available data, in the median Spoofing Episode, Defendants placed and subsequently cancelled

1,000 sell-side shares in Baiting Sell Orders, while in contrast executing zero sell-side orders.  A

sell-side cancellation rate of 100% is a strong indication that Defendants never intended to

execute those Baiting Sell Orders.  These ratios are consistent across the individual Defendants

as well, as the following table shows:

| Defendant | Median Share Volume of Baiting Sell Orders | Median Share Volume of Executed Sales |
|---|---|---|
| CANACCORD GENUITY INC. | 1,194 | 0 |
| CREDIT SUISSE SECURITIES (USA) LLC | 300 | 0 |

| Defendant | Median Share Volume of Baiting Sell Orders | Median Share Volume of Executed Sales |
|---|---|---|
| GTS SECURITIES LLC | 1,900 | 0 |
| INSTINET, LLC | 1,020 | 310 |
| LIME PRIORITY CORP. | 1,542 | 461 |

168.    Eleventh, the size of executed sell-side orders compared to Executing Buy Orders by Defendants is also indicative of scienter.  In the median Spoofing Episode, Defendants executed 300 shares in Executing Buy Orders while in contrast not executing *any* sell-side orders.  The stark contrast between the share volume of Executing Buy Orders and sell-side orders further indicates that Defendants were manipulating the market by using Baiting Sell Orders as tools to generate artificial prices at which to place Executing Buy Orders at favorable prices.

169.    Twelfth, the ratio of executed sell-side orders compared to Executing Buy Orders by Defendants is thus also indictive of scienter.  In the median Spoofing Episode, Defendants executed 300 shares of Executing Buy Orders while not executing any sell-side orders. A ratio of 300-to-0 further indicates that Defendants never intended to execute its Baiting Sell Orders.

170.    Thirteenth, Defendants carried out thousands of Spoofing Episodes over the Relevant Period, and often multiple episodes per trading day.  The repetition of this pattern of placing fictious Baiting Sell Orders, which creates an artificial price, allowing Executing Buy Orders to be executed at the artificial price, and then cancelling all of the Baiting Sell Orders, is indicative of scienter.

171.    Fourteenth, Defendants' behavior was inconsistent with bona fide market making. On average, over Baiting Periods, Defendants posted 57% more new sell-side orders than new buy-side orders.  Over Cancellation Periods, Defendants cancelled 196% of the sell-side orders created during Baiting Periods, but only 40% of the buy-side orders created during Baiting

Periods.  This asymmetry in order cancellation rates, as well as the asymmetry in order execution rates, described previously, are both inconsistent with bona fide market making, which involves purchases and sales in roughly comparable amounts to provide liquidity to customers or other broker-dealers while remaining roughly market neutral.

172.   Finally, there is an extremely low statistical likelihood that the price variations for each of the Spoofing Episodes occurred naturally, based on the Spoofing Episodes of each Defendant.  The market impact of these Spoofing Episodes was material and statistically significant.

173.   Defendants had a strong motive to spoof the shares of GTII stock and engage in their manipulative scheme.  By manipulating the share price of GTII downward, Defendants were able to purchase thousands of shares of GTII at artificially depressed prices, the cumulative effect of which is likely to exceed millions of dollars.

## VIII.   DEFENDANTS USED NATIONAL SECURITIES EXCHANGES AND THE MAILS TO PERPETRATE THEIR MARKET MANIPULATION SCHEME

174.   Each Defendant used the means or instrumentalities of interstate commerce, the facilities of a national securities exchange, and the mail, to trade GTII's securities by placing, routing, filling, and executing its orders.

175.   Defendants each knowingly employed devices, schemes, or artifices to defraud and engaged in acts, practices, and a course of conduct which operated as a fraud upon GTII and the market in violation of Section 10(b) and Rule 10b-5 promulgated under the Exchange Act.

## IX.   CLAIMS FOR RELIEF

### A.   First Claim for Relief for Spoofing in Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b-5(a) and (c) Promulgated Thereunder Against Defendants

176.   Plaintiff incorporates by reference paragraphs 1 through 175 as if more fully set forth herein.

177.   During the Relevant Period, Defendants engaged in and employed devices, schemes, illegal acts, practices, and a course of conduct, that were intended to manipulate the market price of GTII shares which traded on the OTC Link Global OTC ATS trading venues, and which operated as a fraud and deceit upon GTII.

178.   As a direct and proximate result of Defendants' wrongful conduct Plaintiff suffered damages in that it sold shares at manipulative prices, in reliance on an assumption of an efficient market free of manipulation.  Plaintiff would not have sold shares at the prices sold if it had been aware of Defendants' manipulative conduct which artificially affected the process of GTII shares.

### B.   Second Claim for Relief for Spoofing in Violation of Section 9(a)(2) of The Securities Exchange Act of 1934 Against Defendants

179.   Plaintiff incorporates by reference paragraphs 1 through 178 as if more fully set forth herein.

180.   Based upon the conduct described above, Defendants' manipulative scheme violated Section 9(a)(2) of the Securities Exchange Act of 1934, which makes it unlawful to engage in a series of manipulative transactions "in any security…creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purposes of inducing the purchase or sale of such security by others."

181.    By reason of the conduct described above, Defendants directly used the mails, or instrumentalities of interstate commerce, or a facility of a national securities exchange, to affect alone or with one or more other persons, a series of transactions in GTII's securities that created actual or apparent trading in such securities or raising or depressing the price of such securities for the purpose of inducing the purchase or sale of such securities by others, engaged in the market manipulation strategy of spoofing which artificially affected the prices of GTII's securities that Plaintiff sold.

182.    Defendants' conscious misbehavior or recklessness artificially affected the price of GTII's shares that Plaintiff sold during the Relevant Period.  GTII's financial injuries would not have been as extensive but for the Defendants' conscious misbehavior or recklessness.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.    Finding that Defendants violated the federal securities laws as alleged in this complaint;

B.    Ordering Defendants to pay damages as a result of their unlawful conduct in an amount to be determined at trial;

C.    Awarding reasonable attorney's fees and costs together with all available pre and post judgment interest; and

D.    Granting such other and further relief as the Court deems just and appropriate.

## XI. <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial

by jury in this action of all issues so triable.

Dated: March 13, 2023
　　　　New York, New York

　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　By: /s/ Alan M. Pollack
　　　　　　　　　　　　　　　　　　　　　Alan M. Pollack, Esq.
　　　　　　　　　　　　　　　　　　　　　Warshaw Burstein, LLP
　　　　　　　　　　　　　　　　　　　　　575 Lexington Avenue, 7th Floor
　　　　　　　　　　　　　　　　　　　　　New York, New York 10022
　　　　　　　　　　　　　　　　　　　　　Tel:  (212) 984-7700
　　　　　　　　　　　　　　　　　　　　　Fax: (212) 972-9150

　　　　　　　　　　　　　　　　　　　　　　　and

　　　　　　　　　　　　　　　　　　By: /s/ James Wes Christian
　　　　　　　　　　　　　　　　　　　　　James Wes Christian, Esq.
　　　　　　　　　　　　　　　　　　　　　Christian Levine Law Group, LLC
　　　　　　　　　　　　　　　　　　　　　2302 Fannin, Suite 205
　　　　　　　　　　　　　　　　　　　　　Houston, Texas 77002
　　　　　　　　　　　　　　　　　　　　　Tel:  (713) 659-7617