**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GLOBAL TECH INDUSTRIES GROUP, INC., <br><br>     Plaintiff, <br><br>     v. <br><br><br> CANACCORD GENUITY LLC, CREDIT SUISSE SECURITIES (USA) LLC, INSTINET, LLC, LIME TRADING CORP., GTS SECURITIES LLC, and JOHN DOES 1-50, <br><br>         Defendants. | Case No. 1:23-cv-02139 |

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND ...................................................................................3

    A.    The Parties ................................................................................3

    B.    The OTC Trading Venues ...............................................................4

    C.    Purported "Spoofing" of GTII Shares ..............................................6

        1.    The Alleged "Spoofing" ........................................................6

        2.    The Amended Complaint Does Not Account for Obvious Alternative Explanations for Any Declines in GTII's Stock Price.............8

ARGUMENT ...................................................................................9

I.    GTII'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED .................................9

    A.    GTII Does Not Adequately Allege Manipulative Conduct.................................10

    B.    GTII Does Not Allege The Required Strong Inference of Scienter....................11

        1.    GTII's allegations are more plausibly explained as routine market activity..............................................................12

        2.    GTII has not adequately alleged a "concrete and personal benefit" resulting from the purported spoofing.....................................13

        3.    GTII fails to allege conscious misbehavior or recklessness....................15

    C.    GTII Does Not Adequately Allege Loss Causation...........................................19

II.    GTII's AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE...................................................................22

CONCLUSION...................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007)....................................................................9, 10, 11, 12

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    579 F.3d 143 (2d Cir. 2009)....................................................................................6

*Blue Tree Hotels Inc. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*,
    369 F.3d 212 (2d Cir. 2004)....................................................................................3

*C.F.T.C. v. Wilson*,
    2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018)......................................................18

*Cohen v. Stevanovich*,
    722 F. Supp. 2d 416 (S.D.N.Y. 2010)...............................................................9, 19

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) .............................................................................................20

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)..................................................................................15

*Fezzani v. Bear, Stearns & Co. Inc.*,
    777 F.3d 566 (2d Cir. 2015)..................................................................................22

*Gamma Traders I LLC v. Merrill Lynch Commodities, Inc*,..................................20, 21
    41 F.4th 71, 80 (2d Cir. 2022)

*Glaser v. The9, Ltd*, 772 ......................................................................................19
    F. Supp. 2d 573, 591(S.D.N.Y. 2011)

*Harrington Global Opportunity Fund, Ltd v. CIBC World Markets Corp.*,
    2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023)....................................................13

*Harrington Global Opportunity Fund, Ltd v. CIBC World Markets Corp.*,
    585 F.Supp.3d 405 (S.D.N.Y. 2022).....................................................................13

*In re Citigroup Auction Rate Sec. Litig.*,
    700 F. Supp. 2d 294 (S.D.N.Y. 2009)..................................................................19

*In re Citigroup, Inc.*,
    2011 WL 744745 (S.D.N.Y. Mar. 1, 2011), *aff'd sub nom. Finn v. Barney*, 471
    F. App'x 30 (2d Cir. 2012)......................................................................................4

*In re Duane Read Inc. Sec. Litig.*, ....................................................................................14
    2003 WL 22801416, at *9 n.12 (S.D.N.Y. Nov. 25, 2003)

*In re Fed Ex Corp. Sec. Litig.*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021) ............................................................22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
    574 F.3d 29 (2d Cir. 2009) ..............................................................................22

*In re iAnthus Cap. Holdings, Inc. Sec. Litig.*,
    2021 WL 3863372 (S.D.N.Y. Aug. 30, 2021) ..................................................4

*In re Livent, Inc., Noteholders Sec. Litig.*,
    151 F.Supp.2d 371 (S.D.N.Y. 2001) ...............................................................11

*In re London Silver Fixing Ltd., Antitrust Litig.*,
    332 F. Supp. 3d 885 (S.D.N.Y. 2018) ............................................................20

*In re Merrill, BOFA, & Morgan Stanley Sec. Litig.*,
    2021 WL 827190 (S.D.N.Y. 2021) ...........................................................20, 21

*In re MRU Holdings Sec. Litig.*,
    769 F. Supp. 2d 500 (S.D.N.Y. 2011) ............................................................18

*In re Take-Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ..............................................................9

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020) ..............................................................................18

*Kalnit v. Eichler*,
    264 F.3d 131 (2d. Cir. 2001) ...........................................................................13

*Kemp v. Universal Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ........................................................3

*Kessev Tov, LLC v. Doe(s)*,
    2022 WL 2356626 (N.D. Ill. June 30, 2022) ........................................13, 16, 18

*Lattanzio v. Deloitte & Touche LLP*,
    476 F.3d 147 (2d Cir. 2007) ............................................................................22

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Comm.*,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010) ..............................................................4

*Schwab v. E*TRADE Fin. Corp.*,
    258 F. Supp. 3d 418 (S.D.N.Y. 2017) ............................................................18

*Stone Family Trust v. Credit Suisse AG*,
    2022 WL 954743 (S.D.N.Y. Mar. 30, 2022) ....................................................9

*Tellabs v. Makor Issues & Rights, Ltd.* ................................................................4, 11, 12, 13
   551 U.S. 308 (2007)

*Union Cent. Life Ins. Co. v. Ally Financial, Inc*., ....................................................................14
   2013 WL 2154220, at *3 (S.D.N.Y. March 29, 2013)

**Rules/Statutes**

15 U.S.C. § 78u-4(b)(2)(A)................................................................................................*passim*

Fed. R. Civ. P. 9(b) ...........................................................................................................*passim*

Fed. R. Civ. P. 11.....................................................................................................................6

Defendants[1] respectfully submit this memorandum of law in support of their motion to dismiss Plaintiff Global Tech Industries Group, Inc. ("GTII")'s Amended Complaint (ECF 58).

## PRELIMINARY STATEMENT

This case is a transparent attempt by GTII, a failing public company, to scapegoat investors for its own gross mismanagement, serious financial reporting deficiencies, and fundamental failure to generate any meaningful revenue. It is precisely the kind of abusive litigation that courts should check by enforcing the exacting pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA").

