# **<u>EXHIBIT 2</u>**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)**
**OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

**Commission file number 000-10210**

# GLOBAL TECH INDUSTRIES GROUP, INC.
### (Formerly Tree Top Industries, Inc.)

| | |
|---|---|
| **Nevada** | **83-0250943** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| | |
| **511 Sixth Avenue, Suite 800** **New York, New York** | **10011** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**212.204.7926**
**Registrant's telephone number, including**
**area code:**

**Securities Registered Pursuant to Section 12(b) of the Act: None**

**Securities Registered Pursuant to Section 12(g) of the Act:**

**Common Shares, par value $0.001 per share**
**(Title of class)**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [  ] No [X]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes [  ] No [X]

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [  ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [  ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or a smaller reporting company (all as defined in Rule 12b-2 of the Exchange Act).

| | | | |
|---|---|---|---|
| Large Accelerated filer | [  ] | Accelerated filer | [  ] |
| Non-accelerated filer | [  ] | Smaller reporting company | [X] |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [  ] No [X]

The aggregate market value of voting stock held by non-affiliates of the registrant was approximately $10,260,000 as of April 13, 2016 (computed by reference to the last sale price of a share of the registrant's common stock on that date as reported by Financial Industry Regulatory Authority Bulletin Board).

There were 114,527,990 shares outstanding of the registrant's common stock as of April 15, 2017.

**Table of Contents**

**PART I**

Item 1. Business ................................................................................................................................ 3

Item 2. Properties .............................................................................................................................. 7

Item 3. Legal Proceeding ................................................................................................................. 7

Item 4. Mine Safety Disclosures

**PART II**

Item 5. Market for the Registrant's Common Equity and Related Stockholder Matters and Issuer Purchases of Equity Securities ... 8

Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations ... 9

Item 8. Financial Statements and Supplementary Data ................................................................. 13

Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure

Item 9A. Controls and Procedures .................................................................................................. 33

**PART III**

Item 10. Directors and Executive Officers and Corporate Governance ....................................... 35

Item 11. Executive Compensation ................................................................................................. 39

Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters ... 42

Item 13. Certain Relationships and Related Transactions, and Director Independence ............... 42

Item 14. Principal Accounting Fees and Services ......................................................................... 43

**PART IV**

Item 15. Exhibits, Financial Statements Schedules ....................................................................... 44

Signatures ...................................................................................................................................... 47

Certifications

Table of Contents

**PART I**

**ITEM 1. BUSINESS**

**General**

Global Tech Industries Group, Inc. ("Global Tech", "GTII" , "we". "our", "us", "the Company", "management") is a Nevada corporation which has been operating under several different names since 1980.

Western Exploration, Inc., a Nevada corporation, was formed on July 24, 1980. In 1990, Western Exploration, Inc. changed its name to Nugget Exploration, Inc. On November 10, 1999, a wholly owned subsidiary of Nugget Exploration, Inc., Nugget Holdings Corporation merged with and into GoHealthMD, Inc., a Delaware corporation. Shortly thereafter, Nugget Exploration, Inc. changed its name to GoHealthMD, Inc. a Nevada corporation.

On August 18, 2004, GoHealthMD, Inc., the Nevada Corporation, changed its name to Tree Top Industries, Inc. On July 7, 2017, Tree Top Industries, Inc. changed its name to Global Tech Industries Group, Inc. GoHealthMD, Inc. continues to exist as a Delaware corporation and wholly owned subsidiary of Global Tech Industries Group, Inc. MLN, Inc., BioEnergy Applied Technologies, Inc. ("BAT"), Eye Care Centers International, Inc., GoHealthMD Nano Pharmaceuticals, Inc., TTI Strategic Acquisitions and Equity Group, Inc., and TTII Oil & Gas, Inc., a Delaware corporation all were formed by Global Tech in the anticipation of technologies, products, or services being acquired. G T International, Inc. a Nevada corporation is an also wholly-owned subsidiary of Global Tech Industries Group, Inc, existing as a Wyoming corporation. Not all subsidiaries are currently active.

Effective August 12, 2009, Global Tech completed a stock exchange with BAT, BioEnergy Systems Management Inc., Wimase Limited and Energetic Systems Inc., LLC. whereby Global Tech acquired 100% of the issued and outstanding stock of BAT. BAT is the originator of various proprietary, clean-tech, environmentally friendly technologies and intellectual properties in the areas of hazardous waste destruction, energetic materials, chemical recycling processes, and coal gasification. BAT also maintains unique electrolytic technology that simplifies the production of bio fuels, specifically biodiesel and its byproducts. Global Tech acquired all the issued and outstanding shares of BAT. Global Tech issued 35,000 shares of its common stock, par value $.001 per share, to the stockholders of BAT in exchange for the transfer of all the issued and outstanding shares of common stock of BAT by such stockholders.

The Company also owns NetThruster, Inc., a Nevada corporation ("NetThruster"), which was formally known as Ludicrous, Inc. ("Ludicrous"). On January 28, 2011, the Board of Directors of Global Tech adopted resolutions approving the disposition by the Company of all the common stock of its wholly-owned subsidiary, NetThruster, Inc., a Delaware corporation ("NetThruster Delaware"), in a spin-off to Global Tech's shareholders on a pro rata basis (the "Spin-Off"). Thereafter, NetThruster Delaware would be owned by Global Tech's shareholders. David Reichman, the CEO of Global Tech was named Chairman of the Board, CEO and CFO of NetThruster Delaware. Kathy M. Griffin was named a Director and corporate secretary. The Board of Directors of NetThruster Delaware is comprised of David Reichman and Kathy Griffin. On February 9, 2011, Global Tech entered into a distribution agreement with NetThruster Delaware (the "Distribution Agreement"). The Spin-Off is governed by the Distribution Agreement. A copy of the Distribution Agreement is attached by reference. The Spin-Off was disclosed in a Form 8-K, filed on February 9, 2011, which announced that the NetThruster division would be spun-off into a separate entity. Subsequently, management and the board of directors agreed to postpone the spin-off indefinitely

Table of Contents

On May 25, 2011Global Tech signed a licensing agreement with WorldWithoutBlindness ("WWB") for the right to market and sell their patented eye screening equipment on a global basis outside the United States, for a period of two years. Eye Care Centers International, Inc, was formed to support the further growth and development of ("WWB"), an organization whose primary mission is to bring patented eye screening equipment to the developing world. The WWB technology uses objective parameters instead of traditional subjective eye chart examinations, to screen children as young as six months old. This agreement was extended an additional two years through May 25, 2015.

On December 31, 2012, Global Tech and its new subsidiary, TTII Oil & Gas, Inc., a Delaware corporation, signed a binding asset purchase agreement with American Resource Technologies, Inc. ("ARUR"), a Kansas corporation, to acquire all the assets of ARUR for a purchase price of $513,538, which was paid in the form of shares of Global Tech's common stock as described in the asset purchase agreement, which was disclosed in a Form 8 – K and is attached as an exhibit incorporated by reference. Subsequent to the Company's purchase of the assets and the termination of the operator, a mechanics lien has filed against the property claiming approximately $267,000 in fees are due to the previous operator. At December 31, 2012, due to the lien, the Company impaired the recorded cost, leaving no value associated with the acquisition. See Note 11 for detail of the assets acquired from ARUR. An action is pending in the District Court of Chautauqua County, Kansas, captioned Aesir Energy, Inc. vs. American Resource Technologies, Inc.; Nancy Ownbey Archer; Jimmy Stephen Ownbey; Robbie Faye Butts; Tree Top Industries, Inc.; and TTII oil & Gas, Inc. Management intends to vigorously contest AESIR's claims and, at this point, settlement appears unlikely. It has been presented in the County Court that some of ARUR's Directors have acted without authorization in this matter. No monetary claims have been asserted against Global Tech or TTII Oil & Gas, Inc. The Company has made several attempts to recover the shares of GTII stock paid to ARUR for the asset acquisition and the various costs and expenses expended by GTII in fulfillment of its obligations under the contract with ARUR. The failure of non-litigation attempts to resolve the matter resulted in filing an action for declaratory judgment in the US District Court for the Eastern District of New York, case#17-CV-0698. As of this writing the case has not yet been decided.

On December 30, 2016, Global Tech Industries Group, Inc., a Nevada corporation, executed a stock purchase agreement (the "Agreement"), which was signed and closed in Hong Kong, with GoFun Group, Ltd. through its wholly owned subsidiary Go F & B Holdings, Ltd. GoFun Group, Ltd. is a privately held company running a casual dining restaurant business, based in Hong Kong. Pursuant to the Agreement, GTII acquired all the issued and outstanding capital stock of Sky Sovereign (F&B), Ltd., Heartful Blessing Catering Investment Ltd., Shichirin Food & Beverage Corporation Ltd. and Go Inside Kitchen Ltd. for up to 73% of the issued and outstanding shares of GTII. The aforementioned companies (the "Companies") were acquired from Go F&B Holdings Ltd. (the "Seller"), a subsidiary of GoFun Group, Ltd., for 10% of the issued and outstanding shares of common stock of GTII, as of December 30, 2016. Additionally, the Seller may acquire up to an additional 63% of the issued and outstanding shares of common stock of GTII as of December 30, 2016, if certain thresholds have been met.

**Organizational History**

We were incorporated in 1980 under the laws of the State of Nevada under the name of Western Exploration, Inc. Western Exploration, Inc., a Nevada corporation, was formed on July 24, 1980. In 1990, Western Exploration, Inc. changed its name to Nugget Exploration, Inc. On November 10, 1999, a wholly-owned subsidiary of Nugget Exploration, Inc., Nugget Holdings Corporation merged with and into GoHealthMD, Inc., a Delaware corporation. Shortly thereafter, Nugget Exploration, Inc. changed its name to GoHealthMD, Inc. a Nevada corporation.

On August 18, 2004, GoHealthMD, Inc., the Nevada Corporation, changed its name to Tree Top Industries, Inc. On July 7, 2016, Tree Top Industries, Inc. changed its name to Global Tech Industries Group, Inc. GoHealthMD, Inc. continues to exist as a Delaware corporation and wholly-owned subsidiary of Global Tech Industries Group, Inc. NetThruster, Inc. MLN, Inc., BioEnergy Applied Technologies, Inc. (BAT"), Eye Care Centers International, Inc., GoHealthMD Nano Pharmaceuticals, Inc., TTI Strategic Acquisitions and Equity Group, Inc. and TTII Oil & Gas, Inc, all were formed by Global Tech in the anticipation of technologies, products or services being acquired. G T International, Inc. is a wholly owned subsidiary of Global Tech Industries Group, Inc., existing as a Wyoming corporation. Not all subsidiaries are currently active.

On December 31, 2012, Global Tech and its new subsidiary, TTII Oil & Gas, Inc., a Delaware corporation, signed a binding asset purchase agreement with American Resource Technologies, Inc. ("ARUR"), a Kansas corporation, to acquire all the assets of ARUR for a purchase price of $513,538, which was paid in the form of 466,853 shares of Global Tech's common stock as described in the asset purchase agreement. The shares were valued at $1.10 per share, based on the closing trading price of the common stock on the Closing Date. The assets purchased from ARUR include a 75% working interest in oil and gas leases in Kansas, as well as other oil field assets, a natural gas pipeline, currently shut down that is also located in Kansas, 25% interest in three other business entities operating in Kansas, and accounts receivables from two companies operating in Brazil in the amounts of $3,600,000 and $3,600,000 respectively. TTII Oil & Gas, Inc. also purchased three promissory notes in the amounts of $100,000, $100,000 and $350,000, as well an overdue contract for revenue in the amount of $1,000,000. Finally, a gun sight patent was also acquired from Century Technologies, Inc. TTII Oil & Gas, Inc. intends to pursue more opportunities in Kansas to expand the current leases, and to aggressively continue pumping oil from the thirteen currently operating wells. At the same time, both Global Tech Industries Group, Inc. and TTII Oil & Gas, Inc. intend to aggressively pursue the two companies located in Brazil, who are responsible for the over $7,000,000 dollars in monies owed to TTII Oil & Gas, Inc. All accounts and notes receivable were deemed uncollectable due to the age and circumstances, and therefore were assessed no value in the asset purchase. The equity ownerships were also deemed to be impaired due to the inactive nature of the entities, and were not allocated any value. The gun sight patent was also not readily assessable as to value and no purchase price was allocated to this asset. Also, due to the mechanic's lien and lawsuit on the oil leases, as well as the absence of an official reserve report, the oil lease was also impaired and no value was recorded for this asset. On September 2015, the Chautauqua County Court decided that American Resource Technologies Inc management and Board of Directors improperly acted and rendered the original Agreement a nullity. The Company has made several attempts to recover the shares of GTII stock paid to ARUR for the asset acquisition and the various costs and expenses expended by GTII in fulfillment of its obligations under the contract with ARUR. The failure of non-litigation attempts to resolve the matter resulted in filing an action for declaratory judgment in the US District Court for the Eastern District of New York, case#17-CV-0698. As of this writing the case has not yet been decided.

Table of Contents

On December 30, 2016, Global Tech Industries Group, Inc., a Nevada corporation, executed a stock purchase agreement (the "Agreement"), which was signed and closed in Hong Kong, with GoFun Group, Ltd. through its wholly owned subsidiary Go F & B Holdings, Ltd. GoFun Group, Ltd. is a privately held company running a casual dining restaurant business, based in Hong Kong. Pursuant to the Agreement, GTII acquired all the issued and outstanding capital stock of Sky Sovereign (F&B), Ltd., Heartful Blessing Catering Investment Ltd., Shichirin Food & Beverage Corporation Ltd. and Go Inside Kitchen Ltd. for up to 73% of the issued and outstanding shares of GTII. The aforementioned companies (the "Companies") were acquired from Go F&B Holdings Ltd. (the "Seller"), a subsidiary of GoFun Group, Ltd., for 10% of the issued and outstanding shares of common stock of GTII, as of December 30, 2016. Additionally, the Seller may acquire up to an additional 63% of the issued and outstanding shares of common stock of GTII as of December 30, 2016, if certain thresholds have been met.

**Research and Development**

Although Global Tech's staff is limited, it continues to monitor new developments and any emerging technologies.

**Intellectual Property**

Global Tech's success depends in part upon its ability to protect its core technology and other intellectual capital. To accomplish this, Global Tech relies on a combination of intellectual property rights, including patents, trade secrets, copyrights, trademarks, domain registrations and contractual protections. With the acquisition of Adesso Biosciences, Global Tech will have acquired two patents, associated intellectual properties, and other proprietary information in the field of molecular science.

With the acquisition of BAT, Global Tech acquired fifteen (15) intellectual properties pertaining to the construction of the mobile configuration and operation of the glyd-arc medical waste destruction unit, as well as an enhanced configuration and novel method for coal gasification.

As of December 31, 2012, pursuant to the ARUR asset purchase agreement, Global Tech purchased eight related patents for various features of a gun sight, as applied to different types of firearms. The Company has not had time to determine any viable use of the patents, and has not assigned a value to this intangible asset. Other than this purchased patent, Global Tech had received no patents in the United States and no patents in foreign jurisdictions. Global Tech has no pending patent applications in the United States and no pending patent applications in foreign jurisdictions. It had received no trademarks and had no pending trademark applications in the United States. It had no pending trademark applications in foreign countries and no non-U.S. trademark applications had been issued.

Global Tech generally controls access to and use of its software and other confidential information through (a) the use of internal and external controls, including physical and electronic security, contractual protections with employees, contractors, customers and partners, and (b) domestic and foreign copyright laws.

There is currently no use or activity involving the intellectual properties of the Company, and accordingly, there is no recorded value assigned to these assets.