The Amended Complaint alleges that five named Defendants *separately* and *simultaneously* embarked upon *identical* "spoofing" schemes to drive down the price of GTII's stock over the *exact same* 19-month period, in concert with an unspecified number of "John Doe" defendants, all without coordination or communication of any kind. It does not come close to pleading facts sufficient to support such a fanciful assertion. The trading GTII alleges is easily and far more plausibly explained as the routine, lawful activity of broker-dealers, like the Defendants, that transact in the over-the-counter ("OTC") stock markets—frequently, as GTII acknowledges, on behalf of their clients.

The Amended Complaint should be dismissed with prejudice for several independent reasons. *First*, GTII has not pled manipulative conduct with particularity. GTII alleges that the Defendants sought to drive down GTII's stock price by placing so-called "Baiting Orders," which GTII describes as "fictitious" offers to sell that Defendants never intended to be executed, and that they cancelled after executing "Genuine Orders" to buy.[2] But GTII admits that it does not know whether *any*

---

[1] Defendants are GTS Securities LLC ("GTS"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), and Lime Trading Corp. ("Lime"). Canaccord Genuity LLC and Instinet, LLC previously filed stipulations of dismissal.

[2] GTII appears to use the terms "Baiting Quotations," "Baiting Orders," "Spoofing Quotations," and "Spoofing Orders" interchangeably throughout its Amended Complaint. For ease of reference,

Defendant cancelled *any* of the so-called "Baiting Orders." And the allegation that a market participant could display multiple orders and then cancel them is impossible in the venue in which Defendants predominantly traded GTII's stock, which permits a market participant to display only one order at a time.

*Second*, GTII fails to plead any inference of scienter, let alone the "strong inference" required by the PSLRA. GTII concedes that at least some of the trading at issue was done on behalf of clients. This defeats any suggestion that Defendants acted with scienter. While some Defendants engage in market-making on a principal basis, all of them display orders received from clients, some of which are themselves broker-dealers that route orders on behalf of their own underlying clients. GTII does not allege who entered which orders, meaning that the orders it complains about may not have originated with the Defendants at all, but rather by their clients or their clients' clients. GTII does not even attempt to allege that the *same party* placed both the alleged "Baiting Orders" and the corresponding "Genuine Orders." Instead, it simply asks the Court to assume that the Defendants acted with scienter and in concert in the absence of any factual allegations regarding who entered each order or other specifics of the orders. Such speculative inferences are impermissible under the PSLRA and controlling case law.

GTII's allegations of scienter also fail for the independent reason that there is no rational economic explanation for Defendants' purported manipulation. GTII contends that Defendants "rested" these "Baiting Orders" behind better (*i.e.*, lower)-priced offers entered by other, unnamed market participants, and then cancelled them. Yet GTII's own allegations show that Defendants' orders were often entered at prices still *lower* than those GTII claims Defendants rested behind. Nor does GTII offer any factual basis for its assertion that the Defendants could have made "millions"

---

Defendants will refer to these so-called "Baiting Quotations," "Baiting Orders," "Spoofing Quotations," and "Spoofing Orders" collectively as "Baiting Orders."

from the activity alleged in the complaint, an allegation belied by simple math.

*Finally*, GTII has not adequately pled loss causation. It does not allege *any* details regarding when it sold or issued its stock, leaving the Defendants (and the Court) to guess at when GTII transacted, or the price at which it sold or issued stock. Because GTII never alleges the timing of any of its transactions, it does not (and cannot) plead a causal connection between the loss it supposedly incurred and the alleged actions of any Defendant. GTII's throwaway allegation that it suffered a "long-term" or "persistent" decline in its stock price is far too vague to satisfy the demanding requirements of the PSLRA. It is also false: GTII's stock price dramatically *increased* from $2.35 per share on March 25, 2021 to $4.34 per share on October 31, 2022 (which is the "Relevant Period" defined in the Amended Complaint, ¶1). Generalized allegations that defy reality should not be given any weight.

At bottom, what GTII has described with provocative labels is nothing more than routine market activity cherry-picked from a large data set involving many independent investors. Its allegations are internally inconsistent and fail to connect the activity of any Defendant to any supposed transaction or loss. Permitting GTII's allegations to proceed to discovery would invite every failed public company to blame ordinary market participants for "manipulation," undermining the core purpose of the PSLRA and permitting "a never-ending tide of securities lawsuits [to] flood the courts." *Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007).

## FACTUAL BACKGROUND

### A.    The Parties

GTII holds itself out as a "publicly traded, mini conglomerate, trading on the OTC Markets."[3] It purportedly maintains a "diversified portfolio of businesses" in industries including crypto-

---

[3] Exhibit 1 to the Declaration of Peter G. Wilson in support of Defendants' Motion to Dismiss ("Ex."), *Investor Relations*, GTII, https://www.gtii-us.com/investor-relations. The Court may take judicial notice of each of the publicly-available documents cited in this memorandum. *See Blue Tree*

3

currency and Non-Fungible Tokens ("NFTs"), "metaverse" development, gold mining, oil drilling, and optometry and eyewear.[4] Notwithstanding the variety of its supposed business interests, GTII has reported *zero revenue* every year from 2016 to the present (including the Relevant Period), with the exception of 2020 and 2021, when it generated net revenues of $8,500 and $24,120, respectively.[5]

Defendants are SEC-registered broker-dealers. ¶¶ 27-29, 32-33, 35-36.[6] One of them— Lime—is an agency-only broker-dealer that does not engage in proprietary market-making. ¶ 32-34. Despite the Amended Complaint's assertion to the contrary, Lime does not trade GTII stock for itself, but instead operates a platform that allows clients to make their own trading decisions. ¶ 34. The two other Defendants—Credit Suisse and GTS—make markets by publicly displaying quotations to buy and sell OTC equity securities and facilitate client transactions. ¶ 27-31.

### B. The OTC Trading Venues

During the Relevant Period, GTII's stock traded publicly on the OTC market. GTII alleges that the purported spoofing took place on two OTC trading venues: NYSE ARCA Global OTC ("Global OTC") and OTC Link LLC ("OTC Link"). ¶¶ 2, 4.[7] Global OTC is a centralized trading

---

*Hotels Inc. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (court "may also look to public records . . . in deciding a motion to dismiss"); *In re Citigroup, Inc.*, 2011 WL 744745, at *3, 9 (S.D.N.Y. Mar. 1, 2011) (taking judicial notice of SEC Order, disclosure statements, and website and prospectus excerpts), *aff'd sub nom. Finn v. Barney*, 471 F. App'x 30 (2d Cir. 2012); *see also Plumbers & Steamfitters Loc. 773 Pension Fund v. Can. Imperial Bank of Comm.*, 694 F. Supp. 2d 287, 297 n. 2 (S.D.N.Y. 2010) (considering "supplemental documents" to "inform the competing inference analysis required by *Tellabs Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308 (2007) (internal quotation omitted)").