**Government Regulation**

BAT

According to the Environmental Protection Agency ("EPA"), no registration of the BAT system is required because the waste destruction process does not involve incineration. Incineration processes are subject to regulation by the EPA. However, any hazardous waste destruction system that is constructed will be subject to the state laws and regulations where the system is located, as well as any regulations pertaining to the storage, transporting and/or destroying hazardous waste. BAT is also subject to government laws and regulations governing health, safety, working conditions, employee relations, wrongful termination, wages, taxes and other matters applicable to businesses in general.

Table of Contents

NetThruster

NetThruster is subject to various federal, state and local laws affecting the telecommunications and Internet industries. Laws and regulations that apply to communications and commerce conducted over the Internet are becoming more prevalent, both in the United States and internationally, and may impose additional burdens on companies conducting business online or providing Internet-related services such as ours. The laws relating to the liability of private network operators for information carried on or disseminated through their networks are unsettled, both in the United States and abroad. Network operators have been sued in the past, sometimes successfully, based on the content of material disseminated through their networks. The Federal Trade Commission and equivalent state agencies regulate advertising and representations made by businesses in the sale of their products, which apply to us. NetThruster is also subject to government laws and regulations governing health, safety, working conditions, employee relations, wrongful termination, wages, taxes and other matters applicable to businesses in general.

GoHealthMD Nano Pharmaceuticals, Inc.

Governmental authorities in the U.S. and other countries extensively regulate the research, development, testing, manufacture, labeling, promotion, advertising, distribution and marketing, among other things, of biologic products. All our foreseeable product candidates are expected to be regulated.

Oil & Gas Properties

Oil and gas properties are subject to various levels of government controls and regulations in the United States. Legislation affecting the oil and gas industry has been pervasive and is under constant review for amendment or expansion. Pursuant to such legislation, numerous federal, state and local departments and agencies have issued extensive rules and regulations binding on the oil and gas industry and its individual members, some of which carry substantial penalties for failure to comply. Such laws and regulations have a significant impact on oil and gas drilling, gas processing plants and production activities, increase the cost of doing business and, consequently, affect profitability. Inasmuch as new legislation affecting the oil and gas industry is commonplace and existing laws and regulations are frequently amended or reinterpreted, we are unable to predict the future cost or impact of complying with such laws and regulations. A breach or violation of such laws and regulations may result in the imposition of fines and penalties. At present, we do not believe that compliance with environmental legislation and regulations will have a material effect on our operations; however, any changes in environmental legislation or regulations or in our activities may cause compliance with such legislation and/or regulation to have a material impact on our operation. In addition, certain types of operations require the submission and approval of environmental impact assessments. Environmental legislation is evolving in a manner that means stricter standards, and enforcement, fines and penalties for non-compliance are becoming more stringent. Environmental assessments of proposed projects carry a heightened degree of responsibility for companies and directors, officers and employees. The cost of compliance with changes in governmental regulations has a potential to reduce the profitability of operations. We intend to ensure that we comply fully with all environmental regulations relating to our operations.

Restaurant Properties

The Hotel, Restaurant, and Food Service Industries in Hong Kong are subject to many of the same government ordinances and regulations that are prevalent in the United States and other western countries, among them food safety, wages, tips and taxes, child and teen labor, immigration, disabilities protection, proper labelling and storage of food, and applicable building safety codes.

Competition

BAT

There are currently no direct competitors offering this new and novel technology into the waste destruction market. The major companies that deal in hazardous waste management are companies such as Waste Management, Inc. Those companies treat, haul and store hazardous waste in landfills across the country. Some companies destroy hazardous waste, or any carbon-based waste in general, through incineration, which produces a significant carbon footprint and can be as expensive as the storing model. The competitive disadvantage for the BAT process is that it is uncommercialized technology at present, which makes the process of acquiring adequate funding more difficult.

Table of Contents

NetThruster

The content delivery network market is highly competitive and is characterized by constantly declining prices and multiple types of vendors offering varying combinations of computing and bandwidth to content providers. A few of NetThruster's current competitors, as well as a number of NetThruster's potential competitors, have longer operating histories, greater name recognition, broader customer relationships and industry alliances, and substantially greater financial, technical and marketing resources than we do.

GoHealthMD Nano Pharmaceuticals, Inc.

This subsidiary has been organized for the future acquisition of companies involved in the treatment of human disease through nanotechnology and molecular diagnostics. However, such acquisitions have not yet been completed. Therefore this subsidiary is currently inactive with no operations. However, other companies, such as Nanoshpere, Inc., are in the treatment of human disease through nanotechnology and the molecular diagnostics industry.

Oil & Gas Properties:

Oil and gas exploration, and acquisition of undeveloped properties are highly competitive and speculative businesses. We compete with a number of other companies, including major oil and gas companies and other independent operators that are more experienced and which have greater financial resources. We do not hold a significant competitive position in the oil and gas industry.

Restaurant Properties

The restaurant industry in Hong Kong has been growing rapidly, resulting in a highly competitive landscape. The Hong Kong consumer spends almost 60% of his food budget outside the home, paving the way for a competitive marketplace, as restaurants of all kinds compete for the same dollars. Our restaurants cover several different representations of typical Hong Kong restaurant offerings and the Company believes this diversification will result in positive growth in 2017.

**Employees**

As of December 31, 2016, we employed two people on a full-time basis. Both employees are in executive positions.

**Seasonality**

Our operations are not expected to be affected by seasonal fluctuations, although our cash flow may be affected by fluctuations in the timing of cash receipts from our customers.

**ITEM 2. PROPERTIES**

Currently, GTII does not lease, rent or own any property, other than its office which acts only as a mail receipt center.

**ITEM 3. LEGAL PROCEEDINGS**

During April 2012, the Company filed suit in Los Angeles Superior Court against GeoGreen Biofuels, Inc. and related parties, relating to GeoGreen's failure to repay $192,000 advanced pursuant to a Bridge Loan Term Sheet. Although litigation is inherently unpredictable, GTII is confident in its position, and intends to pursue the action aggressively. GeoGreen has filed a cross-complaint against the Company and its two officers, the Chief Executive Officer and the President, however the charges against the officers were subsequently dismissed with prejudice. A motion was also passed denying GeoGreen's motion to strike GTIIs request for punitive damages. The Company has dropped its law suit for the time being.

On February 3, 2017, the Company filed suit in Eastern District Federal Court New York against American resource Technologies, Inc., and several directors and officers relating to the Chautauqua County Court Kansas decision nullifying the Agreement. The Company has made several attempts to recover the shares of GTII stock paid to ARUR for the asset acquisition and the various costs and expenses expended by GTII in fulfillment of its obligations under the contract with ARUR. The failure of non-litigation attempts to resolve the matter resulted in filing an action for declaratory judgment in the US District Court for the Eastern District of New York, case#17-CV-0698. As of this writing the case has not yet been decided.

Table of Contents

During March 2013, the Company was named in an action pertaining to the 75% working interest in the Ownbey Lease. Subsequent to the Company's purchase of the assets and the termination of the operator, a mechanics lien was filed against the property claiming approximately $267,000 in fees are due to the previous operator. An action is pending in the District Court of Chautauqua County, Kansas, captioned Aesir Energy, Inc. vs. American Resource Technologies, Inc.; Nancy Ownbey Archer; Jimmy Stephen Ownbey; Robbie Faye Butts; Global Tech Industries Group, Inc. and TTII oil & Gas, Inc. Management intends to vigorously contest AESIR's claims and, at this point, settlement appears unlikely. It has been presented in the County Court that some of ARUR's Directors have acted without authorization in this matter, and GTII's management is assessing how to proceed at this time. No monetary claims have been asserted against GTII or TTII Oil & Gas, Inc. On the 3rd of February 2017, GTII filed an action for declaratory relief in the Eastern District of New York, for the purpose of recovering the costs, expenses and consideration paid to ARUR for the rights and benefits associated with an Oil and Gas transaction entered into between the parties on December 31st 2012. The action by GTII is predicated on the underlying contract for the sale of the assets of ARUR being vacated by a local Kansas Court on the basis that the company and its officers lacked the authority to enter into the contract. Because of that decision GTII lost all interest in the transaction, their associated benefits and any financial gain that may have been anticipated. Attempts were made to resolve this without litigation but have been unsuccessful. The matter is proceeding accordingly. The Company has made several attempts to recover the shares of GTII, f/k/a TTI stock paid to ARUR for the asset acquisition and the various costs and expenses expended by GTII in fulfillment of its obligations under the contract with ARUR. The failure of non-litigation attempts to resolve the matter resulted in filing an action for declaratory judgment in the US District Court for the Eastern District of New York, case#17-CV-0698. As of this writing the case has not yet been decided.

PART II

## ITEM 5. MARKET FOR THE REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES.

GTII's common stock is quoted through the over-the-counter market on the OTC Market Group, Inc. Board. ("PINK") under the symbol "GTII." Prior to 2010, there was limited trading of GTII's common stock. Liquidity improved in 2010. The following table sets forth high and low sales prices of GTII common stock for each fiscal quarter for the last two fiscal years as reported by the OTCMarkets., based on closing prices. The prices in the table reflect inter-dealer prices, without retail markup, markdown or commission and may not represent actual transactions. The stock prices have been restated for the 10 for 1 forward stock split.

| Year Ended December 31, 2015 | High | | Low | |
|---|---|---|---|---|
| First Quarter ended March 31, 2015 | $ | 0.01 | $ | 0.01 |
| Second Quarter ended June 30, 2015 | $ | 0.01 | $ | 0.01 |
| Third Quarter ended September 30, 2015 | $ | 0.01 | $ | 0.01 |
| Fourth Quarter ended December 31, 2015 | $ | 0.01 | $ | 0.01 |

| Year Ended December 31, 2016 | High | | Low | |
|---|---|---|---|---|
| First Quarter ended March 31, 2016 | $ | 0.56 | $ | 0.16 |
| Second Quarter ended June 30, 2016 | $ | 0.76 | $ | 0.03 |
| Third Quarter ended September 30, 2016 | $ | 0.45 | $ | 0.25 |
| Fourth Quarter ended December 31, 2016 | $ | 0.38 | $ | 0.15 |

As of April 15, 2016, there were approximately 812 record holders of GTII common stock, not including shares held in "street name" in brokerage accounts, which are unknown. As of April 15, 2017, there were 114,527,990 approximately of GTII's common stock outstanding on record.

### Dividends

GTII has not declared or paid any cash dividends on its common stock.

### Transfer Agent and Registrar

The transfer agent and registrar for GTII's common stock is Old Monmouth Stock Transfer Co., Inc. The Company email address is: www. transferagent@oldmonmouthe.com, and the phone number is 732-872-2727.

### Repurchases of Our Securities

None of the shares of our common stock were repurchased by the Company during the fiscal year ended December 31, 2015.

### Sales of Our Unregistered Securities during 2016 Not Previously Disclosed

On July 6, 2016, GTII issued 7,715,420 shares for cash of $370,000 on a private placement exemption, that was not registered with the SEC.

Table of Contents

**ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Cautionary Statements**

This Form 10-K may contain "forward-looking statements," as that term is used in federal securities laws, about Global Tech's consolidated financial condition, results of operations and business. These statements include, among others:

- statements concerning the potential benefits that may be experienced from business activities and certain transactions contemplated or completed; and

- statements of our expectations, beliefs, future plans and strategies, anticipated developments and other matters that are not historical facts. These statements may be made expressly in this Form 10K. You can find many of these statements by looking for words such as "believes," "expects," "anticipates," "estimates," "opines," or similar expressions used in this Form 10-K. These forward-looking statements are subject to numerous assumptions, risks and uncertainties that may cause our actual results to be materially different from any future results expressed or implied in those statements. The most important facts that could prevent us from achieving our stated goals include, but are not limited to, the following:

a) volatility or decline of Global Tech's stock price; potential fluctuation of quarterly results;

b) potential fluctuation of quarterly results;

c) failure to earn revenues or profits;

d) inadequate capital to continue or expand our business, and inability to raise additional capital or financing to implement our business plans;

e) failure to commercialize our technology or to make sales;

f) decline in demand for our products and services;

g) rapid adverse changes in markets;

h) litigation with or legal claims and allegations by outside parties against GTII, including but not limited to challenges to intellectual property rights;

i) insufficient revenues to cover operating costs; and

Table of Contents

There is no assurance that we will be profitable, we may not be able to successfully develop, manage or market our products and services, we may not be able to attract and retain qualified executives and technology personnel, we may not be able to obtain customers for our products or services, our products and services may become obsolete, government regulation may hinder our business, additional dilution in outstanding stock ownership may be incurred due to the issuance of more shares, warrants and stock options, or the exercise of outstanding warrants and stock options, and other risks inherent in our businesses.

Because the statements are subject to risks and uncertainties, actual results may differ materially from those expressed or implied by the forward-looking statements. We caution you not to place undue reliance on the statements, which speak only as of the date of this Form 10-K. The cautionary statements contained or referred to in this section should be considered in connection with any subsequent written or oral forward-looking statements that we or persons acting on our behalf may issue. We do not undertake any obligation to review or confirm analysts' expectations or estimates or to release publicly any revisions to any forward-looking statements to reflect events or circumstances after the date of this Form 10K, or to reflect the occurrence of unanticipated events.

Table of Contents

## PLAN OF OPERATIONS

With the suspension of the Company's oil operation, and the legal ruling that the oil properties were no longer the property of GTII, the Company has entertained and negotiated additional business ventures. On December 30, 2016, the Company negotiated the acquisition of several restaurants in Hong Kong and intends to expand its operations into that business sector during 2017. The Company continues to investigate the potential acquisitions of other opportunities in order to secure sufficient operations to support its administrative expenses, and will continue to do so in 2017.

This plan is totally dependent on the Chairman, David Reichman's continued support, as well as our ability to raise capital. Execution of the business plan is subject to this constraint as well as the finding of sufficient funding.

## RESULTS OF OPERATIONS

During the 2016 year, with the discontinuance of our oil operations, we realized revenues of $0, compared to $1,126 for 2015. Our oil operating expenses were $377 in 2016 compared to $11,987 in 2015, leaving a gross loss of $(377) and $(10,861), respectively. Much of the oil production expenses were for operator services in suspending operations. Our other operating expenses increased from $191,928 in 2015 to $7,996,611 in 2016. The increase was primarily the result of share based compensation of $7,026,736, issued to various individuals, professional, and management for services provided. General and administrative expenses increased from $124,039 to $938,558 or 691%, due to the expenses related to securing the acquisition of Go Fun. Compensation and professional fees increase by $6,961,305, due to the increased requirements from our professionals and management during 2016 to re-active the Company and get it current in its filings as a registrant, and in pursuing the legal activities disclosed herein. Depreciation expense decreased from $2,458 to $1,317.

Our net loss increased by $7,765,733 to $(8,074,026) in 2016 from $(308,293) in 2015. This translates to a $.08 decrease in loss per share from $(.00) in 2015 to $(0.08) in 2016. Included in our net loss was $7,562,882 and $0, for the value of common stock issued in 2016 and 2015 respectively. Excluding these non-cash expenses, our net loss would have been $511,144 and $308,293, respectively. We expect that our losses may increase in the coming year as we continue to develop our operations.

## LIQUIDITY AND CAPITAL RESOURCES

At December 31, 2016, we had cash on hand of $40,656 compared to $108 at December 31, 2015. We used cash in our operations of $358,180 in 2016 compared to $115,988 in 2015, an 282% increase. We had an increase in cash provided by investing activities in 2016 of $76,400 from the sale of treasury stock, compared to purchases only in 2015. We raised cash of $370,000 from the sale of our common stock or exercises of stock options in 2016 compared to $0 in 2015. However, we raised $450,624 and $118,338 from related party loans in 2016 and 2015, and $3,000 and $81,000 from other notes payable, respectively. We anticipate that we will continue to have a decrease in our cash flow from continuing operations of approximately $10,000 per month for 2017. We do not have sufficient cash on hand at December 31, 2016 to cover our negative cash flow. We will attempt to increase our operating activities and possibly raise capital through the sale of our common stock or through debt financing.