[4] Ex. 8, (GTII 2022 Form 10-K) at 3-5.

[5] Exs. 2-8, (GTII Forms 10-K, 2016-2022).

[6] The Amended Complaint is attached as Ex. 9.

[7] General characteristics of OTC markets, including that OTC Link involves dealer-to-dealer trading instead of centralized execution, are subject to judicial notice by the Court as facts that are "generally known within" the District. *In re iAnthus Cap. Holdings, Inc. Sec. Litig.*, 2021 WL 3863372, at *3 n.24 (S.D.N.Y. Aug. 30, 2021) (taking "judicial notice of the fact that securities on the OTCQX are quoted on OTC Link"); *see supra* n. 3.

platform, that, like Nasdaq or other stock exchanges, directly matches buyers and sellers for automated execution. OTC Link operates differently: it is an inter-dealer quotation system that allows broker-dealers to display orders to buy (known as "bids") and sell ("offers") and to negotiate trades directly with other market participants. ¶ 4 nn. 5-7.[8] OTC Link is commonly used by broker-dealers to display quotes to buy and sell OTC stocks like GTII's.

The differences between OTC Link and Global OTC are significant in light of GTII's allegations. In particular, OTC Link permits market participants to display *only one bid and one offer per security at a time*, ¶ 54, consisting of their single best bid and single best offer. Broker-dealers using OTC Link must generally update their currently displayed quote if they receive an order from a client at a better bid or offer.[9] As a result, when a broker-dealer's displayed best bid or offer changes, it does not necessarily mean that the previously displayed order was cancelled. Rather, even if a bid or offer is no longer displayed, the broker-dealer may continue to retain the previously displayed client order, which it may redisplay if it once again becomes the broker-dealer's best bid or offer.[10] These features of trading on OTC Link mean that it is not possible for a market participant

---

[8] *See also* Ex. 10, *Over-the-Counter Market*, SEC. EXCH. COMM'N, https://www.sec.gov/divisions/marketreg/mrotc (explaining that OTC Link provides this capability to broker-dealers on its platform). The Court may take judicial notice of SEC documents. *See supra* n. 3.

[9] *See also* Ex. 11, *OTC Link Fix Quot. Serv.—"FIXIE Quote" Client Specification 14*, OTC Markets Grp., Inc., (Feb. 28, 2023), https://www.otcmarkets.com/files/FIXIE_Quote_Spec.pdf (showing that participants will receive error code "105" if they attempt to disseminate two or more quotes for any given security). The Court may take judicial notice of OTC Link rules. *See supra* n. 2.

[10] For example, suppose Client A places an order to buy at $1.01 and Client B places an order to sell at $1.04 with the same broker-dealer. That broker-dealer's displayed quote would be $1.01 x $1.04. Then suppose Client C places a buy order at $1.02 with the same broker-dealer. Because $1.02 is a better (higher) bid than $1.01, and because the platform only allows broker-dealers to display a single bid and offer per security, the broker-dealer must update its quote to $1.02 x $1.04. Client A's order at $1.01 is no longer displayed but has not been cancelled and is still active and waiting to be redisplayed (if, for example, Client C's order at $1.02 is executed).

to *display*, or for other market participants to *see*, more than a single bid or offer on OTC Link from any market participant at any time.

### C.  Purported "Spoofing" of GTII Shares

#### 1.  *The Alleged "Spoofing"*

GTII alleges that the five Defendants—separately, without coordinating their activities—each "spoofed" GTII stock on thousands of occasions during the exact same period from March 25, 2021 to October 31, 2022. ¶ 1.[11] The Amended Complaint sets out 26 example "episodes" that follow the same general pattern:[12]

*First,* GTII alleges that, during a two-minute period, a Defendant placed "Baiting Orders"—offers to sell, generally at a range of prices, that allegedly were "never intended to be executed" but instead were placed to "send false signals" that there was an "excess supply" of GTII, to "bait" or "trick" other market participants into placing genuine sell orders, ¶ 2 n. 3, ¶¶ 45, 102. GTII does not allege how many offers the Defendants placed, or whether they were placed on behalf of clients or on a proprietary basis, and generally fails to allege the volume and price of each offer.

*Second*, GTII alleges that at least some Defendants (it does not say how many) regularly and intentionally "rested" these "Baiting Orders" behind orders placed by other market participants. *E.g.*, ¶¶ 57, 181. According to GTII, this establishes that these "Baiting Orders" were "extraordinarily

---

[11] Despite references to "Defendants' collective spoofing schemes," *e.g.*, ¶ 6, GTII nowhere alleges that Defendants conspired or otherwise coordinated any activities. GTII does not attempt to explain why or how Defendants all purportedly alighted on identical but uncoordinated schemes to spoof the same stock over the same arbitrary 19-month period.

[12] For the avoidance of doubt, Defendants do not concede the accuracy of any of the purported trade data referenced in the Amended Complaint, and reserve all rights to challenge the accuracy of that data and analysis, including by seeking relief in connection with the Rule 11 analysis required by the PSLRA. *See ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 152 (2d Cir. 2009) ("The statute *requires* district courts, at the conclusion of private actions arising under federal securities laws, to make Rule 11 findings as to each party and each attorney . . . and if a Rule 11 violation is found, the statute *requires* courts to impose sanctions.") (emphasis in original).

unlikely to be executed" and thus "fictitious." ¶ 181. GTII does not identify any specific examples of actual lower-priced offers entered by other market participants; instead, it simply alleges the supposed best bid and offer for its stock at the end of each example. *E.g.*, ¶¶100-101. These allegations, however, are internally inconsistent: despite alleging what it claims to have been the best (lowest) offer at the end of each example, GTII also frequently alleges, without explanation, that Defendants had concurrently entered offers priced *lower* than the supposed "best offer."