Some of Global Tech's past due obligations, including $338,000 of accounts payable, and $113,000 of notes payable and judgments, some of which are duplicative, were incurred or obtained prior to 2005. No actions have been taken by any of the applicable creditors. Action by any such creditor would materially decrease our liquidity. Global Tech has no credit facilities with which to resolve these outstanding obligations from prior years, but will fully resolve them upon a successful capital raise and monetary action of the business. This may have a negative impact on our future liquidity in the event we must prioritize the repayment of these obligations when capital becomes available. During 2013, Global Tech was successful in negotiating the conversion of $204,081 in accounts payable and the settlement of officer debt of $3,843,133 for shares of common stock and forgiveness. As of December 31, 2016, there is an amount due to officers and Directors equal to $876,077 as compared to $905,120 as of December 31, 2015, respectively, which may increase if such officers and/or Directors continue to provide additional sums of money and/or services that are payable upon demand. Our liquidity would decrease materially if any such officer or Director demanded repayment. These loans must be considered in any capital raise and could continue to restrict our liquidity upon such capital raise if repayment is thereby demanded. Global Tech shall attempt to cause these officers and Directors to request repayment in a way as to not materially harm the Company's liquidity.

11

Table of Contents

Any remedy to our current lack of liquidity must take into account all the foregoing liabilities. Global Tech intends to continue its pursuit to raise capital in order to monetize its business and pay all its liabilities. Capital raise plans are under consideration but it cannot be assured that they will materialize in the current economic environment. Currently, Global Tech is without adequate financing or assets. Because no actions have been taken on the aforementioned past due obligations and demand has not been made by the applicable officers or Directors, we are unable to accurately quantify the effect the overdue accounts have on Global Tech's financial condition, liquidity and capital resources. However, in the event that all of these obligations and notes payable were required to be paid in an amount equal to the full balance of each, Global Tech would not be able to meet the obligations based upon its current financial status. The liquidity shortfall of $3,028,119 would cause GlobalTech to default and, further, would put our continued viability in jeopardy.

**CONTRACTUAL OBLIGATIONS**

**None**

**Critical Accounting Policies and Estimates**

Our discussion and analysis of our financial condition and results of operations are based upon our consolidated financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles. These principles require us to make estimates and judgments that affect the reported amounts of assets, liabilities, revenue and expenses, cash flow and related disclosure of contingent assets and liabilities. Our estimates include those related to revenue recognition, accounts receivable reserves, income and other taxes, stock-based compensation and equipment and contingent obligations. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results may differ from these estimates. To the extent that there are material differences between these estimates and our actual results, our future financial statements will be affected.

We define our "critical accounting policies" as those U.S. generally accepted accounting principles that require us to make subjective estimates about matters that are uncertain and are likely to have a material impact on our financial condition and results of operations as well as the specific manner in which we apply those principles. Our estimates are based upon assumptions and judgments about matters that are highly uncertain at the time the accounting estimate is made and applied and require us to continually assess a range of potential outcomes. A detailed discussion of the critical accounting policies that most affect our company is located in Footnote 2 of the notes to our financial statements.

Table of Contents

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

KSP GROUP, INC.
CERTIFIED PUBLIC ACCOUNTING FIRM

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Board of Directors and Stockholders of

Global Tech Industries Group, Inc.

We have audited the accompanying consolidated balance sheets of Global Tech Industries Group, Inc. as of December 31, 2016 and 2015 and the related consolidated statements of operations, changes in stockholders' equity and cash flows for the years then ended. These consolidated financial statements are the responsibility of the Company management. Our responsibility is to express an opinion on these financial statements based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audits included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Global Tech Industries Group, Inc. at December 31, 2016 and 2015, and the results of their operations and their cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1, the Company has incurred significant accumulated deficits, recurring operating losses and a negative working capital. This and other factors raise substantial doubt about the Company's ability to continue as a going concern. Management's plans in regard to these matters are also discussed in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

/s/ KSP Group

Los Angeles, CA
April 17, 2017

13

Table of Contents

**Global Tech Industries Group, Inc.**

Consolidated Balance Sheets

| | | December 31, 2016 | | December 31, 2015 |
|---|---|---|---|---|
| **CURRENT ASSETS** | | | | |
| Cash and cash equivalents | $ | 40,656 | | 108 |
| Prepaid expenses | | 130,345 | | - |
| Marketable securities | | 115,388 | | 106,144 |
| | | | | |
| Total Current Assets | | 286,389 | | 106,252 |
| | | | | |
| Property and Equipment (net) | | 1,679 | | 2,995 |
| | | | | |
| TOTAL ASSETS | $ | 288,068 | $ | 109,247 |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | | | |
| | | | | |
| **CURRENT LIABILITIES** | | | | |
| Accounts payable and accrued expenses | $ | 860,246 | $ | 928,289 |
| Accrued interest payable | | 395,714 | | 309,249 |
| Asset retirement obligation | | 101,250 | | 101,250 |
| Due to officers and directors | | 135,062 | | 164,105 |
| Notes payable- in default | | 315,040 | | 270,840 |
| Current portion of long-term debt-related party | | 744,015 | | 741,015 |
| Current portion of long-term debt | | 763,181 | | 807,382 |
| | | | | |
| Total Current Liabilities | | 3,314,508 | | 3,322,130 |
| | | | | |
| Total Liabilities | | 3,314,508 | | 3,322,130 |
| | | | | |
| **STOCKHOLDERS' (DEFICIT)** | | | | |
| Preferred Stock, par value $.001, 50,000 authorized, 1,000 issued | | 1 | | - |
| Common stock, par value $0.001 per share, 350,000,000 shares authorized; 124,527,990 and 92,250,890 Issued 114,527,990 and 84,250,890 outstanding, respectively | | 124,527 | | 92,251 |
| Additional paid-in-capital | | 158,006,082 | | 149,088,549 |
| Unearned ESOP shares | | (2,876,000) | | (2,176,000) |
| Accumulated other comprehensive income | | 88,251 | | 77,592 |
| Retained (Deficit) | | (158,369,301) | | (150,295,275) |
| | | | | |
| Total Stockholders' (Deficit) | | (3,026,440) | | (3,212,883) |
| | | | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' (DEFICIT) | $ | 288,068 | $ | 109,247 |

The accompanying notes are an integral part of these consolidated financial statements.

14

Table of Contents

**Global Tech Industries Group, Inc.**

Consolidated Statements of Operations

| | For the Years Ended December 31, | |
|---|---|---|
| | **2016** | **2015** |
| REVENUES, net | - | 1,126 |
| COST OF SALES, net | 377 | 11,987 |
| GROSS PROFIT/(LOSS) | (377) | (10,861) |
| OPERATING EXPENSES | | |
| General and administrative | 938,558 | 124,039 |
| Compensation and professional fees | 7,026,736 | 65,431 |
| Depreciation | 1,317 | 2,458 |
| Total Operating Expenses | 7,996,611 | 191,928 |
| OPERATING LOSS | (7,966,988) | (202,789) |
| OTHER INCOME (EXPENSES) | | |
| Interest income | 303 | - |
| Interest expense | (107,341) | (105,504) |
| Total Other Income (Expenses) | (107,038) | (105,504) |
| LOSS BEFORE INCOME TAXES | (8,074,026) | (308,293) |
| INCOME TAX EXPENSE | - | - |
| NET LOSS | $ (8,074,026) | $ (308,293) |
| OTHER COMPREHENSIVE INCOME /(LOSS) net of taxes | | |
| Unrealized gain (loss) on held for sale marketable securities | 10,659 | 26,193 |
| COMPREHENSIVE LOSS | $ (8,063,367) | $ (282,100) |
| BASIC AND DILUTED LOSS PER SHARE | $ (0.08) | $ (0.00) |
| WEIGHTED AVERAGE NUMBER OF SHARES OUTSTANDING, BASIC AND DILUTED | 97,912,754 | 84,250,890 |

The accompanying notes are an integral part of these consolidated financial statements.

15

Table of Contents

**Global Tech Industries Group, Inc.**

Consolidated Statement of Stockholders' Deficit
For the years ended December 31, 2016 and 2015

| | Preferred Stock | | Common Stock | | Additional Capital | Unearned ESOP Shares | Retained (Deficit) | Accumulated Other Comprehensive Income | Total Equity |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | |
| Balance, December 31, 2014 | - | $ - | 92,250,890 | $ 92,251 | $149,075,109 | $(2,176,000) | $(149,986,982) | $ 51,400 | $(2,944,222) |
| Imputed interest – loan | - | - | - | - | 13,440 | - | - | | 13,440 |
| Unrealized gain on marketable securities | | | | | | | | 26,192 | 26,193 |
| Net loss for the year ended December 31, 2015 | - | - | - | - | - | - | (308,293) | | (308,293) |
| Balance, December 31, 2015 | - | $ - | 92,250,890 | $ 92,251 | $149,088,549 | $(2,176,000) | $(150,295,275) | $ 77,592 | $(3,212,883) |
| Preferred stock issuance | 1,000 | 1 | | | | | | | 1 |
| Common stock issued for cash | | | 7,715,420 | 7,715 | 362,285 | | | | 370,000 |
| Common stock issued for services | | | 24,561,680 | 24,561 | 7,768,664 | (700,000) | | | 7,793,225 |
| Imputed interest – loan | - | - | - | - | 13,440 | - | - | | 13,440 |
| Unrealized gain on marketable securities | | | | | | | | 10,659 | 10,659 |
| Gain on sale of treasury shares | | | | | 73,144 | | | | 73,144 |
| Net loss for the year ended December 31, 2016 | - | - | - | - | - | - | (8,074,026) | | (8,074,026) |
| Balance, December 31, 2016 | 1,000 | $ 1 | 124,527,990 | $ 124,527 | $158,006,082 | $(2,876,000) | $(158,369,301) | $ 88,251 | $(3,026,440) |

The accompanying notes are an integral part of these consolidated financial statements.

16

Table of Contents

**Global Tech Industries Group, Inc.**

Consolidated Statements of Cash Flows

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| CASH FLOWS FROM OPERATING ACTIVITIES | | |
| Net loss | $ (8,074,026) | $ (308,293) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Depreciation and amortization | 1,317 | 2,457 |
| Common stock issued for services rendered | 7,562,882 | - |
| Imputed interest on loan | 13,440 | 13,440 |
| Change in operating assets and liabilities, net of acquisition: | | |
| (Increase) decrease in accounts receivable | - | 2,385 |
| Increase (decrease) in accounts payable and accrued expenses | 138,207 | 174,023 |
| Net Cash Used in Operating Activities | (358,179) | (115,988) |
| CASH FLOWS FROM INVESTING ACTIVITIES | | |
| Cash received from sale of marketable securities | 75,884 | - |
| Cash paid for marketable securities | (1,415) | (1,931) |
| Net Cash provided by (used in) Investing Activities | 74,469 | (1,931) |
| CASH FLOWS FROM FINANCING ACTIVITIES | | |
| Cash received from share issuances | 370,000 | - |
| Cash received from notes payable | 3,000 | 81,000 |
| Cash paid to related party loans | (499,366) | (83,000) |
| Cash received from related party loans | 450,624 | 118,338 |
| Net Cash Provided by Financing Activities | 324,258 | 116,338 |
| INCREASE (DECREASE) IN CASH AND CASH EQUIVALENTS | 40,548 | (1,581) |
| CASH AND CASH EQUIVALENTS, BEGINNING OF PERIOD | 108 | 1,689 |
| CASH AND CASH EQUIVALENTS, END OF PERIOD | $ 40,656 | $ 108 |
| SUPPLEMENTAL DISCLOSURES: | | |
| Cash paid for interest | $ - | $ - |
| Cash paid for income taxes | $ - | $ - |
| NON-CASH INVESTING AND FINANCING ACTIVITIES: | | |
| Unrealized gain on marketable securities | $ 10,659 | $ 26,193 |
| Stock issued for services | $ - | $ - |

The accompanying notes are an integral part of these consolidated financial statements.

Table of Contents

**NOTE 1 - NATURE OF OPERATIONS**

**Organizational History**

We were incorporated in 1980 under the laws of the State of Nevada under the name of Western Exploration, Inc. Western Exploration, Inc., a Nevada corporation, was formed on July 24, 1980. In 1990, Western Exploration, Inc. changed its name to Nugget Exploration, Inc. On November 10, 1999, a wholly owned subsidiary of Nugget Exploration, Inc., Nugget Holdings Corporation merged with and into GoHealthMD, Inc., a Delaware corporation. Shortly thereafter, Nugget Exploration, Inc. changed its name to GoHealthMD, Inc. a Nevada corporation.

On August 18, 2004, GoHealthMD, Inc., the Nevada Corporation, changed its name to Tree Top Industries, Inc. On July 7, 2016, Tree Top Industries, Inc. changed its name to Global Tech Industries Group, Inc. GoHealthMD, Inc. continues to exist as a Delaware corporation and wholly owned subsidiary of Global Tech Industries Group, Inc. NetThruster, Inc. MLN, Inc., BioEnergy Applied Technologies, Inc. (BAT"), Eye Care Centers International, Inc., GoHealthMD Nano Pharmaceuticals, Inc., TTI Strategic Acquisitions and Equity Group, Inc., TTII Oil & Gas, Inc., and G T International, Inc. are also wholly owned subsidiaries of Global Tech Industries Group, Inc. Several of these subsidiaries have been formed by us in the anticipation of technologies, products or services being acquired. Not all subsidiaries are currently active.

On December 31, 2012, Global Tech and its new subsidiary, TTII Oil & Gas, Inc., a Delaware corporation, signed a binding asset purchase agreement with American Resource Technologies, Inc. ("ARUR"), a Kansas corporation, to acquire all the assets of ARUR for a purchase price of $513,538, which was paid in the form of 466,853 shares of Global Tech's common stock as described in the asset purchase agreement. The shares were valued at $1.10 per share, based on the closing trading price of the common stock on the Closing Date. The assets purchased from ARUR include a 75% working interest in oil and gas leases in Kansas, as well as other oil field assets, a natural gas pipeline, currently shut down that is also located in Kansas, 25% interest in three other business entities operating in Kansas, and accounts receivables from two companies operating in Brazil in the amounts of $3,600,000 and $3,600,000 respectively. TTII Oil & Gas, Inc. also purchased three promissory notes in the amounts of $100,000, $100,000 and $350,000, as well an overdue contract for revenue in the amount of $1,000,000. Finally, a gun sight patent was also acquired from Century Technologies, Inc.

During 2016 a Kansas court deemed the acquisition of the oil properties from ARUR as an invalid transaction, therefore all oil and gas operations have ceased and litigation has been commenced (See litigation). The Company intends to continue through legal channels to aggressively pursue the two companies located in Brazil, who are responsible for the over $7,000,000 dollars in monies owed to TTII Oil & Gas, Inc. All accounts and notes receivable were deemed uncollectable due to the age and circumstances, and therefore were assessed no value in the asset purchase. The equity ownerships were also deemed to be impaired due to the inactive nature of the entities, and were not allocated any value. The gun sight patent was also not readily assessable as to value and no purchase price was allocated to this asset. Also, due to the mechanic's lien and lawsuit on the oil leases, as well as the absence of an official reserve report, the oil lease was also impaired and no value was recorded for this asset.