*Third*, GTII alleges that the so-called "Baiting Orders" "successfully induced the entry of sell orders from other market participants, driving the price of GTII shares downward." *E.g.*, ¶ 102. These allegations are wholly conclusory; GTII does not identify any other market participants that reacted to Defendants' purported "Baiting Orders," or any details about any sell orders they entered. In fact, GTII alleges no facts at all to support the critical causal allegation that other market participants were induced to do anything by the so-called "Baiting Orders."

*Fourth,* GTII alleges that after the two-minute period in which Defendants placed the so-called "Baiting Orders," the Defendants entered "Genuine Orders" to buy GTII's stock at prices purportedly "below the prevailing best offer." *E.g.*, ¶ 102.

*Fifth,* GTII alleges that within seconds of placing these "Genuine Orders" to buy its stock, the Defendants began cancelling their "Baiting Orders." *E.g.*, ¶ 103.

*Sixth*, GTII alleges that the Defendants profited by "manipulating the bid/ask spread," buying shares at artificially low prices before selling for a profit. ¶¶ 3-4, 62. GTII does not specifically identify any purported sales by the Defendants that would have yielded such a profit, nor does it explain how the Defendants would have profited from the alleged "spoofing" to the extent they were facilitating client trades on an agency basis.

*Finally*, GTII alleges that it "sold or issued for value approximately 19 million of its shares at a time when the prices of its shares on both OTC Link and Global OTC were "artificially

depressed" by Defendants' purported spoofing. ¶ 6. It does not identify the date, time, or price of any of its supposed sales, nor does it attach any exhibit reflecting them.

### 2. The Amended Complaint Does Not Account for Obvious Alternative Explanations for Any Declines in GTII's Stock Price

GTII's characterization of movements in its stock price is misleading in several important respects. To begin, GTII asserts that the Defendants' trading had a "*long-term adverse effect*" on its stock price, ¶ 192 (emphasis in original). In reality, GTII's stock price nearly doubled during the Relevant Period, rising from a closing price of $2.35 per share on March 25, 2021, to a closing price of $4.34 per share on October 31, 2022. Yet the Amended Complaint neither mentions the sharp increase in GTII's stock price during the Relevant Period nor attempts to reconcile it with the claim that GTII was injured by a decline in its stock price caused by the Defendants.

Even if GTII's stock price had declined, moreover, the Amended Complaint omits the many obvious alternative reasons that investors might have wanted to sell GTII's stock during the Relevant Period. For example, the Amended Complaint does not mention that GTII generated *zero* ($0.00) revenue for five of the last seven years, and just $32,620 in total revenue over the same period.[13] It also omits that GTII repeatedly disclosed throughout the Relevant Period that its internal control over financial reporting "had material weaknesses and was not effective" due to "the limited number of persons responsible for the recording and reporting of financial information, the lack of separation of financial reporting duties, and the limited size of [its] management team in general."[14] And the Amended Complaint fails to mention that GTII repeatedly warned investors throughout the same period that it had suffered "significant losses," and that its auditors had "substantial doubt about [its]

---

[13] Ex. 2-8, Consolidated Statements of Operations, (GTII Forms 10-K, 2016-2022).

[14] *See e.g.*, Ex. 8, at 43.

ability to continue" as a going concern.[15] The wholesale omission of such significant, publicly-disclosed business and compliance failings raises serious questions about GTII's allegations and further suggests this lawsuit is an attempt to scapegoat deeper pockets for the company's own financial mismanagement.

## **ARGUMENT**

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). This requires—under both the PSLRA and Rule 9(b)—that a plaintiff "state with particularity the circumstances constituting fraud." *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 259 (S.D.N.Y. 2008); *see also ATSI*, 493 F.3d at 101 ("Because a claim for market manipulation is a claim for fraud, it must be pled with particularity under Rule 9(b).").

## I. GTII'S EXCHANGE ACT CLAIMS SHOULD BE DISMISSED

To state a manipulation claim under Section 10(b) of the Exchange Act, GTII must allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.3d at 101. Similarly, to plead a claim under Section 9(a)(2), GTII must "identify transactions in a security . . . with the intent to deceive or defraud investors." *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010). The analysis of claims under Section 9(a) "'closely parallels' the analysis of claims under Section 10(b)." *Stone Family Trust v. Credit Suisse AG*, 2022 WL 954743, at *6 (S.D.N.Y. Mar. 30, 2022). The Exchange Act claims should be dismissed because GTII has not adequately alleged manipulative acts, scienter, or loss causation.

---

15 *See e.g.*, *Id.* at 13; *see also* Ex. 2 at 18; Ex. 3 at 20; Ex. 4 at 20; Ex. 5 at 20; Ex. 6 at 18; Ex. 7 at 12, 22; Ex. 8 at 13, 23.

### A.    GTII Does Not Adequately Allege Manipulative Conduct

To allege manipulation, GTII must specify "what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *ATSI*, 493 F.3d at 102. GTII's "Baiting Orders" theory —the means by which Defendants supposedly manipulated the market—falls far short of this exacting pleading standard: it is contradicted by GTII's own allegations and impossible in the relevant markets.

To begin, GTII alleges that the "Baiting Orders" were "never intended to be executed," and thus "fictitious," merely because they were cancelled. Yet GTII does not—and cannot—plead with particularity that any so-called Baiting Order on OTC Link was *actually cancelled*. It alleges in a cursory fashion that Defendants each displayed various "Baiting Orders" over a two-minute period and began canceling them after they entered "Genuine Orders."[16] But although a broker-dealer generally must update its quote if it receives a better-priced order, or when a displayed order is filled, replacing one displayed order with another on OTC Link does not imply that the first order was cancelled (rather than temporarily removed). GTII's concession that it cannot distinguish between orders that were cancelled from orders that were replaced defeats its spoofing theory as to trading on OTC Link.