On December 30, 2016, Global Tech Industries Group, Inc., a Nevada corporation, executed a stock purchase agreement (the "Agreement"), which was signed and closed in Hong Kong, with GoFun Group, Ltd. through its wholly owned subsidiary Go F & B Holdings, Ltd. GoFun Group, Ltd. is a privately held company running a casual dining restaurant business, based in Hong Kong. Pursuant to the Agreement, GTII acquired all the issued and outstanding capital stock of Sky Sovereign (F&B), Ltd., Heartful Blessing Catering Investment Ltd., Shichirin Food & Beverage Corporation Ltd. and Go Inside Kitchen Ltd. for up to 73% of the issued and outstanding shares of GTII. The aforementioned companies (the "Companies") were acquired from Go F&B Holdings Ltd. (the "Seller"), a subsidiary of GoFun Group, Ltd., for 10% of the issued and outstanding shares of common stock of GTII, as of December 30, 2016. Additionally, the Seller may acquire up to an additional 63% of the issued and outstanding shares of common stock of GTII as of December 30, 2017, if certain thresholds have been met. As of December 31, 2016, and the date of this report, the shares had not been exchanged with the GoFun shareholders, and due to the contingencies stated in the agreement having not been met, management has determined that the acquisition of GoFun has not been consummated, and has determined not to include the activities of GoFun in these financial statements.

**B) GOING CONCERN**

The accompanying financial statements have been prepared assuming that the Company will continue as a going concern. The Company incurred a net loss of $8,074,026 during the fiscal year ended December 31, 2016 and has an accumulated deficit of $158,369,301. During 2015 the Company incurred losses totaling $308,293 and is in default on several notes payable (see Note 5). The Company also has negative working capital of $3,028,119 and $3,215,878 at the years ended December 31, 2016 and 2015, respectively, and negative cash flow from operations of $358,179 and $115,988.

During 2013, the Company generated significant revenues and has left the exploration stage, however, the Company's revenues and cash flow are not sufficient enough to support all expenses of the Company. The Company as yet, still requires substantial financing. Most of the financing has been provided by David Reichman, the Chief Executive Officer and Chairman. The Company is dependent upon his ability and willingness to continue to provide the financing necessary to meet reporting and filing requirements of a public company.

In order for the Company to remain a going concern, it will need to continue to receive funds from equity or debt financing and increase its operating revenues from the oil and gas operations. There can be no assurance that the Company will continue to receive any proceeds from equity offerings or that the Company will be able to obtain the necessary funds to finance its operations. These conditions raise substantial doubt about its ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty.

Table of Contents

**NOTE 2 - SIGNIFICANT ACCOUNTING POLICIES**

A) PRINCIPLES OF CONSOLIDATION

The accompanying consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Ludicrous, Inc., BioEnergy Applied Technologies Inc., GoHealthMD, Inc., MLN, Inc., Universal Energy and Services Group, Inc. Sky Entertainment, Inc., Eye Care Centers International, Inc., GoHealthMD Nano Pharmaceuticals, Inc., TTI Strategic Acquisitions and Equity Group, Inc, TTII Oil & Gas, Inc., and G T International, Inc. All subsidiaries of the Company, other than TTII Oil & Gas, Inc., currently have no financial activity. All significant inter-company balances and transactions have been eliminated.

B) USE OF MANAGEMENT'S ESTIMATES

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities as of the date of the financial statements and the reported amounts of revenues and expenses during the reported period. Actual results could differ from those estimates. These financial statements have material estimates for valuation of stock and option transactions, and asset retirement obligations associated with the oil and gas operations.

C) CASH EQUIVALENTS

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents. Cash and cash equivalents are maintained with major financial institutions in the U S. Deposits held with these banks at times exceed $250,000 of insurance provided on such deposits. The Company has not experienced any losses in such accounts and believes that it is not exposed to any significant credit risk on cash and cash equivalents. At December 31, 2016 and 2015, no excess existed. There were no cash equivalents at December 31, 2016 and 2015.

D) FIXED ASSETS

Property, plant and equipment are stated at cost. Depreciation is computed using the straight-line method over the estimated useful lives of the related assets, ranging from 3 to 7 years for furniture, fixtures, machinery and equipment. Leasehold improvements are amortized over the lesser of the term of the lease or the economic life of the asset. Routine repairs and maintenance are expensed when incurred.

E) INCOME TAXES

The Company applies ASC 740 which requires the asset and liability method of accounting for income taxes. The asset and liability method requires that the current or deferred tax consequences of all events recognized in the financial statements are measured by applying the provisions of enacted tax laws to determine the amount of taxes payable or refundable currently or in future years. Deferred tax assets are reviewed for recoverability and the Company records a valuation allowance to reduce its deferred tax assets when it is more likely than not that all or some portion of the deferred tax assets will not be recovered.

The Company adopted ASC 740 at the beginning of fiscal year 2008. This interpretation requires recognition and measurement of uncertain tax positions using a "more-likely-than-not" approach, requiring the recognition and measurement of uncertain tax positions. The adoption of ASC 740 had no material impact on the Company's financial statements. Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carry forwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax bases. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all the deferred tax assets will to be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

F) REVENUE RECOGNITION

We recognize oil production revenues, when the oil is accepted and picked up by our service provider in accordance with ASC 605 Revenue Recognition and Revenue Arrangements with Multiple Deliverables. Revenue is recognized when the price is fixed or determinable, persuasive evidence of an arrangement exists, the service is performed and collectability of the resulting receivable is reasonably assured. If we subsequently determine that collection from that customer is not reasonably assured, we record an allowance for doubtful accounts and bad debt expense for all that customer's unpaid invoices and cease recognizing revenue for continued services provided until cash is received.

Table of Contents

G) STOCK-BASED COMPENSATION

The Company accounts for stock-based compensation in accordance with the provisions of ASC 718. ASC 718 requires all share-based payments to employees, including grants of employee stock options, to be recognized in the financial statements based on the grant-date fair value of the award. That cost will be recognized over the period during which an employee is required to provide service in exchange for the reward- known as the requisite service period. No compensation cost is recognized for equity instruments for which employees do not render the requisite service. The grant-date fair value of employee share options and similar instruments are estimated using the Black Scholes option-pricing model adjusted for the unique characteristics of those instruments.

Equity instruments issued to non-employees are recorded at their fair values as determined in accordance with ASC 718 and ASC 595, "Accounting for Equity Instruments That Are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling Goods and Services", and are periodically revalued as the stock options vest and are recognized as expense over the related service period.

H) INTANGIBLE ASSETS AND BUSINESS COMBINATIONS

The Company adopted ASC 805, "Business Combinations", and ASC 350, "Goodwill and Other Intangible Assets", effective June 2001 and revised in December 2007. ASC 805 requires the use of the purchase method of accounting for any business combinations initiated after June 30, 2002, and further clarifies the criteria to recognize intangible assets separately from goodwill. Under ASC 350, goodwill and indefinite−life intangible assets are no longer amortized, but are reviewed for impairment annually.

With the acquisition of BAT, Global Tech fifteen (15) intellectual properties pertaining to the construction of the mobile configuration and operation of the glyd-arc medical waste destruction unit, as well as an enhanced configuration and novel method for coal gasification. These intangibles have an undefined life as the intellectual property has yet to be commercialized. However, because there are no comparable properties, and because there is no cash-flow being generated from these intangibles, the Company could not determine a fair value at December 31, 2009 and therefore recorded an impairment of the entire capitalized value of $2,275,000.

With the acquisition of the assets of ARUR, the company acquired a patent for a gun sight. Since there was no available determinable value to the patent, no allocation of the purchase price was assigned to the patent. In addition, the Company acquired a 75% working interest in an Oil & Gas lease in the state of Kansas. Subsequent to the acquisition, the previous operator filed a mechanics lien on the property. The Company determined that due to this lien and loss of title to the assets, that the cost allocation to this asset would be written off as an impairment of a long-lived asset. The Company acquired various minority equity ownerships in inactive companies in Brazil and uncollectible receivables, therefore no purchase price allocation was assigned to these assets. No other intangible assets were acquired from this purchase.

I) FAIR VALUE OF FINANCIAL INSTRUMENTS

On January 1, 2008, the Company adopted ASC 820, "Fair Value Measurements" ASC 820 defines fair value, establishes a three-level valuation hierarchy for disclosures of fair value measurement and enhances disclosure requirements for fair value measures. The three levels are defined as follows:

[ ] Level 1 inputs to the valuation methodology are quoted prices (unadjusted) for identical assets or liabilities in active markets.

[ ] Level 2 inputs to the valuation methodology include quoted prices for similar assets and liabilities in active markets, and inputs that are observable for the asset or liability, either directly or indirectly, for substantially the full term of the financial instrument.

[ ] Level 3 inputs to the valuation methodology are unobservable and significant to the fair measurement.

The carrying amounts reported in the balance sheets for cash and cash equivalents, and current liabilities each qualify as financial instruments and are a reasonable estimate of fair value because of the short period of time between the origination of such instruments and their expected realization and their current market rate of interest. The carrying value of notes payable approximates fair value because negotiated terms and conditions are consistent with current market rates as of December 31, 2016 and 2015.

Marketable securities are reported at the quoted and listed market rates of the securities held at the year end.

Table of Contents

The following table presents the Company's Marketable securities and Notes Payable within the fair value hierarchy utilized to measure fair value on a recurring basis as of December 31, 2016 and 2015:

| | Level 1 | Level 2 | Level 3 |
|---|---|---|---|
| Marketable Securities – 2016 | 115,388 | -0- | -0- |
| Marketable Securities – 2015 | 106,144 | -0- | -0- |
| Notes payable - 2016 | -0- | -0- | $ 1,822,236 |
| Notes payable - 2015 | -0- | -0- | $ 1,819,236 |

The following table presents a Level 3 reconciliation of the beginning and ending balances of the fair value measurements using significant unobservable inputs as of December 31, 2016 and 2015:

| | Notes payable |
|---|---|
| Balance, December 31, 2014 | $ 1,738,236 |
| Note issuances | 164,000 |
| Note cancellations/payments | (83,000) |
| Balance, December 31, 2015 | $ 1,819,237 |
| Note issuances | 3,000 |
| Note cancellations/payments | - |
| Balance, December 31, 2016 | $ 1,822,236 |

## J) BASIC AND DILUTED LOSS PER SHARE

The Company calculates earnings per share in accordance with ASC 260, "Computation of Earnings Per Share." Basic loss per share is computed by dividing net income (loss) by the weighted-average number of shares of common stock outstanding during the period. Diluted earnings (loss) per share gives effect to dilutive convertible securities, options, warrants and other potential common stock outstanding during the period; only in periods in which such effect is dilutive. For 2016 and 2015, no common stock equivalent shares were excluded from the calculation as their effects are anti-dilutive, respectively. The ESOP shares issued during 2016 and 2015 have also been excluded from the calculation as they were issued but not outstanding.

| | For the Years Ended December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Loss (numerator) | $ (8,074,026) | $ (308,293) |
| Shares (denominator) | 97,912,754 | 84,250,890 |
| Basic and diluted loss per share | $ (.08) | $ (.00) |

Table of Contents

K) RECENT ACCOUNTING PRONOUNCEMENTS

The Company has implemented all new accounting pronouncements that are in effect. These pronouncements did not have any material impact on the financial statements unless otherwise disclosed, and the Company does not believe that there are any other new accounting pronouncements that have been issued that might have a material impact on its financial position or results of operations.

L) BENEFICIAL CONVERSION FEATURE OF DEBENTURES AND CONVERTIBLE NOTES.

In accordance with FASB ASC 470-20, *Accounting for Convertible Securities with Beneficial Conversion Features or Contingently Adjustable Conversion Ratios*, we recognize the advantageous value of conversion rights attached to convertible debt. Such rights give the debt holder the ability to convert his debt into common stock at a price per share that is less than the trading price to the public on the day the loan is made to us. The beneficial value is calculated as the intrinsic value (the market price of the stock at the commitment date in excess of the conversion rate) of the beneficial conversion feature of the debentures and related accruing interest, and is recorded as a discount to the related debt and an addition to additional paid in capital. The discount is amortized over the remaining outstanding period of related debt using the interest method.

M) IMPAIRMENT OF LONG-LIVED ASSETS

The Company has adopted FASB ASC 360 "*Accounting for the Impairment or Disposal of Long-Lived Assets,*" which requires that long-lived assets to be held and used be reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. Oil and gas interests accounted for under the full cost method are subject to a ceiling test, described below, and are excluded from this requirement.

N) OIL AND GAS INTERESTS

The Company utilizes the full cost method of accounting for oil and gas activities. Under this method, subject to a limitation based on estimated value, all costs associated with property acquisition, exploration and development, including costs of unsuccessful exploration; are capitalized within a cost center. No gain or loss is recognized upon the sale or abandonment of undeveloped or producing oil and gas interests unless the sale represents a significant portion of oil and gas interests and the gain significantly alters the relationship between capitalized costs and proved oil and gas reserves of the cost center. Depreciation, depletion and amortization of oil and gas interests is computed on the units of production method based on proved reserves. Amortizable costs include estimates of future development costs of proved undeveloped reserves.

Capitalized costs of oil and gas interests may not exceed an amount equal to the present value, discounted at 10%, of the estimated future net cash flows from proved oil and gas reserves plus the cost, or estimated fair market value, if lower, of unproved interests. Should capitalized costs exceed this ceiling, an impairment is recognized. The present value of estimated future net cash flows is computed by applying average prices, in the preceding twelve months, of oil and gas to estimated future production of proved oil and gas reserves as of year-end, less estimated future expenditures to be incurred in developing and producing the proved reserves and assuming continuation of existing economic conditions.

O) ASSET RETIREMENT OBLIGATIONS

The Company follows FASB ASC 410-20 "*Accounting for Asset Retirement Obligations,*" which addresses financial accounting and reporting for obligations associated with the retirement of tangible long-lived assets and the associated asset retirement costs.

FASB ASC 410-20 requires recognition of the present value of obligations associated with the retirement of tangible long-lived assets in the period in which it is incurred. The liability is capitalized as part of the related long-lived asset's carrying amount.

Over time, accretion of the liability is recognized as an operating expense and the capitalized cost is depreciated over the expected useful life of the related asset. The Company's asset retirement obligations are related to the plugging, dismantlement, removal, site reclamation and similar activities of its oil and gas exploration activities.

Table of Contents

P) Investments – Equity Method

The Company accounts for its investment in private entities using the equity method for investments where the Company's shares held are in excess of 20% of the outstanding shares of the investee. The Company acquired a 25% equity investment in three entities from Brazil. Due to the inactivity of the entities, the Company did not allocate any purchase price to these investments. The Company evaluates its cost investments for impairment of value annually. If cost investments become marketable they are reclassified to Marketable Securities-Available for Sale.

| Investments are as follows: | | |
|---|---|---|
| Balance, December 31, 2015 | $ | 0 |
| Investments acquired in ARUR asset purchase | | 0 |
| Realized gains and losses | | 0 |
| Unrealized gains and losses | | 0 |
| Balance, December 31, 2016 | $ | 0 |

Q) Marketable Securities-Available for Sale

The Company purchased marketable securities during 2012 and 2015. The Company's marketable securities are classified as "available for sale". Accordingly, the Company originally recognizes the shares at the market value purchased. The shares are evaluated quarterly using the specific identification method. Any unrealized holding gains or losses are reported as Other Comprehensive Income and as a separate component of stockholder's equity. Realized gains and losses are included in earnings. Also, other than temporary impairments are recorded as a loss on marketable securities in the statements of operations.

R) Accounts Receivable/Allowances for Doubtful Accounts

The Company regularly assesses the collectability of its accounts receivable, and considers receivables with aging exceeding 120 days to be potentially uncollectible. Management will analyze the need for an allowance for doubtful accounts at that time. As of December 31, 2016, and 2015, there are no allowances recorded.

S) Concentrations of Credit Risk

During the year ended December 31, 2015, the Company had one major customer, through which the Company sold 100% of its oil production. Although the Company believes comparable refineries could be contracted to pick up and purchase our oil the loss of this customer could have a temporary negative impact on the Company's operations.