An accurate understanding of how OTC Link works disproves another fundamental piece of GTII's theory: that Defendants displayed multiple "Baiting Orders" before cancelling any of them. GTII alleges that "[i]mmediately after executing its Genuine Orders . . . , the spoofer cancels its Baiting Orders to sell, ending that spoofing cycle." ¶ 47. This allegation *cannot* be true on OTC Link, because, as GTII admits, "market participants on an IDQS such as OTC Link are limited to one bid

---

16 *See, e.g.*, ¶¶ 103, 107, 111, 115, 119, 123, 127.

quotation and one ask quotation at any given time," ¶ 54. GTII does not attempt to reconcile that concession with its assertion that the Baiting Orders "created artificial selling pressure that induced other market participants to also submit their own sell orders," leading to a "'pile on' effect driving down the price of GTII shares." Nor could it. As GTII acknowledges, a market participant on OTC Link can display only a single offer at a time, and GTII could not plausibly allege that a *single* order artificially depressed the entire market for its stock. The Court "need not feel constrained to accept as truth conflicting pleadings that make no sense, or that would render a claim incoherent, or that are contradicted either by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc., Noteholders Sec. Litig.*, 151 F.Supp.2d 371, 405-06 (S.D.N.Y. 2001).

Finally, the Amended Complaint contains no allegations concerning the number of so-called Baiting Orders in each specific "example," whether they were entered on OTC Link or Global OTC, or the timing, price, or volume of each individual order.[17] Instead, GTII merely alleges the total sum of shares offered and a range of times and prices, making it impossible to identify any particular "manipulative" offers, determine whether they were in fact "rested," whether they were cancelled, or whether they had any potential effect on the market. The PSLRA and Rule 9(b) demand far more specificity to plead manipulative conduct. *See ATSI*, 493 F.3d at 102.

### B.     GTII Does Not Allege The Required Strong Inference of Scienter

To mitigate the risk that private securities fraud actions "can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law," *Tellabs, Inc. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007), the PSLRA requires plaintiffs to "plead with particularity facts giving rise to a strong inference that the defendant intended to deceive investors."

---

[17] *See e.g.*, ¶¶ 101, 105, 109, 113, 117.

*ATSI*, 493 F.3d at 102 (citing 15 U.S.C. § 78u-4(b)(2)); *see also id.* (scienter is often "the only factor that distinguishes legitimate trading from improper manipulation."). "In determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323-24 (cleaned up). And, to satisfy the PSLRA, GTII must allege facts (i) demonstrating that "defendants had both motive and opportunity to commit the fraud," or (ii) "constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. The Amended Complaint fails to satisfy these "heightened pleading requirements." *Id.*

### 1. *GTII's allegations are more plausibly explained as routine market activity.*

Under the PSLRA, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. In other words, the "court must consider plausible, nonculpable explanations for the defendant's conduct," and GTII's theory must be "*at least as likely as* any opposing inference" that could be drawn from the facts as alleged or supplemental facts. *Id.* at 310-11 (emphasis in original). GTII's theory that five independently operated broker-dealers alighted on the exact same 19-month spoofing scheme to drive down the price of an obscure stock is not nearly as plausible as other obvious explanations for the alleged conduct. The far more plausible explanation for the Amended Complaint's allegations is that Defendants and their clients were engaged in routine market activity that GTII has ripped out of context.

Defendants, as broker-dealers, routinely display bids and offers on their own behalf. They may also effect transactions on behalf of clients, and it is the clients that set the terms of those orders.[18] A stringent set of regulations governs how Defendants must handle and display client orders

---

[18] In fact, Lime is *exclusively* an agency broker-dealer, meaning that its activity was entirely attributable to clients. Lime did no proprietary trading of GTII for its own account, and GTII does

via venues such as OTC Link and Global OTC. Viewed against the backdrop of this regulatory regime, the alleged manipulative conduct—the purported displaying and then cancelling of orders—has an obvious alternative explanation: rather than "spoofing," the Defendants were simply making markets or displaying orders on behalf of clients, as they are required to do. There is, of course, nothing inherently wrong with entering and later canceling orders, which is why "placing rapid orders and cancelling them does not necessarily evince illegal market activity." *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at *9 (N.D. Ill. June 30, 2022). And because GTII has not alleged (and cannot allege) which orders were entered by Defendants' clients, and which were entered by Defendants themselves, the assumption that Defendants had culpable intent with respect to the activity alleged in the Amended Complaint is too implausible to satisfy the PSLRA. *Tellabs*, 551 U.S. at 300.[19]

### 2. GTII has not adequately alleged a "concrete and personal benefit" resulting from the purported spoofing.

To plead a strong inference of scienter through allegations of motive and opportunity, GTII must allege "a concrete and personal benefit . . . resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d

---

not – and cannot – allege as much. Rather, GTII can surmise only that Lime might engage in proprietary trading, which is does not. ¶34 (Lime "may also engage in principal trading of securities for their own proprietary purposes…")(emphasis added.).) Even if any of Lime's clients had ever spoofed GTII, it would be baseless and legally insufficient to attribute a client's scienter to Lime. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 2008 WL 850473, at *3 (S.D.N.Y. Mar. 27, 2008) (imposing Rule 11 sanctions where only allegation against market maker was that it processed client orders in the ordinary course), *aff'd in part, rev'd in part*, 579 F.3d 143 (2d Cir. 2009).

[19] This is one of several recent "spoofing" cases filed in this district based on a similar theory. In most of those cases, motions to dismiss are pending but not yet decided. Defendants acknowledge that, in *Harrington Global Opportunity Fund, Ltd v. CIBC World Markets Corp.*, 585 F.Supp.3d 405 (S.D.N.Y. 2022) ("*Harrington I*") and *Harrington Global Opportunity Fund, Ltd v. CIBC World Markets Corp.*, 2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) (*"Harrington II"*), Judge Schofield found a manipulative act was pled in a different "spoofing" case filed against other broker-dealers, rejecting an argument based on the fact that these broker-dealers were alleged to have traded for both their own accounts and the accounts of their customers. Defendants respectfully submit that, on this issue, the *Harrington* opinions are inconsistent with *ATSI* and similar cases requiring more than speculative inferences to state a market manipulation claim.

131, 139 (2d. Cir. 2001). "Motives that are generally possessed by most corporate directors and officers do not suffice." *Id.* GTII's conclusory assertions of motive fall short for at least four reasons.

*First*, simple math belies the allegation that the Defendants collectively earned "millions of dollars" from selling shares of GTII's stock. ¶ 63. GTII alleges that the Defendants collectively bought 77,558 shares of its stock at artificially depressed prices. ¶ 68. For Defendants to have earned even *one* million dollars from selling those shares—much less the "millions" GTII alleges—they would have had to earn an average of $12.89 from the sale of each share of stock they allegedly bought ($1 million divided by 77,558 shares). Yet GTII's stock never traded anywhere close to $12.89 per share during the Relevant Period (and, of course, it would have had to trade still higher than $12.89 to generate "millions" in profits net of the amount Defendants would have paid to buy the stock). The Court need not accept allegations of scienter that are "belied by logic." *In re Duane Read Inc. Sec. Litig.*, 2003 WL 22801416, at *9 n.12 (S.D.N.Y. Nov. 25, 2003).