**NOTE 3 - RELATED PARTY TRANSACTIONS**

The Company is indebted to the officers of the Company for unpaid wages and bonuses from previous years that were converted into Notes. The balances at December 31, 2016 and 2015 are $421,045 to Mr. Reichman and $206,670 to Mrs. Griffin, respectively. The notes bear interest at 5% are due at October 1, 2017 and are unsecured. Accrued interest on the officer loans at December 31, 2016 is $136,264.

Due to officers, as of December 31, 2016 and 2015 totals $135,062 and $170,105, respectively. These balances consist of net cash advances, and unpaid expense reimbursements due to David Reichman. The payables and cash advances are unsecured, due on demand and do not bear interest. During 2016 Mr. Reichman advanced $450,624 to the Company to cover operating expenses, and was repaid $499,366. During 2015 Mr. Reichman advanced $118,338, to the Company and was repaid $83,000. At December 31, 2016 and 2015, the balances due Mr. Reichman are $135,062 and $170,105, respectively.

During 2016 and 2015, a board member advanced $3,000 and $31,800, respectively. These totals consist of several small advances, each covered by separate notes that bear interest at 6%, are unsecured, and are due one year after the date of the advance or longer if extended. The total notes payable to this board member at December 31, 2016 and 2015 amount to $116,300 and $113,300, respectively. All notes to this officer become due during 2016 and are recorded as current liabilities.

Table of Contents

**NOTE 4 - FIXED ASSETS**

Depreciation expense was $1,317 and $2,458 during the years ended December 31, 2016 and 2015, respectively.

Fixed assets consist of the following:

|  | 2016 | 2015 |
|---|---|---|
| Computer equipment | $ 134,896 | $ 134,896 |
| Office equipment | 22,600 | 22,600 |
| Telephone equipment | 12,900 | 12,900 |
|  | 170,396 | 170,396 |
| Accumulated Depreciation | (168,717) | (167,401) |
|  | $ 1,679 | $ 2,995 |

**NOTE 5 - NOTES PAYABLE**

**(a)  NOTES PAYABLE:**

Notes payable consist of various notes bearing interest at rates from 5% to 9%, which are unsecured with original due dates between August 2000 and December 2016. All the notes are unpaid to date and several are in default and are thus classified as current liabilities. At December 31, 2016, notes payable amounted to $1,822,236. Below is a discussion of the details to the notes payable and a table summarizing the notes owed by the Company.

During 2002, the Company settled a trade payable in litigation by executing a note payable to a company on the amount of $18,000, interest accrues at 6% per annum, unsecured, due September 1, 2002, in default. Accrued interest at December 31, 2016 is $16,560.

Also during 2002, in settlement of another trade payable, the Company executed a note payable to a Company in the amount of $30,000, interest accrues at 6% per annum, unsecured, due September 12, 2002, in default. Accrued interest at December 31, 2016 is $25,099.

During 2000, the company executed a note payable to an individual in the amount of $25,000, interest accrues at 5% per annum, unsecured, due August 31, 2000, in default. Accrued interest at December 31, 2016 is $22,089.

In 2002, the Company settled an obligation with a consultant by executing a note payable for $40,000, interest accrues at 7% per annum, unsecured, due July 10, 2002, in default. Accrued interest at December 31, 2016 is $41,087.

On December 27, 2009, the Company executed a note payable to an individual for various advances to the Company in the amount of $292,860. On June 26, 2013, this note was renegotiated to include the accrued interest. The new note balance is $388,376 and interest accrues at 5% per annum, unsecured, and is extended to January 31, 2016, with monthly installments beginning in 2014 of $5,553, which did not occur. Accrued interest at December 31, 2016 is $68,232.

In January 27, 2010, the Company executed a note payable to a corporation in the amount of $192,000, bears no interest and is due on demand after 6 months of execution and is unsecured. No demand has been made at the date of these financial statements. Interest expense in the amount of $13,440 has been imputed for this note in 2016. An offsetting entry to Paid in Capital was made in connection with this adjustment.

On August 28, 2012, and September 17, 2012, the Company executed a note payable to a corporation in the amount of $12,000 and $20,000 respectively. On June 26, 2013, this note was renegotiated to include the accrued interest. The new note balance is $32,960 and interest accrues at 5% per annum, unsecured, and is extended to January 31, 2016, with monthly installments beginning in 2014 of $473, which did not occur, and is unsecured. Accrued interest at December 31, 2016 is $5,791.

Table of Contents

On April 12, 2012, the Company executed a note payable to a corporation in the amount of $100,000, however on June 26, 2013, this note was renegotiated to bear interest at 5% per annum, unsecured, extended to January 31, 2016, with monthly installments beginning in 2014 of $1,430, which did not occur. Accrued interest at December 31, 2016 is $17,568.

On December 31, 2012, the Company executed a note payable to a corporation in the amount of $32,000, however on June 26, 2013, this note was renegotiated to include accrued interest. The new note balance is $32,746, bears interest at 5% per annum, unsecured, extended to January 31, 2016, with monthly installments beginning in 2014 of $468, which did not occur. Accrued interest at December 31, 2016 is $5,752.

On December 3, 2012, the Company executed a note payable to a corporation in the amount of $5,000, however on June 26, 2013, this note was renegotiated to include accrued interest. The new note balance is $5,099, bears interest at 5% per annum, unsecured, extended to January 31, 2016, with monthly installments beginning in 2014 of $71, which did not occur. Accrued interest at December 31, 2016 is $896.

On December 13, 2012, the Company executed a note payable to an individual and board member in the amount of $19,000, interest accrues at 8% per annum, unsecured, due after 8 months of execution, but extended to January 31, 2016. Accrued interest at December 31, 2016 is $5,759.

On February 28, 2013, the Company executed a note payable to a Trust in the amount of $5,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, and is in default. Accrued interest at December 31, 2016 is $1,150.

On March 6, April 22, April 30, May 24, June 14, June 21, July 3, July 30, November 20, December 2, December 13, 2013, the Company executed notes payable to an individual and board member in the total amount of $31,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, but extended to January 31, 2016. Accrued interest at December 31, 2016 is $6,557.

On May 15, July 12, July 17, and November 22, 2013, the Company executed notes payable to an individual in the total amount of $27,340, interest accrues at 6% per annum, unsecured, due after 8 months of execution, and currently in default. Accrued interest at December 31, 2016 is $5,868.

On June 30, 2013, the Company negotiated a settlement of outstanding wages, advances, expenses, etc., to the two officers of the Company. The settlement Notes were for $500,000 and $25,000 to Mr. Reichman and $200,000 and $10,000 to Mrs. Griffin. The balances at December 31, 2016 are $421,045 to Mr. Reichman and $206,670 to Mrs. Griffin. The notes bear interest at 5% and are extended to January 31, 2016. Accrued interest at December 31, 2016 is $ 136,264.

On July 23, July 24, August 5, August 26, and September 13, 2013, the Company executed a note payable to a Trust in the total amount of $80,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, and currently in default. Accrued interest at December 31, 2016 is $ 16,280.

On March 11, 2014, the Company executed a note agreement with an LLC in the amount of $5,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, and currently in default. Accrued interest at December 31, 2016 is $842.

On January 31, 2014, the Company executed a note agreement with a Corporation in the amount of $7,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, but extended to January 31, 2016. Accrued interest at December 31, 2016 is $1,224.

On January 22, 2014, the Company executed a note agreement with an individual in the amount of $14,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, and currently in default. Accrued interest at December 31, 2016 is $2,469.

On April 7, 2014, April 17, 2014, June 6, 2014, July 18, 2014 and October 10, 2014, the Company executed note agreements with an individual in various amounts totaling $24,000, interest accrues at 6% per annum, unsecured, due after 8 months of execution, and currently in default. Accrued interest at December 31, 2016 is $3,684.

Table of Contents

On January 2, January 21, April 24, May 19, July 28, August 26, and December 23, 2014, the Company executed notes payable to an individual and board member in the total amount of $31,500, interest accrues at 6% per annum, unsecured, due after 8 months of execution, but extended to January 31, 2016. Accrued interest at December 31, 2016 is $4,947.

On September 23, and November 10, 2014, the Company executed a note payable to a Trust in the total amount of $2,500, interest accrues at 6% per annum, unsecured, due after 8 months of execution (2015). Accrued interest at December 31, 2016 is $329.

On February 11, April 21, May 6, June 8, June 15, July 17, August 19, October 20, 2015, and January 22, 2016 the Company executed notes payable to an individual and board member in the total amount of $34,800, interest accrues at 6% per annum, unsecured, due after 8 months of execution. Accrued interest at December 31, 2016 is $3,207.

On March 6, March 16, March 25, June 30, August 12, September 10, September 14, October 8, October 14, November 30, December 3, December 7, 2015, the Company executed a note payable to a Trust in the total amount of $49,200, interest accrues at 6% per annum, unsecured, due after 12 months of execution (2016). Accrued interest at December 31, 2016 is $4,059.

None of the above notes are convertible or have any covenants.

**(b)**     **Additional detail to all Notes Payable is as follows:**

| Principal | | Interest Rate | Interest Expense | | | | Maturity |
|---|---|---|---|---|---|---|---|
| | | | | 12/31/2016 | | 12/31/2015 | |
| $ | 19,000 | 8.00% | $ | 1,520 | $ | 1,520 | 10/1/17 |
| | 5,099 | 5.00% | | 255 | | 255 | 10/1/17 |
| | 32,960 | 5.00% | | 1,648 | | 1,648 | 10/1/17 |
| | 37,746 | 5.00% | | 1,936 | | 1,936 | 10/1/17 |
| | 107,000 | 5.00% | | 5,420 | | 5,420 | 10/1/17 |
| | 388,376 | 5.00% | | 19,419 | | 19,419 | 10/1/17 |
| | 192,000 | 0% | | 13,440 | | 13,440 | 10/1/17 |
| | 18,000 | 6.00% | | 1,080 | | 1,080 | 9/1/2002 |
| | 30,000 | 6.00% | | 1,800 | | 1,800 | 9/12/2002 |
| | 25,000 | 5.00% | | 1,251 | | 1,252 | 8/31/2000 |
| | 40,000 | 7.00% | | 2,800 | | 2,800 | 7/10/2002 |
| | 5,000 | 6.00% | | 300 | | 300 | 10/28/2013 |
| | 62,500 | 6.00% | | 3,750 | | 3,750 | 10/1/17 |
| | 65,340 | 6.00% | | 3,920 | | 3,920 | 1/14-10/15 |
| | 409,920 | 5.00% | | 20,496 | | 20,496 | 10/1/17 |
| | 11,125 | 5.00% | | 556 | | 556 | 10/1/17 |
| | 200,000 | 5.00% | | 10,000 | | 10,000 | 10/1/17 |
| | 6,670 | 5.00% | | 334 | | 334 | 10/1/17 |
| | 82,500 | 6.00% | | 4,950 | | 4,950 | 3/14-11/15 |
| | 34,800 | 6.00% | | 2,078 | | 1,129 | 10/1/17 |
| | 49,200 | 6.00% | | 2,952 | | 1,107 | 3/16-12/16 |
| $ | 1,822,236 | | $ | 99,905 | $ | 97,112 | |

At December 31, 2016 and 2015, accrued interest on the outstanding notes payable and convertible notes was $395,714 and $309,249, respectively. Interest expense on the outstanding notes amounted to $99,905 and $97,112 for the years ended December 31, 2016 and 2015, including the imputed interest discussed above.

Table of Contents

**NOTE 6 - INCOME TAXES**

The FASB has issued FASB ASC 740-10 (Prior authoritative literature: Financial Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - An Interpretation of FASB Statement No. 109" (FIN 48)). FASB ASC 740-10 clarifies the accounting for uncertainty in income taxes recognized in an enterprise's financial statements in accordance with prior literature FASB Statement No. 109, Accounting for Income Taxes. This standard requires a company to determine whether it is more likely than not that a tax position will be sustained upon examination based upon the technical merits of the position. If the more-likely-than-not threshold is met, a company must measure the tax position to determine the amount to recognize in the financial statements. As a result of the implementation of this standard, the Company performed a review of its material tax positions in accordance with recognition and measurement standards established by FASB ASC 740-10.

Deferred taxes are provided on a liability method whereby deferred tax assets are recognized for deductible temporary differences and operating loss and tax credit carry-forwards and deferred tax liabilities are recognized for taxable temporary differences. Temporary differences are the differences between the reported amounts of assets and liabilities and their tax basis. Deferred tax assets are reduced by a valuation allowance when, in the opinion of management, it is more likely than not that some portion or all the deferred tax assets will not be realized. Deferred tax assets and liabilities are adjusted for the effects of changes in tax laws and rates on the date of enactment.

Deferred tax assets and the valuation account are as follows:

|  | 2016 | 2015 |
|---|---|---|
| Deferred tax assets: | | |
| NOL carryover | $ 4,816,783 | $ 4,625,997 |
| Valuation allowance | (4,816,783) | (4,625,997) |
| Net deferred tax asset | $ - | $ - |

The income tax provision differs from the amount of income tax determined by applying the U.S. federal and state income tax rates of 39% to pretax income from continuing operations for the years ended December 31, 2016 and 2015.

The components of income tax expense are as follows:

|  | 2016 | 2015 |
|---|---|---|
| Book loss | $ (8,074,026) | $ (308,293) |
| Stock based compensation | 7,562,882 | - |
| Non-deductible expenses | 8,252 | 8,667 |
| Valuation allowance | 502,892 | 299,626 |
|  | $ - | $ - |

The Company has adopted FASB ASC 740-10 to account for income taxes. The Company currently has no issues creating timing differences that would mandate deferred tax expense. Net operating losses would create possible tax assets in future years. Due to the uncertainty of the utilization of net operating loss carry forwards, an evaluation allowance has been made to the extent of any tax benefit that net operating losses may generate. A provision for income taxes has not been made due to net operating loss carry-forwards of $12,364,596 and $11,861,704 as of December 31, 2016 and 2015, respectively, which may be offset against future taxable income from 2031 through 2032. No tax benefit has been reported in the financial statements.

A reconciliation of the beginning and ending amount of unrecognized tax benefits is as follows:

|  | December 31, | |
|---|---|---|
|  | 2016 | 2015 |
| Beginning balance | $ - | $ - |
| Additions based on tax positions related to current year | - | - |
| Additions for tax positions of prior years | - | - |
| Reductions for tax positions of prior years | - | - |
| Reductions in benefit due to income tax expense | - | - |
| Ending balance | $ - | $ - |

Table of Contents

The Company did not have any tax positions for which it is reasonably possible that the total amount of unrecognized tax benefits will significantly increase or decrease within the next 12 months.

The Company includes interest and penalties arising from the underpayment of income taxes in the consolidated statements of operations in the provision for income taxes. As of December 31, 2016, and 2015, the Company had no accrued interest or penalties related to uncertain tax positions.

The tax years that remain subject to examination by major taxing jurisdictions are for the years ended December 31, 2016, 2015, 2014, and 2013.

**NOTE 7 - STOCKHOLDERS' DEFICIT**

A) NUMBER OF SHARES AUTHORIZED

Under the Company's charter, 750,000 shares of $0.001 par value common stock were authorized as of December 31, 2006. On November 28, 2007, the stockholders approved the increase in the Company's authorized shares of common stock from 750,000 to 3.50 million shares, changed the par value to $0.001 and authorized 50,000 shares of $0.001 par value "blank check" preferred stock. On December 18, 2011, the Board of Directors approved an increase in the Company's authorized common stock to 10,000,000. On December 28, 2012, the Board of Directors approved a 100 to 1 reverse stock split. All per share information in these financial statements have been retroactively restated for the reverse stock split. As of December 31, 2016, and 2015, 124,527,990 and 92,250,890 shares of common stock are issued and 114,527,990 and 84,250,890 shares are outstanding, respectively. The difference between the issued and outstanding shares are the ESOP shares being held in trust.