*Second*, the Amended Complaint fails to allege whether the same party was on both sides of the market—in other words, it does not allege that the same party entered both the supposed "Baiting Sell Orders" and the "Genuine Buy Orders" that purportedly allowed a profit. This is likewise fatal to GTII's claims: without specific allegations that a given set of "Baiting Sell Orders" and "Genuine Buy Orders" were all entered by the same party, there can be no inference that Defendants had a motive to commit fraud.

*Third*, GTII's generic allegations that Defendants were motivated to help clients spoof for "commissions" and "fees," "collecting execution costs," and by avoiding expenditures associated with maintaining adequate controls and compliance procedures, ¶ 64, are too vague to establish scienter. *See, e.g., Union Cent. Life Ins. Co. v. Ally Financial, Inc*., 2013 WL 2154220, at *3 (S.D.N.Y. March 29, 2013) (allegation that defendants "had a motive to grow profits and generate commissions is also totally insufficient to demonstrate scienter."). The same is true of Plaintiffs'

claim that certain Defendants were motivated by an opportunity to "make millions of dollars," ¶ 63, from the bid-ask spread. In any event, GTII pleads no specifics whatsoever regarding any Defendant's supposed profit motives. Such threadbare allegations fall far short of the particularity required to plead the required strong inference of scienter. *In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 305 (S.D.N.Y. 2009) ("Plaintiff's conclusory allegations regarding Defendants' motive . . . to obtain fees for services . . . are insufficient.").

*Finally*, to the extent any Defendants were facilitating client trading in exchange for a fee (rather than profiting from the bid-ask spread), they had no motive to facilitate spoofing. Yet GTII has not alleged that any Defendant's fees for facilitating supposed "Baiting Orders" were higher than the fees they would have collected for any other orders. Without some explanation of how the alleged spoofing caused an increase in any Defendant's fees, GTII has not adequately alleged a "concrete and personal benefit . . . resulting from the fraud." *Kalnit*, 264 F.3d at 139.

### 3. *GTII fails to allege conscious misbehavior or recklessness.*

Because GTII has not plausibly alleged that Defendants had a motive to engage in spoofing, the strength of its allegations of circumstantial evidence of conscious misbehavior or recklessness "must be correspondingly greater." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009) (citation omitted). GTII attempts to meet that heightened standard by rehashing its allegations that Defendants placed and cancelled "Baiting Orders." ¶¶ 179-81. But these allegations—that multiple market participants placed and cancelled quotes to buy and sell securities at different prices—establish nothing more than that the Defendants are broker-dealers engaged in the very market-making activity through which prices are set every day in a functioning market.

To the extent GTII's claims rely on OTC Link trades, the nature of trading on that platform also provides a far more compelling inference for GTII's "cancellation" theory. Because broker-

dealers may only display one bid and one offer on OTC Link at a time, as GTII acknowledges, a market participant may have received a better-priced order from a client that it was required to display as its bid or offer, or the client order that the bid or offer may have represented could have been filled.

GTII's spoofing theory is further refuted by the fact that orders on OTC Link are not anonymous. Orders, volumes, and prices are attributed to specific market participants, and participants therefore know which broker-dealer is quoting at what price. If, as GTII alleges, each Defendant engaged in "thousands of spoofing episodes" over a 19-month period, other market participants would have recognized these as "Baiting Orders" that were "not intended to be executed" and the orders would, therefore, not have "induced other market participants to also submit their own sell orders," and create a "pile-on" effect that" drove down the price of GTII's shares." ¶ 67-68. Plaintiffs' speculative and conclusory allegations to the contrary do not pass the "common sense" test.

Nor can GTII's allegations concerning the supposed "repetition" of alleged Spoofing Orders and the "short time period between the placement and cancellation" of each order, ¶¶ 182-183, meet the heightened standard necessary to allege circumstantial evidence of scienter. Putting aside that GTII cannot tell if any orders were cancelled on OTC Link (or, instead, merely replaced), it is well known that the overwhelming majority of orders in the equity markets are never executed, so the "majority" are cancelled.[20] GTII's allegations regarding rapid cancellations, even if true, fail to show any misconduct, as "placing rapid orders and cancelling them does not necessarily evince illegal market activity," and "courts have recognized the ubiquity of rapid trading across securities platforms." *Kessev Tov, LLC v. Doe(s)*, 2022 WL 2356626, at *9 (N.D. Ill. June 30, 2022). Even if a

---

[20] Ex. 12, *The Speed of the Equity Markets*, SEC. EXCH. COMM'N, (Oct. 9, 2013), https://www.sec.gov/marketstructure/data-highlight/speed-equity-marketsp; *see supra* n. 2.

particular order was cancelled, the far more plausible explanation is that a Defendant or client cancelled the order without manipulative intent.

GTII attempts to plead scienter by alleging that the Defendants "regularly and intentionally 'rested' fictitious Spoofing Orders and Spoofing Quotations behind orders and quotes placed by other traders, which meant that they were extraordinarily unlikely to be executed." ¶ 181. Yet the Amended Complaint does not offer any specifics about the orders behind which the Defendants supposedly "rested" these fictitious orders. To the contrary, it repeatedly alleges that the Defendants entered supposed "Baiting Orders" at prices *lower* than what the Amended Complaint says was the best (*i.e.*, lowest) ask.[21] As but one of many examples, GTII alleges that on December 9, 2021, at 15:36:16, the best offer was $1.29 per share; yet during the prior two minutes, GTII alleges that a Defendant entered "15,300 shares of Baiting Orders . . . at a price of $1.00 per share." The Amended Complaint offers no explanation for the 29 cent discrepancy between the supposed "best offer" and the price at which the Defendant allegedly entered offers. Nor could it. If a Defendant entered orders *equal to or lower* than the supposed "best offer," that suggests that the Defendant's "Baiting Orders" were *more likely* to be executed, not "extraordinarily unlikely," as GTII alleges. Such glaring inconsistencies, which pervade the Amended Complaint, fatally undercut GTII's allegations of scienter.