B) PREFERRED STOCK

As described above, the stockholders voted to authorize 50,000 shares of "blank check" preferred stock. The terms, rights and features of the preferred stock will be determined by the Board of Directors upon issuance. Subject to the provisions of the Company's certificate of amendment to the articles of incorporation and the limitations prescribed by law, the Board of Directors would be expressly authorized, at its discretion, to adopt resolutions to issue shares, to fix the number of shares and to change the number of shares constituting any series and to provide for or change the voting powers, designations, preferences and relative, participating, optional or other special rights, qualifications, limitations or restrictions thereof, including dividend rights (including whether the dividends are cumulative), dividend rates, terms of redemption (including sinking fund provisions), redemption prices, conversion rights and liquidation preferences of the shares constituting any series of the preferred stock, in each case without any further action or vote by the stockholders. The Board of Directors would be required to make any determination to issue shares of preferred stock based on its judgment as to the best interests of the Company.

During 2016, Board of Directors authorized the issuance of 1,000 shares of Series A Preferred Stock to David Reichman, the Company's CEO. Mr. Reichman has advance significant capital and expended significant time to the company without compensation. As an effort to give Mr. Reichman security for his advances, the 1,000 shares of preferred were issued. The Series A Preferred Shares have the following features attached:

1) Non-participating in the dividends to the Common Shareholders
2) No Liquidation Preference
3) Voting Rights to include: the right to vote in an amount equal to 51% of the total vote with respect to any proposal relating to (a) increasing the authorized share capital of the Company, (b) effecting any forward stock split of the Company's authorized, issued or outstanding shares of capital stock, and (c) any other matter subject to a shareholder vote.
4) No conversion rights
5) Redemption Rights: The Series A shares shall be automatically redeemed upon (a) Mr. Reichman ceases to serve as an officer or director of the Company, (b) on the date that the Company's shares or common stock first trade on any national securities exchange

C) ISSUANCES OF COMMON STOCK

On April 1, 2016, the Board of Directors authorized the issuance of 190,418 shares for services, valued at $106,411, the market value of the shares on the day of authorization.

On July 6, 2016, the Board of Directors authorized the issuance of 7,715,420 shares for cash of $370,000, pursuant to a private placement agreement. The shares were valued at $.52 for the agreement.

During July 2016, the Board of Directors authorized the issuance of 22,167,500 shares for services and the ESOP plan valued at $7,946,816, the market price on the day of authorization.

On December 15, 2016, the Board of Directors authorized the issuance of 2,200,000 shares for services valued at $440,000, the market price of the shares upon authorization.

During the twelve months ended December 31, 2016 and 2015, the Company recorded imputed interest on a non-interest bearing note in the amount of $13,440, with an increase in paid in capital.

D) 2007 OMNIBUS STOCK AND INCENTIVE PLAN

On September 24, 2007, the Board of Directors authorized the creation of the 2007 Omnibus Stock and Incentive Plan (the "2007 Plan"). The 2007 Plan was approved by the stockholders on November 28, 2007. An aggregate of 60,000 shares of common stock are reserved for issuance and available for awards under the 2007 Plan.

Awards under the 2007 Plan may include non-qualified stock options, incentive stock options, stock appreciation rights ("SARs"), restricted shares of common stock, restricted units and performance awards. For a complete description of the Plan, see Global Tech's  Form 8-K filed with the SEC on November 7, 2007.

Table of Contents

E) UNEARNED ESOP SHARES

During 2010, the Company issued 2,000,000 shares to a Trust account for the future benefit of the employees of the Company. These shares have been recorded as Unearned ESOP Shares on the balance sheet as a contra equity account, pursuant to the guidance of SOP 93-6. The value recorded for the ESOP shares was the fair value of the shares at the date of issuance, of $1,100,000.

In December 2011, the Company issued an additional 2,000,000 shares to the ESOP Trust account for the future benefit of the employees of the Company. These shares have been recorded as Unearned ESOP Shares on the balance sheet as a contra equity account, pursuant to the guidance of SOP 93-6. The value recorded for the ESOP shares was the fair value of the shares at the date of issuance, of $600,000.

In December 2012, the Company issued an additional 4,000,000 shares to the ESOP Trust account for the future benefit of the employees of the Company. These shares have been recorded as Unearned ESOP Shares on the balance sheet as a contra equity account, pursuant to the guidance of SOP 93-6. The value recorded for the ESOP shares was the fair value of the shares at the date of issuance, of $476,000.

In December 2016, the Company issued 2,000,000 shares to the ESOP Trust account for the future benefit of the employees of the Company. These shares have been recorded as Unearned ESOP Shares on the balance sheet as a contra equity account, pursuant to the guidance of SOP 93-6. The value recorded for the ESOP shares was the fair value of the shares at the date of issuance, of $700,000.

The total balance at December 31, 2016 and 2015 was $2,876,000 and $2,176,000, respectively.

Table of Contents

**NOTE 8- COMMITMENTS AND CONTINGENCIES**

A) LEASES

Global Tech Industries Group, Inc. currently does not lease, rent or own any property.

B) LITIGATION

The Company was a defendant in a lawsuit from a supplier that is alleging non-payment of amounts owed for services rendered. The amount asserted was $54,712 and a judgment was entered in the matter for $55,512. Global Tech has included this amount in accounts payable at December 31, 2016 and 2015.

The Company was a defendant in a lawsuit from another supplier also alleging non-payment of amounts owed for services rendered. The amount asserted was $4,298. A judgment was entered for $4,352 and the Company has included this amount in accounts payable at December 31, 2016 and 2015.

The Company was a defendant in a lawsuit from a third supplier also alleging non-payment of amounts owed for services rendered. The amount asserted was $9,675. Management has included this amount in accounts payable at December 31, 2016 and December 31, 2015. All the notes payable discussed in this section, were incurred before 2002 and before present management took control of the company.

The Company was a defendant in a lawsuit from a supplier alleging nonpayment of amounts owed for services rendered. Management settled this lawsuit on November 30, 2001 and issued a note payable for $18,000 due September 1, 2002 with interest at 6% per annum in full settlement of this claim. As reflected in Notes Payable, the amount due on this note remains unpaid, and management has indicated that it has received no demand for payment from this note holder.

The Company was a defendant in a lawsuit from another supplier also alleging nonpayment of amounts owed for services rendered. This lawsuit was settled on May 1, 2002 by issuing a non-interest bearing note payable for $25,000 due on September 12, 2002. The Company defaulted on this note, has not paid it to date and received a notice of motion dated October 22, 2002, seeking entry of a judgment for $30,000 plus interest effective December 6, 2002. The Company adjusted the note balance to $30,000 and has recorded interest expense at 6% per annum from May 1, 2002, the date of settlement, through the end of 2016.

The Company was a defendant in another lawsuit from a former consultant alleging nonpayment of amounts owed for services rendered. Management has executed a note payable to this plaintiff for $40,000 which was due on July 10, 2002 and remains unpaid. Pursuant to the terms of this note, the Company has recorded interest payable at 7% for the period July 10, 2002 through December 31, 2016.

During April 2012, the Company filed suit in Los Angeles Superior Court against GeoGreen Biofuels, Inc. and related parties, relating to GeoGreen's failure to repay $192,000 advanced pursuant to a Bridge Loan Term Sheet. Although litigation is inherently unpredictable, GTII is confident in its position, and intends to pursue the action aggressively. GeoGreen has filed a cross-complaint against the Company and its two officers, the Chief Executive Officer and the President, however the charges against the officers were subsequently dismissed with prejudice. A motion was also passed denying GeoGreen's motion to strike GTII's request for punitive damages. For the time being GTII has dropped their lawsuit.

Pursuant to the asset purchase agreement with ARUR, the Company has a contingent liability to payback notes payable in the amount of approximately $400,000 if the Company is successful in collecting on certain accounts receivable. If the receivables are not collected, there is no obligation on the Company to pay off the debt.

During March 2013, the Company was named in an action pertaining to the 75% working interest in the Ownbey Lease. Subsequent to the Company's purchase of the assets and the termination of the operator, a mechanics lien was filed against the property claiming approximately $267,000 in fees are due to the previous operator. An action is pending in the District Court of Chautauqua County, Kansas, captioned <u>Aesir Energy, Inc. vs. American Resource Technologies, Inc.; Nancy Ownbey Archer; Jimmy Stephen Ownbey; Robbie Faye Butts; Global Tech Industries Group, Inc. and TTII oil & Gas, Inc.</u> Management intends to vigorously contest AESIR's claims and, at this point, settlement appears unlikely. It has been presented in the County Court that some of ARUR's Directors have acted without authorization in this matter, and GTII's management is assessing how to proceed at this time. No monetary claims have been asserted against GTII or TTII Oil & Gas, Inc. The Company has made several attempts to recover the shares of GTII stock paid to ARUR for the asset acquisition and the various costs and expenses expended by GTII in fulfillment of its obligations under the contract with ARUR. The failure of non-litigation attempts to resolve the matter resulted in filing an action for declaratory judgment in the US District Court for the Eastern District of New York, case#17-CV-0698. On the 3rd of February 2017, GTII filed an action for declaratory relief in the Eastern District of New York, for the purpose of recovering the costs, expenses and consideration paid to ARUR for the rights and benefits associated with an Oil and Gas transaction entered into between the parties on December 31st 2012. The action by GTII is predicated on the underlying contract for the sale of the assets of ARUR being vacated by a local Kansas Court on the basis that the company and its officers lacked the authority to enter into the contract. Because of that decision GTII lost all interest in the transaction, their associated benefits and any financial gain that may have been anticipated. Attempts were made to resolve this without litigation but have been unsuccessful. The matter is proceeding accordingly. The Company has made several attempts to recover the shares of GTII, f/k/a TTI stock paid to ARUR for the asset acquisition and the various costs and expenses expended by GTII in fulfillment of its obligations under the contract with ARUR. The failure of non-litigation attempts to resolve the matter resulted in filing an action for declaratory judgment in the US District Court for the Eastern District of New York, case#17-CV-0698. As of this writing the case has not yet been decided.

Table of Contents

## C) EMPLOYMENT AGREEMENT

Effective October 1, 2007, the Company entered into a two-year employment agreement with David Reichman, Chief Executive Officer, pursuant to which Mr. Reichman was paid an annual salary of $250,000, payable in semi-monthly installments. In addition, Mr. Reichman may be paid a bonus or bonuses during each year, as determined at the sole discretion of the Board of Directors and receive stock options to purchase 1.2 million shares of common stock as discussed above. During the year ended December 31, 2009, the Board of Directors approved the extension of this contract an additional two years from the date of expiration, at an annual salary of $500,000. During the year ended December 31, 2012, the Board of Directors approved the extension of this contract until December 31, 2013 with a salary of $1. Mr. Reichman's salary has been accruing because Global Tech is without the resources to pay the salary in full. This employment agreement was filed on November 7, 2007, as exhibit 99.2 to a current report of the Company on Form 8-K and is incorporated herein by reference. Mr. Reichman's contract has been extended by mutual consent to December 31, 2017.

Effective April 1, 2009, the Company entered into a three-year employment agreement with Kathy Griffin, President, pursuant to which Mrs. Griffin was paid an annual salary of $127,500, payable in semi-monthly installments. In addition, Mrs. Griffin may be paid a bonus or bonuses during each year, as determined at the discretion of the CEO, and receive stock options to purchase shares of common stock as discussed above. Mrs. Griffin was given a salary increase effective April 1, 2010 to an annual salary of $180,000. This salary increase accrued in 2010 because Global Tech was without resources to pay the salary increase. This employment agreement was filed on March 25, 2010 as exhibit 10.1 to a current report of the Company on Form 8-K and is incorporated herein by reference. Mrs. Griffin's employment contract has been extended at December 31, 2012 until December 31, 2013, with a salary of $1. Mrs. Griffin's contract was extended by mutual consent to December 31, 2017.

## NOTE 9 - MARKETABLE SECURITIES – AVAILABLE-FOR-SALE

In May 2012, the Company acquired 2,052 shares of Facebook stock (FB) for $95,256 plus fees. During 2013, the Company sold 1,052 share leaving 1,000 shares held in a trading account. The value of these shares and all others purchased by the Company at December 31, 2016 and 2015 amounted to $115,388 and $106,144, respectively. A 2012 decrease in value, gave rise to an unrealized loss of $40,632 for the year ended December 31, 2012. The Company evaluated the prospects of its investments in relation to the severity and duration of the impairment. Based on that evaluation, the Company consider the shares to be other than temporarily impaired at December 31, 2012, and recorded loss on marketable securities in the statement of operations of $40,632. As of December 31, 2016, and 2015, the company recorded an unrealized gain on the market value of its marketable securities of $88,252 and $77,593, respectively. All unrealized gains in 2016 and 2015 have been recorded as an increase to the marketable securities and an increase to accumulated other comprehensive income in equity.

## NOTE 10 - ASSET RETIREMENT OBLIGATION

During 2013, the Company began the re-work project on various well associated with the Ownbey Oil and Gas Lease purchased on December 31, 2012. The Company will be required as part of the purchase of this lease to remediate the Ownbey property upon its abandonment of the lease. In accordance with FASB ASC 410-20, Asset Retirement Obligations, the Company recognized the fair value of the liability for an asset retirement obligation in the amount of $101,250. Because the Company does not have a certified valuation report for the Ownbey lease we have not capitalized this cost, but instead have expensed the entire amount during the 2013 year. The following table describes all changes to the Company's asset retirement obligation liability during 2016:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | | 2016 | | 2015 |
| Asset retirement obligation-beginning of year | $ | 101,250 | $ | 101,250 |
| Liabilities incurred | | - | | - |
| Accretion expense | | - | | - |
| Revisions in estimated cash flows | | - | | - |
| Asset retirement obligation-end of year | $ | 101,250 | $ | 101,250 |

Table of Contents

**NOTE 11 - SUBSEQUENT EVENTS**

In accordance with ASC 855-10 Company management reviewed all material events through the date of this report and there are no material subsequent events to report other than those reported below.

On December 30, 2016, Global Tech Industries Group, Inc., a Nevada corporation, executed a stock purchase agreement (the "Agreement"), which was signed and closed in Hong Kong, with GoFun Group, Ltd. through its wholly owned subsidiary Go F & B Holdings, Ltd. GoFun Group, Ltd. is a privately held company running a casual dining restaurant business, based in Hong Kong. Pursuant to the Agreement, GTII acquired all the issued and outstanding capital stock of Sky Sovereign (F&B), Ltd., Heartful Blessing Catering Investment Ltd., Shichirin Food & Beverage Corporation Ltd. and Go Inside Kitchen Ltd. for up to 73% of the issued and outstanding shares of GTII. The aforementioned companies (the "Companies") were acquired from Go F&B Holdings Ltd. (the "Seller"), a subsidiary of GoFun Group, Ltd., for 10% of the issued and outstanding shares of common stock of GTII, as of December 30, 2016. Additionally, the Seller may acquire up to an additional 63% of the issued and outstanding shares of common stock of GTII as of December 30, 2017, if certain thresholds have been met.

Subsequent to this agreement, the Company expected GoFun Group, Ltd. to surrender their shares and perform various activities including providing audited financial statements to be included with Global Tech's filing. However, GoFun Group has not yet performed on this agreement, and therefore the Company is unable to consummate the agreement and consolidate with the GoFun Group.

**ITEM 9A. CONTROLS AND PROCEDURES**

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information we are required to disclose is recorded, processed, summarized and reported, within the time periods specified in the rules and forms of the Commission. David Reichman, our Chief Executive Officer and our Principal Accounting Officer, is responsible for establishing and maintaining our disclosure controls and procedures.