---

[21] *Compare, e.g.*, ¶ 75 (alleging that the lowest offer at 09:56:14 was $3.75) *with* ¶ 76 (alleging that a Defendant placed orders between 09:54:14 to 09:56:14 at prices as low as $3.73); *compare* ¶ 79 (alleging that the lowest offer at 15:36:16 was $1.29) *with* ¶ 80 (alleging that a Defendant placed orders between 15:34:16 and 15:36:16 as low as $1.00); *compare* ¶ 124 (alleging that the lowest offer at 10:16:35 was $5.67) *with* ¶ 125 (alleging that a Defendant placed orders between 10:14:35 and 10:16:35 as low as $5.59); *compare* ¶ 137 (alleging that the lowest offer at 09:46:57 was $2.73) *with* ¶ 138 (alleging that a Defendant placed orders between 09:44:57 and 09:46:57 as low as $2.62); *compare* ¶ 158 (alleging that the lowest offer at 9:33:56 was $5.17) *with* ¶ 159 (alleging that a Defendant placed orders between 9:31:56 and 9:33:56 as low as $4.90); *compare* ¶ 171 (alleging that the lowest offer at 12:15:17 was $2.00) *with* ¶ 172 (alleging that a Defendant placed orders between 12:15:17 and 12:17:17 as low as $1.99).

GTII's argument that the so-called "Baiting Orders" are indicative of scienter is circular. GTII defines "Baiting Orders" as orders Defendants purportedly never intended to execute, but it provides no support for its assumption regarding Defendants' intent. GTII merely asserts—without any factual basis—that any time an order was purportedly cancelled, the party that placed the order must have never intended to execute it, and the order therefore had "no legitimate economic purpose." ¶ 2. GTII then labels such purportedly cancelled orders as "Baiting Orders," a term GTII uses to refer to offers to sell based on an entirely presumed manipulative intent. Such circular reasoning, where the evidence offered to support a claim is a repetition of the claim itself, cannot create a strong inference of scienter. *See, e.g., C.F.T.C. v. Wilson*, 2018 WL 6322024, at *15 (S.D.N.Y. Nov. 30, 2018) (dismissing Commodity Exchange Act market manipulation claim reliant on "circular" theory that prices were illegitimate because defendants intended to affect them); *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) ("It is rather circular to say that the Individual Defendants committed fraud by concealing their intent to commit fraud.") (cleaned up). Without more, "Plaintiff[] fail[s] to allege sufficient facts underpinning [its] allegations that [] the cancelled orders demonstrate a plan to deceive." *Kessev Tov*, 2022 WL 2356626, at *10.

GTII's conclusory allegation that to "maximize the speed of its market access and the execution of its spoofing strategy, each Defendant utilized algorithmic trading programs, through high frequency trading systems" to place thousands of "Baiting Orders" (¶ 5) is manifestly inadequate. GTII does not specify what programs each of the five distinct Defendants supposedly used to execute their schemes, who ran the programs, or how those programs were used. General assertions that Defendants—who are in the business of trading—used "trading programs" and "algorithms" are not enough to establish a strong inference of fraudulent intent. *See Schwab v. E*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 432-34 (S.D.N.Y. 2017) (dismissing complaint for failure to plead scienter where details about "E*TRADE's trading algorithms" were not alleged).

Commonplace algorithmic trading is not evidence of fraudulent intent, particularly since "placing rapid orders and cancelling them does not necessarily evince illegal market activity." *Kessev Tov*, 2022 WL 2356626, at *1, *9.

Finally, GTII pleads no facts showing any agent's or employee's intent that can be imputed to the Defendants. *See Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (plaintiff must plead "strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter" when defendant is an entity) (citation omitted). A lone conclusory allegation that "activities were approved by corporate officials," ¶ 185, is insufficient without details of what was approved, when, and by whom. *See, e.g., Glaser v. The9, Ltd*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient" to establish scienter). GTII does not allege, as it must, what trading practices were approved, when, or by which officials. Without alleging a single fact about what any employee (much less executive) of any Defendant knew about this supposed "scheme," GTII cannot satisfy the high bar for pleading scienter. *See, e.g., In re Adient plc Sec. Litig., 2020 WL 1644018*, at *28 (S.D.N.Y. Apr. 2, 2020) (dismissing for failure to plead scienter where plaintiff did not sufficiently allege executives had knowledge of, or reckless disregard for, falsity).

### C. GTII Does Not Adequately Allege Loss Causation

To state a claim for market manipulation, GTII must plead with particularity facts supporting a "legally cognizable loss" and a "causal connection between the [alleged manipulation or] material misrepresentation and the loss." *Cohen*, 722 F. Supp. 2d at 430 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005)). This requires GTII to "allege that [it] suffered [] *specific* economic harm as a result of Defendants' conduct." *In re Citigroup Auction Rate Sec. Litig*., 700 F. Supp. 2d at 307. (emphasis added). GTII fails to meet this standard.

GTII fails to sufficiently plead that Defendants' purported spoofing, even assuming spoofing occurred, caused GTII to sell or issue shares at prices lower than it otherwise would have. GTII's implausible, unadorned allegation that every sale during this 19-month period was affected by Defendants' alleged spoofing, and that its stock price continued to be affected long after the purportedly manipulative trades, falls far short of that standard. ¶¶ 191-197. Even if GTII was "regularly in the market and transacting throughout the [Relevant Period], while Defendants were also placing spoof orders, it does not follow that any particular trade of the Plaintiff[]—or necessarily any of the trades made by Plaintiffs—would have been affected by Defendants' alleged manipulative conduct." *In re Merrill, BOFA, & Morgan Stanley Sec. Litig.*, 2021 WL 827190, at *13 (S.D.N.Y. 2021). This is so because "[m]anipulative trading strategies like 'spoofing' . . . depend for their profitability on a reversion of prices to the market-level, meaning that the period of artificiality may be brief." *In re London Silver Fixing Ltd., Antitrust Litig.*, 332 F. Supp. 3d 885, 923 (S.D.N.Y. 2018). For that reason, "[e]ven pleading same-day, post-spoof trades does not justify an inference of injury without any factual allegations to support the inference that the effects of the spoof linger for the remainder of the trading day." *Gamma Traders I LLC v. Merrill Lynch Commodities, Inc*, 41 F.4th 71, 80 (2d Cir. 2022).