Under the supervision and with the participation of our management, including the Chief Executive Officer and Principal Accounting Officer, we have evaluated the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Securities Exchange Act of 1934 (the "Exchange Act")) as of the end of the period covered by this report. Based on that evaluation, the Chief Executive Officer and Principal Accounting Officer has concluded that, as of December 31, 2014, these disclosure controls and procedures were not effective to ensure that all information required to be disclosed by us in the reports that we file or submit under the Exchange Act is: (i) recorded, processed, summarized and reported, within the time periods specified in the Commission's rule and forms; and (ii) accumulated and communicated to our management, including our Chief Executive Officer and Principal Accounting Officer, as appropriate to allow timely decisions regarding required disclosure. The Company's controls are not effective due to a lack of the segregation of duties. The Company lacks the appropriate personnel to handle all the varying recording and reporting tasks on a timely basis. The Company plans to address these material weaknesses as resources become available by hiring additional professional staff, such as a Chief Financial Officer, as funding becomes available, outsourcing certain aspects of the recording and reporting functions, and separating responsibilities.

The term "internal control over financial reporting" is defined as a process designed by, or under the supervision of, the registrant's principal executive and principal financial officers, or persons performing similar functions, and effected by the registrant's Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

[  ]   pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant;

[  ]   provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the registrant are being made only in accordance with authorizations of management and directors of the registrant; and

[  ]   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the registrant's assets that could have a material effect on the financial statements.

Table of Contents

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed by, or under the supervision of, the Chief Executive Officer and Principal Accounting Officer and effected by our Board of Directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

The framework our management uses to evaluate the effectiveness of our internal control over financial reporting is based on the guidance provided by the Committee of Sponsoring Organizations of the Treadway Commission in its 1992 report: INTERNAL CONTROL - INTEGRATED FRAMEWORK. Based on our evaluation under the framework described above, our management has concluded that our internal control over financial reporting was ineffective as of December 31, 2016 due to the same material weaknesses that rendered our disclosure controls and procedures ineffective. The Company's internal control over financial reporting is not effective due to a lack of sufficient resources to hire a support staff in order to separate duties between different individuals. The Company lacks the appropriate personnel to handle all the varying recording and reporting tasks on a timely basis. The Company plans to address these material weaknesses as resources become available by hiring additional professional staff, such as a Chief Financial Officer, as funding becomes available, outsourcing certain aspects of the recording and reporting functions, and separating responsibilities.

This annual report does not include an attestation report of the Company's registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation requirements by the company's registered public accounting firm pursuant to temporary rules of the Securities and Exchange Commission that permit the company to provide only management's report in this annual report.

**Changes in Internal Controls over Financial Reporting**

During the year ended December 31, 2016 there was no significant change in our internal controls over financial reporting or in other factors that materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

**Inherent Limitations over Internal Controls**

GTII's management does not expect that its disclosure controls or its internal control over financial reporting will prevent or detect all error and all fraud. A control system, no matter how well designed and operated, can provide only reasonable, not absolute, assurance that the control system's objectives will be met. The design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Further, because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that misstatements due to error or fraud will not occur or that all control issues and instances of fraud, if any, within GTII have been detected. These inherent limitations include the realities that judgments in decision making can be faulty and that breakdowns can occur because of simple error or mistake. Controls can also be circumvented by the individual acts of some persons, by collusion of two or more people, or management override of the controls. The design of any system of controls is based in part on certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions. Projections of any evaluation of controls effectiveness to future periods are subject to risks. Over time, controls may become inadequate because of changes in conditions or deterioration in the degree of compliance with policies or procedures.

Our disclosure controls and procedures are designed to provide reasonable assurance of that our reports will be accurate. Our Chief Executive Officer and Principal Accounting Officer concludes that our disclosure controls and procedures were not effective at that reasonable assurance level, as of the end of the period covered by this Form 10-K to the lack of sufficient segregation of duties and the lack of appropriate personnel. The Company plans to address these material weaknesses as resources become available by hiring additional professional staff, such as a Chief Financial Officer, as funding becomes available, outsourcing certain aspects of the recording and reporting functions, and separating responsibilities. Our future reports shall also indicate that our disclosure controls and procedures are designed for this reason and shall indicate the related conclusion by the Chief Executive Officer and Principal Accounting Officer as to their effectiveness.

Table of Contents

**PART III**

**ITEM 10. DIRECTORS, EXECUTIVE OFFICERS AND CORPORATE GOVERNANCE**

As of December 31, 2016, the Board of Directors consisted of six Directors. The Board of Directors has determined that each of the Directors, with the exception of Mr. Reichman and Mrs. Griffin, qualifies as "independent" as defined by SEC rules. In making this determination, the Board has concluded that none of these members has a relationship which, in the opinion of the Board, would interfere with the exercise of independent judgment in carrying out the responsibilities of a Director.

During the fiscal year ended December 31, 2016, the Board of Directors held a total of nine board of directors meeting and one executive committee meeting. Mr. Reichman, Mr. Benintendo, Mr. Gilbert and Mrs. Griffin attended at least 90% of the meetings of the Board of Directors and 100% of the meetings of the committees on which he or she served.

The Board of Directors is currently comprised as follows:

David Reichman is the Chairman of the Board and Chief Executive Officer, and has been an executive officer for more than five years. Previously, for more than 27 years, Mr. Reichman maintained a Business Management and Tax Law consulting group. He is an enrolled agent and licensed by the US Treasury/Internal Revenue Service. In addition to his Tax Law Consulting practice, Mr. Reichman was Co -General Partner and Tax Matters Partner in Harrison Re-cycling Associates, a company that maintained and operated the first recycling equipment for non-biodegradable Styrofoam and Styrene plastic in North America. Prior to that, from early 1970 to late April 1975, Mr. Reichman was employed by The American Express Company, where he held several positions, including Manager, Budget and Cost. During his tenure at American Express, Mr. Reichman created and developed, together with Control Data Corporation, the Flexible Budgeting for Management Control of International Operations Program, as well as the use of Time-Share computer equipment. Mr. Reichman's education includes an MBA from Northeastern University through the Harvard Case Study Program, as well as specialized education in financial and scientific theory from The Wharton School of University of Pennsylvania and IBM Systems Scientific Institute.

Table of Contents

Kathy M. Griffin, President of the Company is also a member of the Board of Directors. Mrs. Griffin has been with the Company for over seven years, and has over thirty years of significant professional experience, on the domestic and international scene. Mrs. Griffin has significant experience in marketing, sales, new business development and general business management, both in the United States and internationally. Mrs. Griffin started her career at Superior Brands, where, from December, 1977 to December, 1990, she held several positions, including International Marketing Manager. She was responsible for the successful startup and implementation of the first international joint venture for Superior Brands, Inc. In addition, Mrs. Griffin managed Koning USA, Inc., a consumer products marketing company from 1993 to 2004, and, from January, 2006 to February 2009, was employed as an executive in the New Business Development Group, by Shuster Laboratories, Inc., a division of Specialized Technology Resources, Inc., a global provider of supply chain services, corporate social responsibility, and consulting services. Mrs. Griffin's education includes a Bachelor's degree from Boston College University and a Master's Degree from the John McCormack Graduate School of Global Studies and Public Policy at the University of Massachusetts, Boston, MA.

Frank Benintendo, Secretary has been a Director and Secretary of GTII since 2004. Mr. Benintendo has spent over 40 years in the graphic arts/communication field. Mr. Benintendo is currently the Chief Creative Director of Dale & Thomas Popcorn Inc. From 1999-2000, he was the director of Internet development at ProTeam.Com and from 1998 to 1999 he was responsible for the creative/marketing of a brand driven company to transform each of the company's niche-market catalog businesses into an e-commerce retailer. Mr. Benintendo's skills and background were attractive to GTII since the Company has no creative staff. Mr. Benintendo has designed the current GTII logo, designed and updated all stationary, presentation material and marketing tools and has worked several versions of the GTII website, including the current iteration.

Don Gilbert, Treasurer, has been a Director of GTII since November 2006 and a member of the Audit Committee since November 1, 2007. Since 1995, Mr. Gilbert has been an Enrolled Agent, licensed to practice before the U.S. Treasury Department and Department of Taxation for all 50 States. Mr. Gilbert worked with the U.S. Treasury Department from 1960 to 1994 in various capacities. Mr. Gilbert is a member of the New York State Society of Enrolled Agents. Having worked in the corporate world with executives across the country, Mr. Gilbert has accumulated business connections that may be helpful to Global Tech.

Robert Hantman, Director, resigned in December, 2012. His resignation was disclosed in an 8 – K filing, which is attached here as an exhibit incorporated by reference.

On December 19, 2013, at a meeting of the board of directors of Tree Top Industries, Inc., Mr. Michael Valle and Mr. Gregory Ozzimo were elected to the Board of Directors of Global Tech Industries Group, Inc. (the "Company") for a term commencing on January 15, 2014 until resignation or shareholder vote of a replacement.

Mr. Valle previously served on the board of directors, but resigned for personal reasons in December, 2009. Mr. Valle worked in the financial industry in New York for much of his career, where he served as Vice President of Investments for Smith Barney and Paine Webber, among other financial institutions. Mr. Ozzimo brings over thirty years' experience in the commodities and oil trading businesses, and served as group Vice President at Philipp Brothers (Salomon Brothers) in charge of Energy Product trading for over ten years, among other similar positions in the Energy sector.

The executive officers of GTII are as follows:

| Name | Position |
| --- | --- |
| David I. Reichman | Chairman and CEO |
| Kathy M. Griffin | President |

**Committees of the Board of Directors**

The Board of Directors currently has four standing committees: The Audit Committee, the Compensation Committee, Outside Advisory Committee, and the Science & Technology Committee.

**Family Relationships**

There are no family relationships between or among the directors, executive officers or persons nominated or chosen by us to become directors or executive officers.

Table of Contents

**Involvement in Certain Legal Proceedings**

　　To the best of our knowledge, during the past five years, none of the following occurred with respect to a present or former director, executive officer, or employee: (1) any bankruptcy petition filed by or against any business of which such person was a general partner or executive officer either at the time of the bankruptcy or within two years prior to that time; (2) any conviction in a criminal proceeding or being subject to a pending criminal proceeding (excluding traffic violations and other minor offences); (3) being subject to any order, judgment or decree, not subsequently reversed, suspended or vacated, of any court of competent jurisdiction, permanently or temporarily enjoining, barring, suspending or otherwise limiting his or her involvement in any type of business, securities or banking activities; and (4) being found by a court of competent jurisdiction (in a civil action), the SEC or the Commodities Futures Trading Commission to have violated federal or state securities or commodities law, and the judgment has not been reversed, suspended or vacated.

Table of Contents

## Code of Conduct

We have adopted a Code of Conduct that governs the required ethical conduct of our Directors, officers and employees. The text of the Code of Conduct has been posted on GTII's website and can be viewed at www.Gtii-us.com. Any waiver of the provisions of the Code of Conduct for executive officers and Directors may be made only by the Audit Committee and, in the case of a waiver for members of the Audit Committee, by the Board of Directors. Any such waivers will be promptly disclosed to our shareholders.

## Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires our Directors and executive officers and persons who own more than 10% of a registered class of our equity securities, to file with the SEC and OTCMarkets ("PINK") initial reports of ownership and reports of changes in ownership of shares of common stock of GTII. Officers, Directors and greater than 10% stockholders are required by SEC regulations to furnish us with copies of all Section 16(a) forms they file.

## Board Vacancies

In the event of a vacancy on the Board of Directors, the Board will seek to identify and evaluate director candidates. Such evaluation involves (i) soliciting recommendations, (ii) meetings and background material relating to potential candidates and (iii) interviews of selected potential candidates by members of the Board of Directors.

In considering whether to recommend any particular candidate for inclusion in the Board of Directors' slate of recommended director nominees, the Board reviews each potential candidate's integrity, business acumen, knowledge of our business and industry, experience, diligence, absence of conflicts of interest and the ability to act in the interest of all stockholders. We believe that the backgrounds and qualifications of our Directors, considered as a group, should provide a composite mix of experience, knowledge and abilities that will best allow the Board of Directors to fulfill its responsibilities.

Stockholders may recommend individuals to the Board for consideration as potential director candidates by submitting their names, together with appropriate biographical information and background materials and a statement as to whether the stockholder or group of stockholders making the recommendation has beneficially owned more than 5% of our common shares for at least a year as of the date such recommendation is made. The recommendation should be sent to the Board of Directors, c/o Frank Benintendo, Secretary, Global Tech Industries Group, Inc. 511 Sixth Avenue, Suite 800, New York, N.Y. 10011. Assuming that appropriate biographical and background material has been provided on a timely basis, the committee will evaluate stockholder-recommended candidates by following substantially the same process, and applying substantially the same criteria, as it follows for candidates recommended by our Board or others. If the Board of Directors determines to nominate a stockholder-recommended candidate and recommends his or her election, then his or her name will be included in the proxy card for the next annual meeting.

## Nominating Committee

We do not currently have a nominating committee. We feel this is appropriate due to the small size of our company. Therefore, this function is handled directly by the Board of Directors.

## Audit Committee

Our Audit Committee was established in accordance with section 3(a) (58) (A) of the Exchange Act. It is chaired by Donald Gilbert, a former US Treasury/IRS executive. Our Audit Committee does not have charter. Our Audit Committee has reviewed and discussed the audited financial statements with management, and has discussed with the independent auditors the matters required to be discussed by the statement on Auditing Standards No. 61, as amended (AICPA, Professional Standards, Vol. 1, AU section 380),1 and as adopted by the Public Company Accounting Oversight Board in Rule 3200T;

The Audit Committee has received the written disclosures and the letter from the independent accountant required by the applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the Audit Committee concerning independence, and has discussed with the independent accountant the independent accountant's independence; and

The Audit Committee recommended to the Board of Directors that the audited financial statements be included in GTII's annual report on Form 10-K.

Table of Contents

**ITEM 11. EXECUTIVE COMPENSATION**

The following table sets forth the aggregate compensation earned by our Chief Executive Officer and others officers during 2016 and 2015.

| Name and Principal Position | Year | Salary ($) | Bonuses | Stock Awards ($'s) (1) | Option Awards ($000's) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All other compensation (in excess of $10,000) | Total ($) |
|---|---|---|---|---|---|---|---|---|---|
| David Reichman, | 2016 | 1 | - | 205,000 | $     - | - | - | - | 205,000 |
| CEO | 2015 | 1 | - | -0- | - | | | | 1 |
| | | | | | | | | | |
| Kathy Griffin, | 2016 | 1 | - | 205,000 | - | | | | 205,000 |
| President | 2015 | 1 | - | -0- | - | - | - | - | 1 |

(1)  Stock issuances have been made to both Mr. Reichman and Mrs. Griffin as compensation for their continued work and support of Global Tech, without salary.

The Board determined the compensation for David Reichman, Chairman and Chief Executive Officer for 2012. Mr. Reichman's salary remained at $500,000 for 2012. This is less than the competitive labor market median for someone with his skills and talents, but reflective of the Company's current cash position. The Company has entered into an employment agreement with Mr. Reichman regarding his responsibility for implementing the policies adopted by the Board of Directors. Due to Mr. Reichman's continued willingness to forego his salary payment while the Company attempts to raise capital, the Board of Directors decided to issue 675,000 shares of Global Tech common stock to Mr. Reichman on August 12, 2012. On December 29, 2012, the board and Mr. Reichman agreed that the Company would continue to receive his services through December 31, 2014, at an annual salary of $1.00, said agreement has been extended through December 31, 2017.

The Board also determined the compensation for Mrs. Griffin, President, based on her undeterred commitment to Global Tech. Her salary remained at $180,000 in 2012. Due to the fact that Mrs. Griffin was willing to forego her salary for the entire year of 2012, and any bonus due her, the Board of Directors issued 255,000 shares of common stock to Mrs. Griffin on August 12, 2012. Currently, her salary is less than the competitive labor market median for someone in her position, but reflective of the Company's current cash position. On December 29, 2012, the board and Mrs. Griffin agreed that the company would continue to receive her services through December 31, 2014, at an annual salary of $1.00. Mrs. Griffin agreement has been extended through December 31, 2017.