GTII does not claim that it sold even a single share (or that any of its sales were priced) during the windows of, at most, "one to two minutes" in which it alleges its share price was artificially depressed by a supposed episode of "spoofing." *E.g.*, ¶ 99-103. To the contrary, it alleges that immediately after the purported spoofing, the Defendants "eliminate[d] the artificial sell-side imbalance" and "dramatically revers[ed] the position [they] had taken only moments before." ¶ 103. GTII thus cannot allege it suffered losses based on stock sales it may have executed hours, days or weeks after the alleged spoofing, particularly since there are a "tangle of factors affecting price," and "the longer the time between" the alleged wrongful act and the sale, "the more likely that other factors

caused the loss." *Dura*, 544 U.S. at 343. "To infer otherwise would be to sustain a claim based on rank speculation prohibited by the Supreme Court's decisions in *Twombly* and *Iqbal*." *In re Merrill*, 2021 WL 827190, at *13. Thus, as in *Gamma Traders*, the "[c]omplaint provides no factual basis that would justify an inference that the market price was still artificial by the time [plaintiff] traded." 41 F.4th at 80.

Perhaps recognizing its failure to connect its trading to the specific alleged manipulation, GTII falls back on a claim that the alleged spoofing had a "long-term adverse effect on the market price of GTII's shares," and a "persistent and long-lasting impact" on its stock price. ¶ 192. It asks the Court to assume that the Defendants (i) drove its stock price down so they could buy shares at artificially low prices; (ii) drove the price back up so they could sell those shares at a profit; but that somehow (iii) over the "long term," this activity caused "persistent and long-lasting" declines in its stock price. The heightened pleading standards of the PSLRA do not permit such unvarnished speculation. The Second Circuit has declined to "infer that spoofing's effects last through the day," much less for weeks or months, without more specific allegations supporting such a theory. *Gamma Traders*, 41 F.4th at 80; *see also In re Merrill*, 2021 WL 827190, at *13 (spoofing that allegedly lasted "a matter of seconds" would not necessarily impact the trades of others). And GTII does not offer any such specifics. The wisdom of the Second Circuit's holding is underscored by the reality of this case: contrary to GTII's unexplained theory of long-term impact, its stock price dramatically *increased* during the Relevant Period, from $2.35 per share on March 25, 2021 to $4.34 per share on October 31, 2022. GTII cannot reconcile its theory of harm with this reality, and it does not even try. Its allegation of "persistent and long-lasting" effects of the alleged spoofing is not just speculative; it is entirely nonsensical.

If GTII is actually complaining about intermittent fluctuations in its stock price—notwithstanding the dramatic increase in that price over the entirety of the Relevant Period, and

although it does not make any such specific allegations—it fails to account for the many legitimate micro and macro forces that would have impacted that price. For example, between March 25, 2021, and October 31, 2022, GTII filed five quarterly and two annual reports with the Securities and Exchange Commission, each of which expressed "substantial doubt about [GTII's] ability to continue as a going concern" due to its lack of revenue. Each of these filings also warned GTII's investors that the company lacked adequate internal control over financial reporting. Without pleading any facts even attempting to disaggregate the impact of these investor warnings and other legitimate forces that may have caused investors to sell GTII's stock, GTII fails to adequately allege that Defendants' conduct affected its stock price. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) (holding that a plaintiff must disaggregate losses "caused by changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" to establish loss causation); *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (to allege loss causation, plaintiff must plead "facts that would allow a factfinder to ascribe some rough proportion of the whole loss" to defendant's violation).

GTII has "not specifically pleaded a causal link between any single stock purchase or sale and a corresponding [spoofing episode] by [any specific Defendant] or coordinated transactions by others." *Fezzani v. Bear, Stearns & Co. Inc.*, 777 F.3d 566, 572 (2d Cir. 2015) (affirming dismissal of market manipulation claim). Without such specifics, GTII has not alleged loss causation.

## II.   GTII's AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

After Defendants served GTII a letter indicating their intention to move to dismiss GTII's original Complaint (ECF 1), describing the grounds for their motion as required by Rule II (B)(1) of Judge Marrero's Individual Practices and the Court's April 6, 2023 Order (ECF 24), GTII "concur[red] that there are certain areas in which the Complaint could have been clearer or more specific in explaining the method, means, mechanics, and motivation of Defendants' schemes to

manipulate the share price of GTII's common stock downward, as well as the manner through which such implementation harmed GTII." *See* ECF 43 at 1. GTII had ample opportunity to review the arguments and authorities in Defendants' letter and to address them by amendment. But GTII failed to do this, and has not satisfied the heightened pleading requirements of Rule 9(b) and the PSLRA. Because there are no additional facts that GTII could plead to meet these requirements, further amendment would be futile. *E.g.*, *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 239 (S.D.N.Y. 2021).

## CONCLUSION

GTII's Amended Complaint should be dismissed with prejudice.

Dated: October 25, 2023          Respectfully submitted,

**KATTEN MUCHIN ROSENMAN LLP**
/s/ *Peter G. Wilson*
Peter G. Wilson
Christian T. Kemnitz (admitted *pro hac vice*)
Benjamin C. Levine (admitted *pro hac vice*)
525 West Monroe Street
Chicago, Illinois 60661-3693
Telephone: (312) 902-5200
peter.wilson@katten.com
christian.kemnitz@katten.com
benjamin.levine@katten.com

*Attorneys for Defendant GTS Securities LLC*

**CAHILL GORDON & REINDEL LLP**
/s/ *Herbert S. Washer* (with permission)
Herbert S. Washer
Jason M. Hall
32 Old Slip
New York, New York 10005
Telephone: (212) 701-3000
hwasher@cahill.com
jhall@cahill.com

*Attorneys for Defendant Credit Suisse Securities (USA) LLC*

**KEESAL, YOUNG & LOGAN**
A Professional Corporation
*/s/ Stephen Young* (with permission)
Stephen Young (admitted *pro hac vice*)
Elizabeth H. Lindh (admitted *pro hac vice*)
400 Oceangate Avenue, Suite 1400
Long Beach, California 90802
Telephone: (562) 436-2000
steve.young@kyl.com
elizabeth.lindh@kyl.com

*Attorneys for Defendant Lime Trading Corp.*