Table of Contents

**Employment Agreements**

Mr. Reichman's employment agreement provides for:

[ ]    an eighteen months' term through December 31, 2017 at an annual base salary of $1;

[ ]    at least one annual salary review by the Board of Directors;

[ ]    participation in any discretionary bonus plan established for senior executives;

[ ]    retirement and medical plans, customary fringe benefits, vacation and sick leave

Mrs. Griffin's employment agreement provides for:

[ ]    a sixteen-month term through December 31, 2017 at an annual base salary of $1.

[ ]    at least one annual salary review by the Chief Executive Officer;

[ ]    participation in any discretionary bonus plan established for senior executives;

[ ]    retirement and medical plans, customary fringe benefits, vacation and sick leave

**Director Compensation**

The members of the Board of Directors are compensated by grants of stock and options, in lieu of cash payments. The Directors were issued 500,000 shares of common stock in July, 2016. They were not issued any options. No compensation was provided to the Board of Directors during 2016 or 2015.

Table of Contents

Director Summary Compensation Table

| Name and Principal Position | Year | | Bonus ($) | Stock Awards ($'s) | Option Awards ($) | Non-Equity Incentive Plan Compensation ($) | Change in Pension Value and Nonqualified Deferred Compensation Earnings ($) | All Compensation (in excess of $10,000) | Total ($'s) |
|---|---|---|---|---|---|---|---|---|---|
| David Reichman, Chairman/Director | 2016 | - | - | 205,000 | - | - | - | - | 205,000 |
| Frank Benintendo, Treasurer/Director | 2016 | - | - | 205,000 | - | - | - | - | 205,000 |
| Don Gilbert, Secretary/Director | 2016 | - | - | 205,000 | - | - | - | - | 205,000 |
| Kathy Griffin, Director | 2016 | - | - | 205,000 | - | - | - | - | 205,000 |
| Gregory Ozzimo, Director | 2016 | - | - | 205,000 | - | - | - | - | 205,000 |
| Michael Valle, Director | 2016 | | - | 205,000 | - | - | - | - | 205,000 |

OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END
OPTION AWARDS

| Name (a) | Number of Securities Underlying Unexercised options (#) (b) | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) (c) | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) (d) | Option Exercise Price ($) (e) | | Option Expiration Date ($) (f) |
|---|---|---|---|---|---|---|
| David I. Reichman | - | N/A | N/A | $ | - | N/A |
| Kathy M. Griffin | - | N/A | N/A | $ | - | N/A |
| Donald H. Gilbert | - | N/A | N/A | $ | - | N/A |
| Frank Benintendo | - | N/A | N/A | $ | - | N/A |
| Robert Hantman | - | N/A | N/A | $ | - | N/A |

On August 16, 2011, the Board of Directors authorized the issuance of 579,400 shares of common stock to the officers, directors for the cancellation of all outstanding options, and there are currently no outstanding options.

41

Table of Contents

**ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS**

**Security Ownership of Certain Beneficial Owners and Management**

| Title of class | Name and address of beneficial owner (1) | Amount of Shares | Nature of beneficial ownership | Percent of class (2) |
|---|---|---|---|---|
| Common Stock | David Reichman | 34,398,900 | Direct | 30.0 |
| Common Stock | Frank Benintendo | 3,433,990 | Direct | 3.0 |
| Common Stock | Don Gilbert | 3,183,990 | Direct | 2.8 |
| Common Stock | Kathy Griffin | 9,310,140 | Direct | 8.1 |
| Common Stock | Gregory Ozzimo | 500,000 | Direct | .004 |
| Common Stock | Michael Valle | 609,000 | Direct | .005 |

_____II

(1)   In care of Global Tech Industries Group, Inc. 511 Sixth Ave., Suite 800, New York, NY 10011

(2)   Calculated from the total of outstanding shares of common stock as of April 1, 2017 (114,527,990).

**ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS AND DIRECTOR INDEPENDENCE**

The Company has not and does not provide business services to executives or Directors of the Company or their family members. The Company has no agreement with Mr. Reichman for repayment of loans, other than the Board acknowledges and agrees that such loans, both of cash, as well as non-payment of salary and expenses are due on demand and without interest, except to the extent that interest charged by a bank, credit card, or other institution or person who loaned money. The Board also acknowledges and agrees that loans by Mrs. Griffin, specifically the non-payment of her salary, are due on demand and without interest.

Mr. Reichman is the principle shareholder in the Company, and has been since 2002. He also operates as the CEO of the company and Chairman of the Board. If not for the continued monetary support of Mr. Reichman, the Company would not have been able to meet its obligations for the last eight years. Mrs. Griffin is a principle shareholder  and is President of the Company. She has operated as President since May 28, 2009.

The aggregate amount of the loans outstanding and due to Mr. Reichman and Mrs. Griffin, is $762,777 and $791,819 as of December 31, 2016 and 2015 respectively. They are both non-interest bearing, due on demand payables as well as 5% interest bearing notes due on October 15, 2017. At December 31, 2016 and 2015, the balances due each officer are as follows: Mr. Reichman: $556,107 and $585,149, respectively, and Mrs. Griffin: $206,670 and $206,670, respectively.

The Company's Code of Conduct provides that when any potential conflict exists, it must be properly disclosed and an appropriate determination made by the Company. The Chairman and CEO is ultimately responsible for the determination. The Company's policies and procedures were followed in connection with all the above.

**Director Independence**

The Board of Directors has determined that each of the Directors, with the exception of Mr. Reichman and Mrs. Griffin, qualifies as "independent" directors, as that term is defined under the FINRA listing standards.

Table of Contents

**ITEM 14. PRINCIPAL ACCOUNTING FEES AND SERVICES**

KSP Group served as the Company's independent registered public accounting firm for the year ended December 31, 2016 and 2015.

Fees for professional services rendered to the Company during the fiscal year ended December 31, 2016 were as follows:

| | | |
|---|---|---|
| Audit Fees | $ | 12,500 |
| Audit Related Fees | | - |
| All Other Fees | | - |
| Total Fees | $ | 12,500 |

Fees for professional services rendered to the Company during the fiscal years ended December 31, 2015 were as follows:

| | | |
|---|---|---|
| Audit Fees | $ | 12,500 |
| Audit Related Fees | | - |
| All Other Fees | | - |
| Total Fees | $ | 12,500 |

Table of Contents

Audit Fees: The audit fees for the fiscal years ended December 31, 2016 and 2015 were for professional services rendered in connection with the audit of the Company's annual financial statements, assistance with review of documents filed with the SEC, consents and other services required to be performed by our independent registered public accounting firm.

Audit-Related Fees: There were no audit-related fees during the fiscal years ended December 31, 2016 and December 31, 2015.

Tax Fees: No fees were billed to the Company.

All Other Fees: There were no fees billed in the fiscal years ended December 31, 2016 and 2015 for products and services provided by the independent auditors, other than the services reported above under other captions of this Item 14.

**Pre-Approval Policies and Procedures**

Our Board of Directors adopted resolutions in accordance with the Sarbanes-Oxley Act of 2002 requiring pre-approval of all auditing services and all audit related, tax or other services not prohibited under Section 10A(g) of the Securities Exchange Act of 1934, as amended to be performed for us by our independent auditors, subject to the deminimus exception described in Section 10A(i)(1)(B) of the Exchange Act. These resolutions authorized our independent auditor to perform audit services required in connection with the annual audit relating to the fiscal years ended December 31, 2016 and 2015. Our Board of Directors also appointed and authorized David Reichman to grant pre-approvals of other audit, audit-related, tax and other services requiring board approval to be performed for us by our independent auditor, provided that the designee, following any such pre-approvals, thereafter reports the pre-approvals of such services at the next following regular meeting of the Board. The percentage of audit-related, tax and other services that were approved by the board of directors is 100%.

PART IV

**ITEM 15. EXHIBITS, FINANCIAL STATEMENT SCHEDULES**

The following documents are filed as part of this 10-K:

1. Financial Statements

The following documents are filed in Part II, Item 8 of this annual report on Form 10-K:

[  ]   Report of KSP Group, Inc. a CA Independent Registered Public Accounting Firm

[  ]   Consolidated Balance Sheets as of December 31, 2016 and 2015

[  ]   Consolidated Statements of Operations for the years ended December 31, 2016 and 2015

[  ]   Consolidated Statement of Stockholders' Deficit for the years ended December 31, 2016 and 2015

[  ]   Consolidated Statements of Cash Flows for the years ended December 31, 2016 and 2015

[  ]   Notes to Consolidated Financial Statements

2. Financial Statement Schedules

None

Table of Contents

**ITEM 6. EXHIBITS**

3. Exhibits

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| 3.1 | Articles of incorporation of Global Tech Industries Group, Inc. as amended (1) |
| 3.2 | By-Laws (2) |
| 10.1 | Employment Agreement, dated October 1, 2007, by and between Global Tech Industries Group, Inc. and David Reichman (3) |
| 10.2 | Employment Agreement, dated April 1, 2009, by and between Global Tech Industries Group, Inc. and Kathy Griffin (4) |
| 10.3 | Bridge Loan Term Sheet, dated January 11, 2010, by and between Global Tech Industries Group, Inc. and GeoGreen Biofuels, Inc. (5) |
| 10.4 | Business and Financial Consulting Agreement, dated February 22, 2010 by and between Global Tech Industries Group, Inc. and Asia Pacific Capital Corporation (6) |
| 10.5 | Distribution Agreement, by and between Global Tech Industries Group, Inc. and NetThruster, Inc., dated February 9, 2011(7) |
| 10.6 | Term Agreement by and between Global Tech Industries Group, Inc. and Sky Corporation, doo, dated April 18, 2011 (8) |
| 10.7 | Term Agreement by and between Global Tech Industries Group, Inc. and Adesso Biosciences, Ltd, dated October 12, 2011(9) |
| 10.8 | Term Agreement by and between Global Tech Industries Group, Inc. and Stemcom, LLC d/b/a Pipeline Nutrition, dated March 1, 2012(10) |
| 10.9 | Mutual disengagement agreement by and between Global Tech Industries Group, Ind. and Stemcom, LLC d/b/a Pipeline Nutrition, dated March 23, 2012(11) |
| 10.10 | Reserve Equity financing agreement by and between Global Tech Industries Group, Inc. and AGS Capital Group, dated August 15, 2012. (12) |
| 10.11 | Asset purchase Agreement by and between TTII Oil & Gas, Inc. a subsidiary of Global Tech Industries Group, Inc. and American Resource Technologies, Inc. (13) |
| 10.12 | Resignation of Mr. Robert Hantman, Esq. as a member of the board of directors (14) |
| 21.1 | Subsidiaries of the registrant |
| 31.1 | Section 302 Certification of Chief Executive Officer and Chief Financial Officer |
| 32.1 | Section 906 Certification of Chief Executive Officer |

Table of Contents
Back to Table of Contents

(1)   Filed November 13, 2009, as an exhibit to a Form 10-Q and incorporated herein by reference.
      Filed January 3, 2012, as an exhibit to an 8 – K and incorporated herein by reference.
      Filed April 12, 2013, as an exhibit to an 8 – K and incorporated herein by reference.

(2)   Filed July 19, 2010, as an exhibit to a Form 10-K/A and incorporated herein by reference.

(3)   Filed November 7, 2007, as an exhibit to a Form 8-K and incorporated herein by reference.

(4)   Filed March 25, 2010, as an exhibit to a Form 8-K and incorporated herein by reference.

(5)   Filed January 19, 2010, as an exhibit to a Form 8-K and incorporated herein by reference.

(6)   Filed July 19, 2010, as an exhibit to a Form 10-Q/A and incorporated herein by reference.

(7)   Filed February 9, 2011, as an exhibit to a Form 8-K and incorporated herein by reference.

(8)   Filed April 19, 2011, as an exhibit to a Form 8 - K and incorporated herein by reference.

(9)   Filed October 18, 2011 as an exhibit to a Form 8 - K and incorporated herein by reference.

(10)  Filed March 6, 2012 as an exhibit to a Form 8 – K and incorporated herein by reference.

(11)  Filed March 23, 2012 as an exhibit to a Form 8 – K and incorporated herein by reference.

(12)  Filed August 21, 2012 as an exhibit to a Form 8 – K and incorporated herein by reference.

(13)  Filed January 8, 2013 as an exhibit to a Form 8 – K and incorporated herein by reference.

(14)  Filed January 8, 2013 as an exhibit to a Form 8 – K and incorporated herein by reference.

   (a)   Exhibits

3. Exhibits

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**GLOBAL TECH INDUSTRIES GROUP, INC.**

Dated: April 17, 2017

By: */s/ David Reichman*

David Reichman,
Chairman of the Board,
Chief Executive Officer,
Chief Financial Officer and
Principal Accounting Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

By: */s/ David Reichman*                          Dated: April 17, 2017

David Reichman,
Chairman of the Board,
Chief Executive Officer,
Chief Financial Officer and
Principal Accounting Officer

By: */s/ Kathy M. Griffin*                          Dated: April 17, 2017

Kathy M. Griffin,
Director and President

By: */s/ Donald Gilbert*                          Dated: April 17, 2017

Donald Gilbert,
Director & Treasurer

47

Subsidiaries of the Registrant:

1. NetThruster, Inc.
Nevada Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

2. MLN, Inc.
Delaware Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

3. Gohealth.MD, Inc.
Delaware Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

4. BioEnergy Applied Technologies, Inc.
Nevada Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

5. Eye Care Centers International, Inc.
Delaware Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

6. TTII Oil & Gas, Inc.
Delaware Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

7. GoHealthMD, Inc. Nano Pharmaceuticals, Inc.
Delaware Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

8. TTI Strategic Acquisitions & Equity Group, Inc.
Delaware Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

9. G T International, Inc.
Wyoming Corporation
511 Sixth Avenue, Suite 800
New York, NY 10011

EXHIBIT 31.1

### SECTION 302 CERTIFICATION

I, David Reichman, certify that:

1.  I have reviewed this Annual report on Form 10-K of Global Tech Industries Group, Inc.

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (of persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: April 17, 2017

*/s/ David Reichman*
David Reichman, Chief Executive Officer
(Principal Executive Officer)

## SECTION 302 CERTIFICATION

I, David Reichman, certify that:

1.  I have reviewed this Annual report on Form 10-K of Global Tech Industries Group, Inc

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the small business issuer's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (of persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the small business issuer's internal control over financial reporting.

Date: April 17, 2017

*/s/ David Reichman*

David Reichman, Chief Financial Officer
(Principal Financial/Accounting Officer)

EXHIBIT 32.1

**SECTION 906 CERTIFICATION**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Global Tech Industries Group, Inc. (the "Company") on Form 10-K for the period ending December 31, 2016 (the "Report") I, David Reichman, Chief Executive Officer of the Company, certify, pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge and belief:

(1) The Report fully complies with the requirements of Section 13(a) or 15(d)of the Securities Exchange Act of 1934; and

(2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

*/s/ David Reichman*                                    Date: April 17, 2017
David Reichman,
Chief Executive Officer

This certification accompanies the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act of 1934, as amended.

EXHIBIT 32.2

**SECTION 906 CERTIFICATION**
**PURSUANT TO 18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Annual Report of Global Tech Industries Group, Inc (the "Company") on Form 10-K for the period ending December 31, 2016 (the "Report") I, David Reichman, Chief Executive Officer of the Company, certify, pursuant to 18 USC Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that to the best of my knowledge and belief:

(1)  The Report fully complies with the requirements of Section 13(a) or 15(d)of the Securities Exchange Act of 1934; and

(2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

_/s/ David Reichman_                                                        Date: April 17, 2017

David Reichman,
Chief Financial Officer

This certification accompanies the Report pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 and shall not, except to the extent required by the Sarbanes-Oxley Act of 2002, be deemed filed by the Company for purposes of Section 18 of the Securities Exchange Act as amended.